IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

)
LAND OF LINCOLN MUTUAL HEALTH           )
INSURANCE COMPANY,                      )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      No. 16-744C
                                        )      Judge Charles F. Lettow
THE UNITED STATES OF AMERICA,           )
                                        )
            Defendant.                  )
_____ )


**PLAINTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

**Page**

I.      Preliminary Statement............................................................................................... 1

II.     Statement of the Questions Presented................................................................. 2

III.    Statement of the Case.............................................................................................. 3

      A.      The ACA's RCP provisions were intended to mitigate annual risks and losses to induce QHPs to participate. ...............................................................................3

      B.      Lincoln, as an approved QHP, participated in Exchanges and set prices in reliance on the payment of Risk Corridors Payments program and is entitled to receive RCPs as specified in the ACA....................................................................4

      C.      Because the Government lacks sufficient funds to pay all RCPs for amounts admittedly owed, it failed to make RCPs in the full amounts owed to Lincoln as required. .............................................................................................................5

      D.      Lincoln is entitled to payment now of the RCPs determined to be owing and has suffered substantial harm as a result of the Government's refusal to pay the RCPs owed...............................................................................................................7

IV.     Argument ..................................................................................................................... 8

      A.      The Court has jurisdiction under the Tucker Act....................................................8

      B.      The ACA requires annual RCPs to be paid in the full amounts determined as owing which the Government failed to do.............................................................9

      C.      The Court can grant relief notwithstanding that Congress has not appropriated sufficient funds for payment of RCPs to all QHPs entitled to RCPs....................11

      D.      Lincoln is entitled to judgment on the Administrative Record.............................13

V.      Conclusion ................................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & D Fire Prot., Inc. v. United States,*
  72 Fed. Cl. 126 (2006) .............................................................13

*Advanced Concepts Enters., Inc. v. United States,*
  No. 15-75C, 2015 U.S. Claims LEXIS 1115 (Fed. Cl. Sept. 2, 2015) ...................................13

*Albino v. United States,*
  104 Fed. Cl. 801 (2012) ...........................................................8

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005)................................................13

*Excelsior Ambulance Serv., Inc. v. United States,*
  124 Fed. Cl. 581 (2015) ...........................................................13

*Fisher v. United States,*
  402 F.3d 1167 (Fed. Cir. 2005)................................................8

*Salazar v. Ramah Navajo Chapter,*
  132 S. Ct. 2181 (2012)........................................................12, 13

**Statutes**

28 U.S.C. § 1491(a)(1)................................................................8

42 U.S.C. § 18062....................................................................*2, 8*

ACA ................................................................................... *passim*

Section 1342 of the Affordable Care Act. ........................................ *passim*

*Consolidated Appropriations Act, 2016* (Pub. L. No. 114-113) (2016 Spending
  Bill) ...................................................................................6

*Consolidated and Further Continuing Appropriations Act of 2015* (Pub. L. No.
  113-235) (2015 Spending Bill) ................................................6

*Health Care and Education Reconciliation Act*, Pub. L. 111-152 (March 30,
  2010), 124 Stat. 1029 ...........................................................2

Medicare Prescription Drug, Improvement, and Modernization Act .............................4

*Patient Protection and Affordable Care Act*, Pub. L. 111-148 (March 23, 2010),
124 Stat. 119 ................................................................................................................2

Part D of Title XVIII of the Social Security Act ...................................................4, 12

Tucker Act. ....................................................................................................................8

**Other Authorities**

45 C.F.R. § 153.510 ....................................................................................................5, 8

45 C.F.R. § 153.510(b) .........................................................................................9, 13, 14

78 Fed. Reg. 15409, 15473 ..........................................................................................11

Bulletin, CMS, "Risk Corridors Payments for the 2014 Benefit Year" (Nov. 19,
2015) ............................................................................................................................9

Rule 52.1(c) of the Rules of the United States Court of Federal Claims....................1, 13

United States Government Accountability Office, GAO Report GAO-15-447
(April 2015) ...............................................................................................................12

**PLANTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD AND MEMORANDUM IN SUPPORT**

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC), Plaintiff Land of Lincoln Mutual Health Insurance Company (Lincoln) moves this Court for judgment on the administrative record and submits this Memorandum in support.

## I.    PRELIMINARY STATEMENT

This action is appropriate for summary resolution on an expedited basis.  The facts are undisputed.  Lincoln is owed Risk Corridors Payments (RCPs) from Defendant, the United States of America (Government), by statute, regulation and contract, and is entitled to be paid.

The Government (acting through the U.S. Department of Health & Human Services (HHS) and its Centers for Medicare & Medicaid Services (CMS)) has acknowledged that it must pay RCPs to Qualified Health Plans like Lincoln.  The RCP amounts are determined pursuant to a statutory and regulatory formula and are not disputed.  The only reason that the Government has not paid Lincoln is because the Government claims to lack sufficient appropriated funds to do so.  As discussed below, that reason is legally insufficient to avoid payment, and this Court can grant Lincoln appropriate relief to mitigate the irreparable injury that Lincoln and its policyholders are facing.  Appropriate relief is a prompt judgment from this Court directing defendant to pay the RCPs for calendar years 2014 and 2015, which are owed now and undisputed in amount, and for a related declaration directing defendant to pay the risk corridors amount for Fiscal Year 2016 once it is finally determined in mid-2017.

Lincoln was induced to become a Qualified Health Plan issuer (QHP) based on Section 1342 of the Affordable Care Act (ACA),[1] which provided for Risk Corridors Payments that capped the risk of large losses in performing as a QHP, 42 U.S.C. § 18062, *see* Appendix (App.) 1 to this Motion (also Complaint Ex. 1). The ACA and its implementing regulation mandated payments to QHPs when their costs, calculated and reported to the Government in accordance with its guidelines, exceeded certain limits. *Id.* Lincoln entered into a contract with the Government to perform as a QHP, complied with the data reporting and submission requirements, and qualified for RCPs due to heavy losses, but has not received the RCPs provided for by statute and regulation. Lincoln has to date received only 12.6 percent of the RCPs owed for 2014 for a deficit totaling $3,925,418.48 and has received nothing for 2015 (RCPs owed in the amount of $71,833,251) for a grand total presently owed of $75,758,669.48.

The Administrative Record (AR) in this case shows that the Government concedes that it owes RCPs under the ACA for 2014 and 2015 to QHPs like Lincoln. The ACA is a money-mandating statute that unambiguously states and provides that the Government "shall" pay all RCPs to QHPs. Lincoln is presently owed $75,758,669.48 for 2014 and 2015 and judgment in its favor in that amount should be entered.

## II.   STATEMENT OF THE QUESTIONS PRESENTED

The issues before the Court and raised by this motion are as follows:

1.   Whether, as plainly specified in the ACA and its implementing regulation, Lincoln is owed RCPs and is entitled to judgment for the owed amounts.

2.   Whether the Court has jurisdiction to enter a judgment providing for payment of the RCPs owed to Lincoln.

---

[1]   The Government enacted the *Patient Protection and Affordable Care Act*, Pub. L. 111-148 (March 23, 2010), 124 Stat. 119 and the *Health Care and Education Reconciliation Act*, Pub. L. 111-152, (March 30, 2010), 124 Stat. 1029 (collectively the "Affordable Care Act" or ACA).

### III.    STATEMENT OF THE CASE

####    A.    The ACA's RCP provisions were intended to mitigate <u>annual</u> risks and losses <u>to induce</u> QHPs to participate.

Enactment of the ACA was a major change to the regulation and management of healthcare in the United States.   One key change was the mandatory requirement for all individuals to purchase coverage if they were not otherwise insured – the individual mandate. Concurrently, the ACA created a complex and elaborate framework to offset the unknown and unreasonable costs of initiating ACA coverage.   These changes resulted in a dramatic increase in the number of individuals purchasing health insurance, many of whom had previously been uninsured.

The ACA also established health insurance exchanges – online marketplaces for purchase of insurance by individuals.   To facilitate the creation of qualified nonprofit health insurance issuers like Lincoln to promote affordability and competition in the exchanges, the Government provided for a Consumer Operated and Oriented Plan (CO-OP) program, which was to increase competition and provide consumers with a non-profit option for high-quality care.   The ACA required CO-OP insurers like Lincoln to derive substantially all of their business from the individual and small group markets.

The new requirements of the ACA regarding certain mandated essential health benefits (with no associated beneficiary cost sharing or copays) and the new and uncertain risk pool created significant uncertainties in pricing and administering the new health plans for newly insured individuals starting in 2014.   Accordingly, the ACA provided three marketplace premium stabilization programs, one permanent and two temporary, known as the "three R's" (3Rs) – reinsurance (temporary for three years), risk corridors (also temporary for the years 2014-2016), and risk adjustment (permanent).   *See e.g.,* AR at 1-11, 35 (App. 2).   The 3R

programs were designed to limit the effects of adverse selection and to mitigate the annual risk and uncertainty inherent in establishing yearly rates for new, unquantifiable health insurance risks under an untested regulatory framework.  The risk corridors program in particular was passed in conjunction with risk adjustment and reinsurance, to protect against inaccurate initial rate setting.  App. 2 (AR 35).  It specifies that QHPs that incur lower-than-expected allowable costs in the benefit year pay a portion of the differential to the Government ("payments in"), and conversely, the Government pays a portion of the differential to QHPs that realize higher-than-expected allowable costs in that same benefit year (RCPs or "payments out").[2]  The RCPs aspect of the risk corridors program specifically guaranteed that if a QHP's allowable costs "for any plan year" exceeded the target amount, the Government (acting through HHS and CMS) "shall pay to the plan" the amounts set forth in the ACA for that plan year.   App. 1.   The Administrative Record provides no evidence of any deliberation or basis to make RCPs other than annually.

> **B.    Lincoln, as an approved QHP, participated in Exchanges and set prices <u>in reliance</u> on the payment of Risk Corridors Payments program and is entitled to receive RCPs as specified in the ACA.**

Lincoln entered into a contract with the Government to become a qualified and approved QHP for the 2014, 2015 and 2016 benefit years.  App. 3-5 (Complaint, Exhibits 2-4) Lincoln's commitment to participate as a QHP was fixed and irrevocable as of September 2013, September

---

[2]    The ACA requested that the structures of the risk corridors program be patterned after a similar program (Part D of Title XVIII of the Social Security Act) enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act signed into law in 2003 and managed on an annual basis.  Specifically, Section 1342 of the ACA contains two related mandatory terms for all issuers of QHPs on an exchange:  (1) any health insurer selling a QHP on the exchange (a "QHP issuer") would receive compensation from the Government if its losses exceeded a certain defined amount due to high utilization and high medical costs; and (2) the QHP issuers would pay the Government a percentage of any gains they made in excess of similarly defined amounts.  The ACA's framework thus compares "allowable costs" (essentially claims costs and adjustments for quality improvement activities, reinsurance, and risk adjustment charges or payments) with a "target amount" (the QHP's premium less its allocable administrative costs).  If the ratio of a QHP issuer's allowable costs to the target amount is greater than 1, then it experiences losses; but if the ratio is less than 1, then it experiences gains.  App. 1.

2014 and September 2015, respectively. Lincoln thus relied on the ACA's risk corridors provisions as a factor limiting its risks in offering plans to beneficiaries with the express understanding – based on the plain text of Section 1342 – that if its allowable costs "for any *plan year*" exceeded the target amount, the Secretary "*shall pay to the plan*" the amounts set forth in the ACA. App. 1. The implementing regulations at 45 C.F.R. § 153.510 expressly reiterated this ACA requirement, stating that when a QHP's allowable costs "for any *benefit year*" exceeded the target amount, "*HHS will pay the QHP issuer*'' the amounts set forth in the ACA. App. 6 (AR 725). The Government gave no indication at that time that it would subsequently refuse to pay its risk corridors obligations, or hold payments due for a particular plan year until a later and indefinite date.

Section 1342 does not establish a fund into which QHP issuers must make payments due or from which payments must be made under the risk corridors program, *i.e.*, the statute does not create a single account to service both payments in and payments out. Nor does the statute provide that the risk corridors program must be budget neutral – in other words, payments out are not subject to payments in, and vice versa. Lincoln experienced significant losses in performing as a QHP, and properly submitted the cost data and revenue calculations showing those losses, which is the only significant precondition for the Government's payment obligations for the RCPs owed to Lincoln. AR 270 (2014 risk corridors net amount owed $3,925,418.48) (App. 7); *see also* AR 1256 (App. 8) (2015 risk corridors amounts owed totaling $71,833,251).

**C.   Because the Government lacks sufficient funds to pay all RCPs for amounts admittedly owed, it failed to make RCPs in the full amounts owed to Lincoln as required.**

The Government has not made full, timely (annual) Risk Corridors Payments because it did not have the funds to do so, (*e.g.* AR 293 (App. 9)) though it has repeatedly acknowledged

the Government's legal obligation to make full risk payments (AR 293, 431 (App. 9)) and App. 10 (September 9, 2016 CMS payment announcement).  There are two apparent reasons for the failure to pay.  First, Congress limited the Government's ability to fund the RCPs with certain appropriations while leaving the obligation to pay RCPs intact.  In the *Consolidated and Further Continuing Appropriations Act of 2015* (Pub. L. No. 113-235) (2015 Spending Bill) and in the *Consolidated Appropriations Act, 2016* (Pub. L. No. 114-113) (2016 Spending Bill) a year later, Congress prohibited CMS and its parent agency, HHS, from using certain accounts to fund the risk corridors payments it was obligated to pay under the ACA.  Specifically, Congress prohibited CMS from using the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, as well as funds transferred from other accounts funded by the 2015 Spending Bill and 2016 Spending Bill to the CMS Program Management account for fiscal year 2015 and 2016.  Congress, however, did not otherwise restrict availability of federal funds and did not amend Section 1342 to limit, or eliminate the Government's risk corridors payment obligations to QHPs under the ACA.

Second, as a consequence, the Government, acting through CMS and HHS, has attempted to manage the RCPs in a "budget neutral" fashion by paying RCPs from receipts from QHPs under the risk corridors program (i.e., "payments in").  The Government treated these payments it collected under the "payments in" portion of the Risk Corridors Program as "user fees," which it determined could be used to fund RCPs.  *See* AR at 114 (App.11) (GAO determination that risk corridors "payments in" could be viewed as "user fees" by HHS and CMS and used to make RCPs).  *See also* AR at 1482 (HHS General Counsel letter to GAO asserting HHS has authority to make risk corridors payments out of risk corridors user fees).  (App. 12).  However, the "payments in" amount was far less than the funds needed to make the Risk Corridors Payments "out" to Lincoln and the many other QHPs that experienced significant losses, and Congress

6

failed to appropriate additional funds that would have allowed HHS and CMS to make the full RCP payments. As a consequence, the Government paid only a tiny portion (12.6%) of the RCPs due to Lincoln and all other QHPs entitled to RCPs. AR 262 (App. 9). In making only 12.6% of required RCPs to QHPs for 2014, the Government has violated the statutory and regulatory mandate to timely make RCPs.

The record shows that the amounts available to the Government from collected risk corridors user fees exceeded the amounts necessary to pay Lincoln in full for the RCPs due to Lincoln for 2014 and 2015. AR 262, 293 (App. 9); AR 270 (App. 7). These amounts available to the Government could have been used to pay Lincoln in full instead of being distributed to all QHPs pro rata and comprising 12.6 percent of all RCPs due to QHPs.

**D.      Lincoln is entitled to payment now of the RCPs determined to be owing and has suffered substantial harm as a result of the Government's refusal to pay the RCPs owed.**

The practical impact of the 2015 Spending Bill and the lower than anticipated "payments in" from QHPs under the Risk Corridors program was that the Government did not pay Lincoln or other QHP issuers the full amount of RCPs for 2014. During 2014, Lincoln incurred $4,165,273.75 (individual group market) and $326,970.05 (small group market) in compensable losses that were to be reimbursed through RCPs (totaling $4,492,243.80 for 2014). AR 270 (App. 7). The Government concedes that Lincoln is owed this amount as the RCP for 2014. AR 262, 293, 431 (App. 9). Lincoln has received payment of only $525,568.68 (individual market) and $41,256.64 (small group market) (12.6% of the amount due, totaling $566,825.32) for an amount remaining due for Fiscal Year 2014 of $3,925,418.48. AR 270 (App. 7). Lincoln incurred significantly greater losses in 2015, which were reimbursable through RCPs ($59,546,957 for the individual group market and $12,286,294 for the small group market),

totaling $71,833,251.   *See* AR 1256 (App. 8).   These amounts are also due and owing, but Lincoln has not been paid.

The Government has stated that it will not make full payment of the owed RCPs for 2014 and 2015 until a later, yet-to-be-determined date.   AR at 262, 293, 431 (App. 9); App. 10.   The Government's failure to timely make the RCPs in the full amount determined has significantly damaged Lincoln, and resulted in Lincoln being placed in receivership by the State of Illinois.

## IV.   ARGUMENT

### A.   The Court has jurisdiction under the Tucker Act.

The Court plainly has jurisdiction for this action.   Lincoln's complaint alleges a Tucker Act[3] claim based on a statute and regulation which are money-mandating, specifically Section 1342 of the ACA and 45 C.F.R. § 153.510.   Under Federal Circuit guidance, if this Court concludes that the statute or regulation meets the money-mandating test, it has jurisdiction. *Fisher v. United States*, 402 F.3d 1167, 1173-74 (Fed. Cir. 2005).   Under *Fisher*, Lincoln need only show that the statute or regulation "can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s]," and (2) is "reasonably amenable to the reading that it mandates a right to recovery in damages." *Id.* (citations omitted). The Federal Circuit confirms that a "fair inference" that the statute is amenable to such a reading is sufficient. *Id.   See also Albino v. United States*, 104 Fed. Cl. 801, 813 (2012) (jurisdiction exists "if a statute is reasonably amenable to a reading that is money-mandating and the plaintiff falls within the class of plaintiffs entitled to recover under the statute").

Here the relevant statute (ACA Section 1342)[4] expressly provides that the Government "shall pay" risk corridor payments to QHPs like Lincoln, but those payments have not been

---

[3]     *See* 28 U.S.C. § 1491(a)(1).
[4]     Codified at 42 U.S.C. § 18062 (App. 1).

made.   Therefore, there is no doubt that the ACA is a money-mandating statute requiring payment from the Government to QHPs and that money is owed.   Similarly, the ACA is implemented by a money-mandating regulation also requiring payment to QHPs.   45 C.F.R. § 153.510(b) (App. 6).   The Government's failure to pay its Risk Corridors Payment obligations has damaged Lincoln, and caused the money damages now sought in Lincoln's Complaint.

Finally, the Government does not dispute that the RCP statute and regulation are "money-mandating."   To the contrary, in written communications to QHPs, Government officials have expressly "reiterate[ed] that risk corridor payments are an obligation of the U.S. Government" and further:

> I wish to reiterate to you that the Department of Health and Human Services (HHS) recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers, and that HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligations of the United States government for which full payment is required.

Email and Letter from K. Counihan, CMS, App. 13.   The Government (HHS and CMS) made the same acknowledgement as above in a public bulletin on November 19, 2015, regarding CY 2014 risk corridor payments:

> HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers, and HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligation [sic] of the United States Government for which full payment is required.

Bulletin, CMS, "Risk Corridors Payments for the 2014 Benefit Year" (Nov. 19, 2015), AR at 262 (App. 9).

Based on the money-mandating nature of the ACA and its implementing regulation and the Government's admissions, this Court has jurisdiction.

     **B.**     **The ACA requires <u>annual</u> RCPs to be paid in the full amounts determined as owing which the Government failed to do.**

The ACA's risk corridors program specifically mandates that if a QHP's allowable costs "for any plan year" exceed the target amount, the Government (HHS) "shall pay to the plan" the amounts set forth in the ACA.  The only significant precondition for the Government's payment obligation is the submission of revenue and cost data for the plan year to the Government by QHPs.

Because the purpose of the risk corridors program was to induce QHP participation in the health insurance exchanges on an annual basis by mitigating their risk of loss, it is evident that the ACA's intention was that RCP payment obligations were also to be implemented on an annual or plan year basis.  Indeed, everything about the RCP program is annual.  RCPs that were not annual would not serve the intended Congressional purpose of risk mitigation if QHP's losses were not confined to the risk corridors on an annual basis.  To the contrary, absent timely payment of RCPs, QHPs would then encounter potentially enormous and unbudgeted losses over a plan year, which could then not be collected even though the accounting for the plan year had been finalized and the RCPs owed had been established.

The Government has not made full, timely (annual) Risk Corridors Payments because it did not have the funds to do so for apparently two reasons.  First, Congress limited the Government's ability to fund the RCPs with certain appropriations while leaving the obligation to pay RCPs intact.  Second, in the absence of additional appropriations, the Government, acting through CMS and HHS, has attempted to manage the RCPs in a "budget neutral" fashion by paying them from receipts (payments in) from QHPs under the risk corridors program.  The Government treated these payments it collected under the "payments in" portion of the Risk Corridors Program as user fees, which it determined could be used to fund RCPs.  *See* AR at 114, 1482 (Apps. 11, 12).  However, the "payments in" were far less than the funds needed to

make the Risk Corridors Payments "out" to QHPs that experienced significant losses, and Congress failed to appropriate additional funds that would have allowed the Government to make the full payments.  As a result, the Government paid only a tiny portion (12.6%) of the RCPs due to Lincoln and other QHPs.[5]  In making only 12.6% of required RCPs to QHPs for 2014, the Government has violated the statutory and regulatory mandate to timely make RCPs.

### C.  The Court can grant relief notwithstanding that Congress has not appropriated sufficient funds for payment of RCPs to all QHPs entitled to RCPs.

Section 1342 does not establish a fund into which QHP issuers must make payments due or from which payments must be made under the risk corridors program.  The statute does not create a single account to service both payments in and payments out.  The statute also does not provide that the risk corridors program must be budget neutral – in other words, payments out are not subject to payments in, and vice versa.  Indeed, in its Notice of Benefit and Payment Parameters, issued March 11, 2013, HHS conceded this, stating that "[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under Section 1342 of the Affordable Care Act."  78 Fed. Reg. 15409, 15473, AR 703, 767 (App. 14).

The prohibitions enacted by Congress in the 2015 Spending Bill and the 2016 Spending Bill restricting CMS and HHS from using certain accounts to fund the risk corridors payments the Government was obligated to pay under the ACA did not otherwise restrict availability of federal funds and did not amend Section 1342 to limit or eliminate the Government's risk corridors payment obligations to QHPs under the ACA.  As noted above, sufficient funds were available to the

---

[5]   It was not until October 2015, long after QHPs had set premiums and agreed to participate for the last year of the risk corridors program, that the Government *first* indicated that it would pay only 12.6 percent of its obligations under the risk corridors program for the 2014 benefit year.

Government to pay the RCPs owed to Lincoln.   Further, the undisputed sequence of events demonstrates Congress understood HHS/CMS would use risk corridor user fees as appropriated funds to make risk corridor payments.   Congress asked HHS by what authority it could make risk corridors payments.   AR 1429.   HHS told Congress it had authority to pay out of risk corridor user fees.   AR 1482 (App. 12).   The GAO also told Congress risk corridor user fees could be used in 2014 and in 2015 and in 2016 if the Government's appropriations bill for those years included the language "such funds as may be collected from authorized user fees."   AR 114, 117 (App 11). Congress then included that very language in both the 2015 and 2016 appropriation acts and the Administrative Record contains no further objection by Congress to use of risk corridors user fees to make Risk Corridors Payments.

Additionally, Congress itself has confirmed that the risk corridors program is not required to be budget neutral.   Congress stated expressly in Section 1342 that the risk corridors program is to be modeled after the Medicare Part D risk mitigation program, which is not budget neutral.   *See* United States Government Accountability Office, GAO Report GAO15-447 (April 2015) at 14 (App. 15) ("for the Medicare Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to issuers is not limited to issuer contributions.").

Under the Supreme Court's decision in *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012), it is a well-established principle that where one party is one of several persons to be paid out of a larger appropriation sufficient in itself to pay that party, the Government is responsible to that party for the full amount due, even if the agency exhausts the appropriation in service of other permissible ends.   The Court noted:

> When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends. See *Ferris v. United States, 27 Ct. Cl. 542, 546.* That is so "even if an agency's

total lump-sum appropriation is insufficient to pay all" of its contracts. *Cherokee Nation, 543 U. S., at 637, 125 S. Ct. 1172, 161 L. Ed. 2d 66*.

132 S. Ct. at 2184.

Under *Salazar*, the Government had sufficient funds of over $360 million to pay the $76 million in RCPs owed to Lincoln. AR 262 (App. 9). This Court should enter judgment accordingly.

### D.    Lincoln is entitled to judgment on the Administrative Record

Lincoln has moved for judgment on the administrative record pursuant to RCFC 52.1(c). In ruling on this motion, the Court asks "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States,* 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed. Cir.  2005).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." *Bannum, 404 F.3d at 1356*. *Excelsior Ambulance Serv., Inc. v. United States*, 124 Fed. Cl. 581, 585 (2015).  "The existence of a material issue of fact does not prohibit the Court from granting a motion for judgment on the administrative record, even if the Court has not conducted an evidentiary proceeding." *Advanced Concepts Enters., Inc. v. United States*, No. 15-75C, 2015 U.S. Claims LEXIS 1115 at *16 (Fed. Cl. Sept. 2, 2015), citing *Bannum,* 404 F.3d at 1357.

The Administrative Record before the Court shows that, as part of its obligations under Section 1342 of the ACA and its obligations under 45 C.F.R. § 153.510(b), the Government is required to pay QHPs certain amounts exceeding the target costs the QHP incurred in 2014 and 2015 as Risk Corridors Payments.  Lincoln is a QHP under the ACA and, based on its adherence to the ACA and its submission of allowable costs and target costs to CMS, satisfies the

13

requirements for payment from the Government under Section 1342 of the ACA and 45 C.F.R. § 153.510(b).  The AR further shows that the Government has failed, without legal justification, to perform its obligations under Section 1342 of the ACA and 45 C.F.R. § 153.510(b).  The Government has affirmatively stated that it will not perform as required.  Finally, the AR shows that the Government's failure to provide timely RCPs to Lincoln is a violation of Section 1342 of the ACA and 45 C.F.R. § 153.510(b) and Lincoln has been substantially harmed by these failures.

Based on the foregoing, Lincoln has met its burden of proof based on evidence in the record and is entitled to judgment.

## V.        CONCLUSION

Risk corridors program payments for benefit years 2014 and 2015 are presently due to Lincoln in an amount totaling $75,758,669.48.  Lincoln seeks full payment of the risk corridors payments it is entitled to from the Government under the ACA for those years.  The law is clear that the Government must abide by its statutory obligations to make the required risk corridors payments.  Lincoln respectfully asks the Court to compel the Government to do so now.  Accordingly, Lincoln respectfully requests that the Court grant Lincoln's motion for judgment on the Administrative Record, for $75,758,669.48, also grant judgment for Lincoln for its risk corridors payment for fiscal year 2016 for the amount finally determined in 2017, and grant Lincoln all such further and additional relief as may be appropriate under the circumstances.

Dated: September 23, 2016                  Respectfully Submitted,

                                      s/ Daniel P. Albers

                                      Daniel P. Albers
                                      BARNES & THORNBURG LLP
                                      One N. Wacker Drive, Suite 4400
                                      Chicago, IL 60606
                                      Telephone:  (312)357-1313
                                      Fax:  (312) 759-5646
                                      Email: dalbers@btlaw.com

                                      *Of Counsel:*

                                      Scott E. Pickens
                                      BARNES & THORNBURG LLP
                                      1717 Pennsylvania Avenue N.W.
                                      Suite 500
                                      Washington, DC 20006
                                      Telephone: (202) 371-6349
                                      Fax: (202) 289-1330
                                      Email: scott.pickens@btlaw.com

                                      *Counsel for Plaintiff Land of Lincoln*
                                      *Mutual Insurance Company*

# APPENDIX

1.  42 U.S.C. § 18062

2.  Administrative Record ("AR") 1-11, 35

3.  Lincoln QHP Agreement with CMS for Benefit Year 2014

4.  Lincoln QHP Agreement with CMS for Benefit Year 2015

5.  Lincoln QHP Agreement with CMS for Benefit Year 2016

6.  45 CFR 153.510

7.  AR 270

8.  AR 1256 (Spread Sheet showing Risk Corridors Payment Amount for 2015 for Land of Lincoln)

9.  AR 262, 293, 431

10. September 9, 2016 CMS Risk Corridor payment announcement

11. AR 114-120

12. AR 1482

13. Mr. Counihan (CMS) email and letter of 11/2/15 to Wilson (Complaint Exhibit 23)

14. AR 703

15. GAO Report GAO-15-447 (April 2015)(excerpt)  pp.13-14

# Appendix 1



ation under chapter 1 of title 26. The preceding sentence shall not apply to the tax imposed by section 511 such[3] title (relating to tax on unrelated business taxable income of an exempt organization).

### (d) Coordination with State high-risk pools

The State shall eliminate or modify any State high-risk pool to the extent necessary to carry out the reinsurance program established under this section. The State may coordinate the State high-risk pool with such program to the extent not inconsistent with the provisions of this section.

(Pub. L. 111–148, title I, § 1341, title X, § 10104(r), Mar. 23, 2010, 124 Stat. 208, 906.)

#### AMENDMENTS

2010—Pub. L. 111–148, § 10104(r)(1), substituted "market" for "and small group markets" in section catchline.

Subsec. (b)(2)(B). Pub. L. 111–148, § 10104(r)(2), substituted "paragraph (1)(B)" for "paragraph (1)(A)" in introductory provisions.

Subsec. (c)(1)(A). Pub. L. 111–148, § 10104(r)(3), substituted "individual market" for "individual and small group markets".

### § 18062. Establishment of risk corridors for plans in individual and small group markets

#### (a) In general

The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w–101 et seq.].

#### (b) Payment methodology

##### (1) Payments out

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

##### (2) Payments in

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary

an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

#### (c) Definitions

In this section:

##### (1) Allowable costs

###### (A) In general

The amount of allowable costs of a plan for any year is an amount equal to the total costs (other than administrative costs) of the plan in providing benefits covered by the plan.

###### (B) Reduction for risk adjustment and reinsurance payments

Allowable costs shall[1] reduced by any risk adjustment and reinsurance payments received under section[2] 18061 and 18063 of this title.

##### (2) Target amount

The target amount of a plan for any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan.

(Pub. L. 111–148, title I, § 1342, Mar. 23, 2010; 124 Stat. 211.)

#### REFERENCES IN TEXT

The Social Security Act, referred to in subsec. (a), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Part D of title XVIII of the Act is classified generally to part D (§ 1395w–101 et seq.) of subchapter XVIII of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

### § 18063. Risk adjustment

#### (a) In general

##### (1) Low actuarial risk plans

Using the criteria and methods developed under subsection (b), each State shall assess a charge on health plans and health insurance issuers (with respect to health insurance coverage) described in subsection (c) if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actuarial risk of all enrollees in all plans or coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1001 et seq.]).

##### (2) High actuarial risk plans

Using the criteria and methods developed under subsection (b), each State shall provide a payment to health plans and health insurance issuers (with respect to health insurance coverage) described in subsection (c) if the ac-

---

[3] So in original. Probably should be preceded by "of".

[1] So in original. Probably should be followed by "be".
[2] So in original. Probably should be "sections".

# Appendix 2

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Medicare & Medicaid Services

# Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans (CMS-9989-P) and Standards Related to Reinsurance, Risk Corridors and Risk Adjustment (CMS-9975-P)

## Preliminary Regulatory Impact Analysis
(CMS-9989-P2)

Center for Consumer Information & Insurance Oversight

July 2011

AR 1

**SUMMARY:**

This document announces the impact statement for the proposed rules entitled "Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans," and "Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment," which are published in the **Federal Register.**

AR 2

3

Table of Contents

I. Executive Orders 12866 and 13563                                                4

II. Estimates of the Impact of Exchanges                                           7

III. Benefits                                                                      11

IV. Costs                                                                          15

V. Impacts of the Proposed Rule on Standards Related to Reinsurance, Risk Corridors and Risk

Adjustment                                                                         30

VI. Alternatives Considered                                                        39

VII. Limitations of Analysis                                                       42

VIII. Accounting Statement                                                         44

IX. Citations                                                                      44

AR 3

4

**IMPACT ANALYSIS:**

1. Executive Orders 12866 and 13563

We have examined the impacts of these regulations under Executive Order 12866 on Regulatory Planning and Review (September 30, 1993) and Executive Order 13563 on Improving Regulation and Regulatory Review (February 2, 2011).

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). A regulatory impact analysis (RIA) must be prepared for rules with economically significant effects ($100 million or more in any 1 year). Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more in any one year or adversely affect in a material way a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal government or communities [also referred to as "economically significant"];

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in [Executive Order 12866].

AR 4

5

OMB has determined that this rule is "economically significant" within the meaning of section 3(f)(1) of Executive Order 12866, because it is likely to have an annual effect of $100 million in any one year.  Accordingly, we have prepared a Regulatory Impact Analysis that presents the costs and benefits of these proposed rulemakings.

This analysis focuses on an initial set of proposed requirements for the establishment of Affordable Insurance Exchanges (Exchanges), Qualified Health Plans (QHPs) and the Small business Health Options Program (SHOP).  The notices of proposed rulemaking (NPRMs) described in this impact analysis implement provisions related to Exchanges, including reinsurance, risk adjustment and risk corridors.  The NPRMs set forth proposed standards for States that seek to establish an Exchange and for health insurance issuers.  Specifically, the NPRMs propose: (1) standards for States with respect to the establishment and operation of an Exchange; (2) standards for health insurance issuers with respect to participation in the Exchange, including the minimum certification requirements for qualified health plan (QHP) certification; (3) risk-spreading mechanisms for which health plan issuers both within and outside of the Exchange must meet requirements; and (4) basic requirements that employers must meet with respect to their voluntary participation in SHOP.  Authority lies primarily in Title I of the Patient Protection and Affordable Care Act, sections 1301-1302, 1311, 1313, 1321, 1323, 1331-1334, 1341-1343, 1401, 1402, and 1411-1413.  HHS has drafted these proposed regulations to implement Congressional mandates in the most economically efficient manner possible.

Need for Regulatory Action

A central aim of Title I of the Affordable Care Act is to expand access to health insurance coverage through the establishment of Exchanges.  The number of uninsured Americans is rising

AR 5

6

due to lack affordable insurance, barriers to insurance for people with pre-existing conditions, and high prices due to limited competition and market failures. Millions of people without health insurance use health care services for which they do not pay, shifting the uncompensated cost of their care to health care providers. Providers pass much of this cost to insurance companies, resulting in higher premiums that make insurance unaffordable to even more people. The Affordable Care Act includes a number of policies to address these problems, including the creating of Affordable Insurance Exchanges.

Starting in 2014, individuals and small businesses will be able to purchase private health insurance through State-based competitive marketplaces called Affordable Insurance Exchanges, or "Exchanges." Exchanges will offer Americans competition, choice, and clout. Insurance companies will compete for business on a level playing field, driving down costs. Consumers will have a choice of health plans to fit their needs. And Exchanges will give individuals and small businesses the same purchasing clout as big businesses. The Departments of Health and Human Services, Labor, and the Treasury (the Departments) are working in close coordination to release guidance related to Exchanges in several phases. The first in this series was a Request for Comment relating to Exchanges, published in the Federal Register on August 3, 2010 (75 FR 45584). Second, Initial Guidance to States on Exchanges was issued on November 18, 2010. Third, a proposed rule for the application, review, and reporting process for waivers for State innovation was published in the **Federal Register** on March 14, 2011 (76 FR 13553). Fourth, two proposed regulations are being published in the **Federal Register** to implement components of the Exchange and health insurance premium stabilization policies in the Affordable Care Act.

Subjects included in the Affordable Care Act to be addressed in subsequent rulemaking include (but are not limited to): standards for individual eligibility for participation in the

AR 6

Exchange, advance payments of the premium tax credit, cost-sharing reductions, and related health programs and appeals of eligibility determinations; standards with respect to ongoing Federal oversight of Exchanges and actions necessary to ensure their financial integrity; and standards for Exchanges and QHP issuers related to quality, among others.

The budget and coverage effects described in this analysis also include provisions that will be implemented by other Departments. For example, section 1401 of the Affordable Care Act contains the provision that pertains to the establishment and administration of the premium tax credits that will primarily be implemented by the Department of Treasury. The Departments of Labor and the Treasury have primary jurisdiction over employer responsibility provisions in section 1513 of the Affordable Care Act. This analysis will serve as the base for estimating the non-tax and non-Medicaid impacts of these interrelated provisions.

## II. Estimates of the Impact of Exchanges

This preliminary impact analysis references the estimates of the CMS Office of the Actuary (OACT) (CMS, April 22, 2010), but primarily uses the underlying assumptions and analysis completed by the Congressional Budget Office (CBO) and the staff of the Joint Committee on Taxation. Their modeling effort accounts for all of the interactions among the interlocking pieces of the Affordable Care Act including its tax policies, and estimates premium effects that are important to assessing the benefits of the NPRM. A description of CBO's methods used to estimate budget and enrollment impacts is available elsewhere.[1] The CBO estimates are not significantly different than the comparable components produced by OACT. Based on our review, we expect that the requirements in these NPRMs will not substantially alter CBO's estimates of the budget impact of Exchanges or enrollment. The proposed requirements

---

[1] CBO. "CBO's Health Insurance Simulation Model: A Technical Description." (2007, October).

are well within the parameters used in the modeling of the Affordable Care Act and do not diverge from assumptions embedded in the model.  Our review and analysis of the proposed requirements indicate that the impacts are within the model's margin of error.

CBO estimated outlays for the Exchanges and Exchange-related requirements in two areas: reinsurance and risk adjustment programs, and estimates of State Planning and Establishment Grants for the implementation of State Exchanges.  Below we display the estimates for outlays and enrollment by type of health insurance coverage over a five-year period (FY 2012 - FY 2016 for outlays and calendar year 2012-2016 for enrollment).  Individuals will not begin enrollment in the Exchanges until January 1, 2014.  Hence, while there are no Exchange enrollment estimates for 2012 and 2013, other provisions of the law related to the preparation for Exchange implementation, such as State grants are estimated.

Table 1 includes the CBO's estimates of outlays for reinsurance and risk adjustment, and estimates of grants from 2012 to 2016.  It does not include costs related to reduced Federal revenues from refundable premium tax credits, which are administered by the Department of the Treasury subject to IRS rulemaking, the Medicaid effects, which are subject to future rulemaking, or the policies whose offsets led CBO to estimate that the Affordable Care Act would reduce the Federal budget deficit by over $200 billion over the next 10 years.  Table 2 includes the CBO's estimates of receipts for reinsurance and risk adjustment.

AR 8

**Table 1. Estimated Outlays for the Affordable Insurance Exchanges FY 2012 - FY2016, in billions of dollars**

| Year | 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|------|
| Reinsurance and Risk Adjustment Program Payments[a] | --- | --- | 11 | 18 | 18 |
| Grant Authority for Exchange Start up[2] | 0.6 | 0.8 | 0.4 | 0.2 | 0.0 |

[a] Risk-adjustment payments lag receipts shown in Table 2 by one quarter.
Source: CBO

CBO. *2011 Letter to Hon. John Boehner. Feb. 18, 2011* http://www.cbo.gov/ftpdocs/120xx/doc12069/hr2.pdf Accessed on 7/6/11

CBO. 2011. *Letter to Hon. Nancy Pelosi.* March 20, 2010.
http://www.cbo.gov/ftpdocs/113xx/doc11379/AmendReconProp.pdf. Accessed on 7/1/11

**Table 2. Estimated Receipts for the Affordable Insurance Exchanges FY 2012 - FY2016, in billions of dollars**

| Year | 2012 | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|------|
| Reinsurance and Risk Adjustment Program Receipts[a] | --- | --- | 12 | 16 | 18 |

[a] Risk-adjustment payments shown in Table 1 lag receipts by one quarter.

Source: CBO. 2011. *Letter to Hon. Nancy Pelosi.* March 20, 2010.
http://www.cbo.gov/ftpdocs/113xx/doc11379/AmendReconProp.pdf

Because Exchanges do not begin operation until 2014, there are no outlays for reinsurance and

risk adjustment in 2012 and 2013. CBO estimates that risk adjustment payments and collections

are equal in the aggregate, but that risk adjustment payments lag revenues by one quarter. CBO

---

[2] OACT estimates that the initial start-up costs for Exchanges will be $4.4 billion for 2011-2013 (Sisko, A.M., et al., 'National Health Spending Projections: The Estimated Impact of Reform through 2019," *Health Affairs,* 29, no. 10 (2010): 1933-1941.

did not score the impact of risk corridors, but assumed collections would equal payments to plans in the aggregate.

CBO's estimate of the number of people receiving tax credits through Exchanges under the Affordable Care Act is based in part on the assumption that Exchanges would be operational by January 2014. Participation rates among potential enrollees are expected to be lower in the first few years (beginning in 2014) as employers and individuals adjust to the features of the Affordable Care Act and Exchanges become fully operational.

Table 3 contains the estimates of the number of people enrolled in Exchanges from 2012 through 2016.  These estimates show that there will be nearly 22 million people enrolled in Exchanges by the year 2016, and that there will be 32 million fewer uninsured due to the combined impact of all of the provisions of the Affordable Care Act.

**Table 3. Estimated Number of People Enrolled in Exchanges 2012-2016, in millions by Calendar Year**

| Year | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Total Exchange Enrollment[3] | --- | --- | 9 | 14 | 22 |
| Exchange Enrollees Receiving Tax Credits | --- | ---- | 8 | 12 | 18 |
| Employment-Based Coverage Purchased Through Exchanges | --- | --- | 3 | 2 | 3 |
| Change to Uninsured Coverage^4 | -3 | -3 | -21 | -26 | -32 |

[3] OACT estimates that total Exchange enrollment will be 16.9 million in 2014, 18.6 million in 2015, and 24.8 million in 2016.
[4] OACT estimated that the number of uninsured covered will be 26.2 million in 2014, 29.5 million in 2015, and 32.1 million in 2016.

AR 10

^ Figure includes total effects of Affordable Care Act on change in number of uninsured individuals. Totals may not add up due to rounding.

*Source:*
CBO. 2011. *CBO March 2011 Baseline: Health Insurance Exchanges.*
http://www.cbo.gov/budget/factsheets/2011b/HealthInsuranceExchanges.pdf. Accessed on 4/29/2011

CBO's March 2011 Baseline: Health Insurance Exchanges.
http://www.cbo.gov/budget/factsheets/2011b/HealthInsuranceExchanges.pdf Accessed on June 30, 2011.

CBO's March 2011 baseline: Health Insurance Exchanges. March 18, 2011.

III. Benefits

This RIA accompanies proposed rules that implement key provisions of the Affordable

Care Act related to Affordable Insurance Exchanges, including risk adjustment, reinsurance, and

risk corridors. It is difficult to discuss the benefits of these provisions in isolation.  The

overarching goal of Exchanges and related policies in the Affordable Care Act is to make

affordable health insurance available to individuals without access to affordable employer-

sponsored coverage.  Different elements of the Affordable Care Act work together to achieve

this goal. Affordable Insurance Exchanges, which create competitive marketplaces where

individuals and small businesses can shop for coverage, reduce the unit price of insurance for the

average consumer by pooling risk and promoting competition. Risk adjustment, reinsurance, and

risk corridors as envisioned in the NPRM play a critical role in ensuring the success of the

Exchanges. Risk corridors encourage health insurance issuers to offer QHPs on Exchanges in the

first three years of their operation by ensuring that all issuers share the risk associated with initial

uncertainty in the pricing of QHPs. Reinsurance protects health insurance issuers from the risk of

high-cost individuals, enabling issuers to offer coverage at a lower premium.  Risk adjustment

plays an ongoing role in ensuring that Exchanges are not harmed by adverse selection.

AR 11

much as possible. Risk corridors act as an after-the-fact adjustment to premiums based on the health insurance issuer's experience. They are designed to protect QHP issuers in the individual and small group market against inaccurate rate setting. Due to uncertainty about the population during the first years of Exchange operation, plans may not be able to predict accurately their risk, and their premiums may reflect costs that are ultimately much lower or much higher than predicted, as reflected in overall profitability. For these plans, risk corridors are designed to shift cost from plans that overestimate their risk to plans that underestimate their risk. The threshold for risk corridor payments and charges is reached when a QHP issuer's allowable costs reach plus or minus three percent of the target amount. An issuer of a QHP plan whose gains are greater than three percent of the issuer's projections must remit charges to HHS, while HHS must make payments to an issuer of a QHP plan that experiences losses greater than three percent of the issuer's projections.

## Risk Adjustment

Risk adjustment is a permanent program, administered by States that operate a HHS-approved Exchange, with risk adjustment criteria and methods established by HHS, with States having the option of proposing alternative methodologies. Risk adjustment is applied to health plans offered in the individual and small group markets, both inside and outside of the Exchange, except for grandfathered plans. A State that does not operate an Exchange cannot operate risk adjustment, although a State operating an Exchange can elect not to run risk adjustment. For States that do not operate an Exchange, or do not elect to operate risk adjustment, HHS will administer the risk adjustment functions. The Exchange may operate risk adjustment, although a State may also elect to have an entity other than the Exchange perform the risk adjustment functions, provided that the selected entity meets the requirements to operate risk adjustment.

# Appendix 3

## A GREEMENT BETWEEN QUALIFIED HEALTH PLAN ISSUER AND

## THE CENTERS FOR MEDICARE & MEDICAID SERVICES

**THIS QUALIFIED HEALTH PLAN ("QHP") ISSUER AGREEMENT** ("Agreement") is entered into by and between THE CENTERS FOR MEDICARE & MEDICAID SERVICES "(CMS"), as the Party (as defined below) responsible for the management and oversight of the Federally-facilitated Exchange ("FFE"), including the Federally-facilitated Small Business Health Options Program ("FF-SHOP") and CMS Data Services Hub ("Hub"), and
Land of Lincoln Health *                    ("QHPI"), an Issuer that provides Health Insurance Coverage through QHPs offered through the FFE and FF-SHOP to Enrollees; and provides customer service. CMS and QHPI each are herei nafter referred to as a "Party" or, collectively, the "Parties."

### WHEREAS:

1. Section 1301(a) of the Affordable Care Act ("ACA") provides that QHPs are health plans that are certified by an Exchange and, among other things, comply with the regulations developed by the Secretary of the Department of Health and Human Services under section 1311(d) and other requirements that an applicable Exchange may establish.

2. QHPI is an entity licensed by an applicable State Department of Insurance ("DOI") as an Issuer and seeks to offer through the FFE in such State one or more plans that are certified to be QHPs.

3. QHPI will not, without signing another agreement specified by CMS, assist Consumers, Applicants, Qualified Individuals, Enrollees, Qualified Employers, and Qualified Employees, as applicable, in applying for a determination or redetermination of eligibility for coverage through the FFE or for insurance affordability programs;

4. It is anticipated that periodic APTCs, advance payments of CSRs, and payments of FFE user fees will be due between CMS and QHPI.

Now, therefore, in consideration of the promises and covenants herein contained, the adequacy of which the Parties acknowledge, QHPI and CMS agree as follows:

I.   Definitions.
   a. **Affordable Care Act (ACA)** means the Patient Protection and Affordable Care Act (Public Law 111-148), as amended by the Health Care and Education Reconciliation Act of 2010 (Public Law 111-152), which are referred to collectively as the Affordable Care Act.

   b. **Advance Payments of the Premium Tax Credit (APTC)** has the meaning set forth in 45 CFR 155.20.

1

*Land of Lincoln Mutual Health Insurance Company

c. **Applicant** has the meaning set forth in 45 CFR 155.20.

d. **CMS Companion Guides** means a CMS-authored guide, available on the CMS web site, which is meant to be used in conjunction with and supplement relevant implementation guides published by the Accredited Standards Committee.

e. **CMS Data Services Hub (Hub)** is the CMS Federally-managed service to interface data among connecting entities, including HHS, certain other Federal agencies, and State Medicaid agencies.

f. **CMS Data Services Hub Web Services (Hub Web Services)** means business and technical services made available by CMS to enable the determination of certain eligibility and enrollment or Federal financial payment data through the Federally-facilitated Exchange web site, including the collection of personal and financial information necessary for Consumer, Applicant, Qualified Individual, Qualified Employer, Qualified Employee, or Enrollee account creations; Qualified Health Plan (QHP) application submissions; and Insurance Affordability Program eligibility determinations.

g. **Consumer** means a person who, for himself or herself, or on behalf of another individual, seeks information related to eligibility or coverage through a Qualified Health Plan (QHP) or other Insurance Affordability Program, or whom an agent or broker (including Web-brokers), Navigator, Issuer, Certified Application Counselor, or other entity assists in applying for a coverage through QHP, applying for APTCs and CSRs, and/or completing enrollment in a QHP through its web site for individual market coverage.

h. **Cost-sharing Reduction (CSR)** has the meaning set forth in 45 CFR 155.20.

i. **Day or Days** means calendar days unless otherwise expressly indicated in this Agreement.

j. **Enrollee** has the meaning set forth in 45 CFR 155.20.

k. **Federally-facilitated Exchange (FFE)** means an **Exchange** (or **Marketplace**) established by HHS and operated by CMS under Section 1321(c)(1) of the ACA for individual or small group market coverage, including the Federally-facilitated Small Business Health Options Program (FF-SHOP).

2

l. **Health Insurance Coverage** has the meaning set forth in 45 CFR 155.20.

m. **Health Insurance Portability and Accountability Act (HIPAA)** means the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, as amended, and its implementing regulations.

n. **Issuer** has the meaning set forth in 45 CFR 144.103.

o. **Personally Identifiable Information (PII)** has the m eaning contained in OMB Memoranda M-07-16 (May 22, 2007) and means information which can be used to distinguish or trace an individual's identity, such as their name, social security number, biometric records, *etc.*, alone, or when combined with other p ersonal or i dentifying information that is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, *etc.*

p. **Qualified Employee** has the meaning set forth in 45 CFR 155.20.

q. **Qualified Employer** has the meaning set forth in 45 CFR 155.20.

r. **Qualified Health Plan (QHP)** has the meaning set forth in 45 CFR 155.20.

s. **Qualified Individual** has the meaning set forth in 45 CFR 155.20.

t. **State** means the State that has licensed the Agent, Broker, or Issuer that is a party to this Agreement or the State where the Certified Application Counselor, N avigator, or Non -Navigator that is a party to this Agreement is operating.

II. Acceptance of Standard Rules of Conduct

a. Q HPI hereby a cknowledges and agrees to accept and abide by the st andard rules of conduct set forth below, and to require that its employees, officers, directors, contractors, agents, and representatives strictly adhere to the same, in order to gain and maintain access to the CMS Data Services Hub Web Services ("Hub Web Services"). QHPI agrees that it will create, collect, disclose, access, maintain, use, or store PII that it receives from Hub Web Services only in accordance with all laws as applicable, including HIPAA and section 1411(g) of the ACA.

b. Standards for Communication with the Hub.

3

(1)   QHPI must complete testing for each type of transaction it will implement and shall not be allowed to exchange data with CMS in production mode until testing is satisfactorily passed as determined by CMS in its sole discretion. Satisfactorily passed testing generally means the ability to pass all HIPAA compliance standards, and to process electronic healthcare information transmitted by QHPI to the Hub. This capability to submit test transactions will be maintained by QHPI throughout the term of this Agreement.

(2)   As applicable, all transactions must be formatted in accordance with the Accredited Standards Committee Implementation Guides, adopted under HIPAA, available at http://store.x12.org/store/. CMS will make available Companion Guides for all applicable transactions, which specify certain situational data elements necessary.

(3)   QHPI agrees to abide by the Standard Companion Guide Transaction Information Instructions related to the ASC X12 Benefit Enrollment and Maintenance (834) transaction, based on the 005010X220 Implementation Guide and its associated 005010X220A1 addenda for the Federally facilitated Exchange (FFE) Companion Guide Version 1.5, released March 22, 2013, and the CMS Instructions related to the ASC X12 820 transaction as specified in the ASC X12 005010X306 Health Insurance Exchange Related Payments (820) Implementation Guide.

(4)   QHPI agrees to submit test transactions to the Hub prior to the submission of any transactions to the FFE production system, to determine that the transactions and responses comply with all requirements and specifications approved by the CMS and/or the CMS contractor.[1]

(5)   QHPI agrees that prior to the submission of any additional transaction types to the FFE production system, or as a result of making changes to an existing transaction type or system, it will submit test transactions to the Hub in accordance with paragraph(1) above.

(6)   If QHPI enters into relationships with other affiliated entities, or their authorized designees, for submitting and receiving FFE data, it must execute contracts with such entities that stipulate that such entities and any subcontractors or affiliates of

---

[1] While CMS owns data in the FFE, other contractors operate the FFE system in which the enrollment and financial management data flow. Contractors provide the pipeline network for the transmission of electronic data, including the transport of Exchange data to and from the Hub and QHPI so that QHPI may discern the activity related to enrollment functions of persons they serve. QHPI may also use the transported data to receive descriptions of financial transactions from CMS.

4

such entities, must be bound by the terms of this Agreement, test software, and receive QHPI's approval of software as being in the proper format and compatible with the FFE system.

c. As part of a monthly payments and collections reconciliation process, CMS will recoup or net payments due to QHPI against amounts owed to CMS by QHPI or any entity operating under the same tax identification number as QHPI (including overpayments previously made) with respect to offering of QHPs, including the following types of payments: APTCs, advance payments of CSRs, and payment of Federally-facilitated Exchange user fees.

d. CMS will undertake all reasonable efforts to implement systems and processes that will support QHPI functions. In the event of a major failure of CMS systems and processes, CMS will work with QHPI in good faith to mitigate any harm caused by such failure.

III.    Effective Date; Term; Renewal

a. Effective Date and Term. This Agreement becomes effective on the date the last of the two Parties executes this Agreement and ends December 31, 2014.

b. Renewal. This Agreement may be renewed upon the mutual written consent of both parties for subsequent and consecutive one (1) year periods.

IV.    Termination.

a. This Agreement shall terminate automatically upon QHPI's ceasing to provide all coverage under any QHPs that were offered through an FFE in the State(s) QHPI offered them.

b. Termination with Cause

1. Termination with Notice by CMS. CMS may terminate this Agreement for cause upon sixty (60) Days' written notice to QHPI if QHPI materially breaches any term of this Agreement as determined at the sole but reasonable discretion of CMS, unless QHPI commences curing such breach(es) within such 60-Day period to the reasonable satisfaction of CMS in the manner hereafter described in this subsection, and thereafter diligently prosecutes such cure to completion. A QHPI's inability to perform due to a CMS error will not be considered a material breach. The 60-Day notice from CMS shall contain a description of the material breach and any suggested options for curing the breach(es), whereupon QHPI shall have seven (7) Days from the date of the

5

notice in which to propose a plan and a time frame to cure the material breach(es), which plan and time frame may be rejected, approved, or amended in CMS' sole but reasonable discretion. The Agreement shall not be terminated if QHPI cures the cause for termination within 30 Days' of the written notice to the satisfaction of CMS, which satisfaction shall be in CMS' sole discretion but shall not be unreasonably withheld. Notwithstanding the foregoing, QHPI shall be considered in "Habitual Default" of this Agreement in the event that it has been served with a 60-Day notice under this subsection more than three (3) times in any calendar year, whereupon CMS may, in its sole discretion, immediately thereafter terminate this Agreement upon notice to QHPI without any further opportunity to cure or propose cure.

2. Termination with Notice by QHPI. At any time prior to midnight on October 31, 2013, QHPI may terminate this Agreement upon sixty (60) Days' written notice to CMS if CMS materially breaches any term of this Agreement, unless CMS commences curing such breach(es) within such 60-Day period to the reasonable satisfaction of QHPI in the manner hereafter described in this subsection, and thereafter diligently prosecutes such cure to completion. The 60-Day notice shall contain a description of the material breach(es) and any suggested options for curing the breach(es), whereupon CMS shall have fifteen (15) Days from the date of the notice in which to propose a plan and a time frame to cure the material breach(es), which plan and time frame shall be accepted by QHPI unless the same is substantially unreasonable on its face, in which case the Parties shall thereafter use good faith efforts to come to an agreement of reasonable cure terms.

c. QHPI acknowledges that termination of this Agreement 1) may affect its ability to continue to offer QHPs through the FFE; 2) does not relieve QHPI of applicable obligations to continue providing coverage to enrollees; and 3) specifically does not relieve QHPI of any obligation under applicable State law to continue to offer coverage for a full plan year. This Agreement does not impose any independent obligation on QHPI, after termination of this Agreement, to continue enrollment or treat those enrolled as being contracted for coverage.

V. Miscellaneous

a. Notice. All notices specifically required under this Agreement shall be given in writing and shall be delivered as follows:

If to QHPI: To the contact identified in QHPI's QHP Application using the contact information provided in QHPI's QHP Application.

6

If to CMS:

> Centers for Medicare & Medicaid Services (CMS)
> Center for Consumer Information & Insurance Oversight (CCIIO)
> Attn: Office of the Director – Issuer Agreement
> Room 739H
> 200 Independence Avenue, SW
> Washington, DC 20201

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, provided that notices not given on a business day (i.e., Monday – Friday excluding Federal holidays) between 9:00 a.m. and 5:00 p.m. local time where the recipient is located shall be deemed to have been given at 9:00 a.m. on the next business day for the recipient. QHPI or CMS to this Agreement may change its contact information for notices and other communications by providing thirty (30) Days' written notice of such change in accordance with this provision.

b. Assignment and Subcontracting QHPI shall assume ultimate responsibility for all services and functions includes those that are assigned or subcontracted or other entities and must ensure that subcontractor and assigns will perform all functions in accordance with all applicable requirements. QHPI shall further be thereafter subject to such compliance actions for functions assigned to subcontractors or assignees as may otherwise be provided for under applicable law. Notwithstanding any assignment of this Agreement or subcontracting of any responsibility hereunder, QHPI shall not be released from any of its performance or compliance obligations hereunder, and shall remain fully bound to the terms and conditions of this Agreement as unaltered and unaffected by such assignment or subcontracting.

c. Amendment. CMS may amend this Agreement for purposes of reflecting changes in applicable law or regulations, with such amendments taking effect upon sixty (60) Days' written notice to QHPI ("CMS notice period"). Any amendments made under this provision will only have prospective effect and will not be applied retrospectively. QHPI may reject such amendment, by providing to CMS, during the CMS notice period, sixty (60) Days' written notice of its intent to reject the amendment ("rejection notice period"). Any such rejection of an amendment made by CMS shall result in the termination of this Agreement upon expiration of the rejection notice period.

d. Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. In the event that any provision of this Agreement is determined to be invalid,

7

unenforceable or otherwise illegal, such provision shall be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intention of the parties, and the remainder of the Agreement shall be in full force and effect.

e.  Disclaimer of Joint Venture. Neither this Agreement nor the activities of the QHPI contemplated by and under this Agreement shall be deemed or construed to create in any way any partnership, joint venture or agency relationship between CMS and QHPI. Neither QHPI nor CMS is, nor shall either QHPI or CMS hold itself out to be, vested with any power or right to bind the other Party contractually or to act on behalf of the other Party, except to the extent expressly set forth in ACA and the regulations codified thereunder, including as codified at 45 CFR part 155.

f.  Remedies Cumulative. No remedy herein conferred upon or reserved to CMS under this Agreement is intended to be exclusive of any other remedy or remedies available to CMS under operative law and regulation, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy now or hereafter existing at law or in equity or otherwise.

g.  Governing Law. This Agreement will be governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies, without regard to any conflict of laws statutes or rules. QHPI further agrees and consents to the jurisdiction of the Federal Courts located within the District of Columbia and the courts of appeal therefrom, and waives any claim of lack of jurisdiction or forum *non conveniens.*

h.  Audit. QHPI agrees that CMS, the Comptroller General, the Office of the Inspector General of HHS or their designees have the right to audit, inspect, evaluate, examine, and make excerpts, transcripts, and copies of any books, records, documents, and other evidence of QHPI's compliance with the requirements of this Agreement, upon reasonable notice to QHPI and during QHPI's regular business hours and at QHPI's regular business location. QHPI further agrees to allow reasonable access to the information and facilities requested by CMS, the Comptroller General, the Office of the Inspector General of HHS or their designees for the purpose of such an audit.

[remainder of page intentionally blank]

8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated by each signature.

**FOR QHPI**

Signature of Person Authorized to Enter Agreement
on behalf of QHPI

Dennis Rizzo, CFO, Land of Lincoln Health *
Typed or printed Name and Title of Person
Authorized to Enter into Agreement for QHPI

Land of Lincoln Health *

Issuer Name

79763

Issuer HIOS ID

222 S. Riverside Plaza, Suite 1900, Chicago, IL 60606
Entity Address

9/11/13

Date

9

*Land of Lincoln Mutual Health Insurance Company

**FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)**

The undersigned are officials of CMS who are authorized to represent CMS for purposes of this Agreement.

9-23-13

**James Kerr**                                                           **Date**
Acting Deputy Director, Operations
Center for Consumer Information & Insurance Oversight
Centers for Medicare & Medicaid Services

9-23-13

**Tony Trenkle**                                                           **Date**
Director and CMS Chief Information Officer
Office of Information Services
Centers for Medicare & Medicaid Services

10

# Appendix 4

## QUALIFIED HEALTH PLAN CERTIFICATION AGREEMENT AND PRIVACY AND SECURITY AGREEMENT BETWEEN QUALIFIED HEALTH PLAN ISSUER
## AND
## THE CENTERS FOR MEDICARE & MEDICAID SERVICES

THIS QUALIFIED HEALTH PLAN ("QHP") ISSUER AGREEMENT ("Agreement") is entered into by and between THE CENTERS FOR MEDICARE & MEDICAID SERVICES "(CMS"), as the party responsible for the management and oversight of the Federally-facilitated Exchange ("FFE"), including the Federally-facilitated Small Business Health Options Program ("FF-SHOP") and CMS Data Services Hub ("Hub"), and
LAND OF LINCOLN MUTUAL HEALTH INSURANCE COMPANY ("QHPI"), an Issuer that provides Health Insurance Coverage through QHPs offered through the FFE and FF-SHOP to Enrollees; and provides customer service. CMS and QHPI each are hereinafter referred to as a "Party" or, collectively, the "Parties."

### WHEREAS:

1. Section 1301(a) of the Affordable Care Act ("ACA") provides that QHPs are health plans that are certified by an Exchange and, among other things, comply with the regulations developed by the Secretary of the Department of Health and Human Services under section 1311(d) and other requirements that an applicable Exchange may establish.

2. QHPI is an entity licensed by an applicable State Department of Insurance ("DOI") as an Issuer and seeks to offer through the FFE in such State one or more plans that are certified to be QHPs.

3. It is anticipated that periodic APTCs, advance payments of CSRs, and payments of FFE user fees will be due between CMS and QHPI.

4. QHPI and CMS are entering into this Agreement to satisfy the requirements under 45 CFR 155.260(b)(2).

Now, therefore, in consideration of the promises and covenants herein contained, the adequacy of which the Parties acknowledge, QHPI and CMS agree as follows:

I. Definitions

   a. **Affordable Care Act (ACA)** means the Patient Protection and Affordable Care Act (Public Law 111-148), as amended by the Health Care and Education Reconciliation Act of 2010 (Public Law 111-152), which are referred to collectively as the Affordable Care Act.

   b. **Advance Payments of the Premium Tax Credit (APTC)** has the meaning set forth in 45 CFR 155.20.

1

c. **Applicant** has the meaning set forth in 45 CFR 155.20.

d. **Breach** has the meaning contained in OMB Memoranda M-07-16 (May 22, 2007), and means the compromise, unauthorized disclosure, unauthorized acquisition, unauthorized access, loss of control, or any similar term or phrase that refers to situations where persons other than authorized uses or for an other than authorized purpose have access or potential access to Personally Identifiable Information (PII), whether physical or electronic.

e. **CMS Companion Guides** means a CMS-authored guide, available on the CMS web site, which is meant to be used in conjunction with and supplement relevant implementation guides published by the Accredited Standards Committee.

f. **CMS Data Services Hub (Hub)** is the CMS Federally-managed service to interface data among connecting entities, including HHS, certain other Federal agencies, and State Medicaid agencies.

g. **CMS Data Services Hub Web Services (Hub Web Services)** means business and technical services made available by CMS to enable the determination of certain eligibility and enrollment or Federal financial payment data through the Federally-facilitated Exchange web site, including the collection of personal and financial information necessary for Consumer, Applicant, Qualified Individual, Qualified Employer, Qualified Employee, or Enrollee account creations; Qualified Health Plan (QHP) application submissions; and Insurance Affordability Program eligibility determinations.

h. **Consumer** means a person who, for himself or herself, or on behalf of another individual, seeks information related to eligibility or coverage through a Qualified Health Plan (QHP) or other Insurance Affordability Program, or whom an agent or broker (including Web-brokers), Navigator, Issuer, Certified Application Counselor, or other entity assists in applying for a coverage through QHP, applying for APTCs and CSRs, and/or completing enrollment in a QHP through its web site for individual market coverage.

i. **Cost-sharing Reduction (CSR)** has the meaning set forth in 45 CFR 155.20.

j. **Day or Days** means calendar days unless otherwise expressly indicated in this Agreement.

k. **Enrollee** has the meaning set forth in 45 CFR 155.20.

l. **Federally-facilitated Exchange (FFE)** means an **Exchange** (or **Marketplace**) established by HHS and operated by CMS under Section 1321(c)(1) of the ACA for individual or small group market coverage, including the Federally-facilitated Small Business Health Options Program (**FF-SHOP**).

m. **Health Insurance Coverage** has the meaning set forth in 45 CFR 155.20.

2

n. **Health Insurance Portability and Accountability Act (HIPAA)** means the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, as amended, and its implementing regulations.

o. **Incident, or Security Incident,** means the act of violating an explicit or implied security policy, which includes attempts (either failed or successful) to gain unauthorized access to a system or its data, unwanted disruption or denial of service, the unauthorized use of a system for the processing or storage of data; and changes to system hardware, firmware, or software characteristics without the owner's knowledge, instruction, or consent.

p. **Issuer** has the meaning set forth in 45 CFR 144.103.

q. **Personally Identifiable Information (PII)** has the meaning contained in OMB Memoranda M-07-16 (May 22, 2007), and means information which can be used to distinguish or trace an individual's identity, such as their name, social security number, biometric records, *etc.,* alone, or when combined with other personal or identifying information that is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, *etc.*

r. **Qualified Employee** has the meaning set forth in 45 CFR 155.20.

s. **Qualified Employer** has the meaning set forth in 45 CFR 155.20.

t. **Qualified Health Plan (QHP)** has the meaning set forth in 45 CFR 155.20.

u. **Qualified Individual** has the meaning set forth in 45 CFR 155.20.

v. **State** means the State that has licensed the Issuer that is a party to this Agreement.

II.     Acceptance of Standard Rules of Conduct

a. Standards regarding Personally Identifiable Information

QHPI and CMS are entering into this Agreement to satisfy the requirements under 45 CFR 155.260(b)(2). QHPI hereby acknowledges and agrees to accept and abide by the standard rules of conduct set forth herein, and to require that its employees, officers, directors, contractors, agents, and representatives strictly adhere to the same, in order to gain and maintain access to the CMS Data Services Hub Web Services ("Hub Web Services"). QHPI agrees that it will create, collect, disclose, access, maintain, use, or store PII that it receives directly from Exchange applicants and from Hub Web Services only in accordance with all laws as applicable, including HIPAA and section 1411(g) of the ACA.

(1) Safeguards. QHPI agrees to monitor, periodically assess, and update its security controls and related system risks to ensure the continued effectiveness of those controls in accordance with 155.260(a)(5); and to inform the Exchange of any material change in its administrative, technical, or operational environments, or

3

A-30

that would require an alteration of the privacy and security standards within this Agreement.

(2) Downstream Entities QHPI will satisfy the requirement in 45 CFR 155.260(b)(2)(v) to bind downstream entities by entering into written agreements, including where appropriate, Business Associate Agreements (as such term is defined under HIPAA), with any downstream entities that will have access to PII as defined in this Agreement.

b. Standards for Communication with the Hub

(1) QHPI must complete testing for each type of transaction it will implement and shall not be allowed to exchange data with CMS in production mode until testing is satisfactorily passed as determined by CMS in its sole discretion. Satisfactorily passed testing generally means the ability to pass all HIPAA compliance standards, and to process electronic healthcare information transmitted by QHPI to the Hub. This capability to submit test transactions will be maintained by QHPI throughout the term of this Agreement.

(2) As applicable, all transactions must be formatted in accordance with the Accredited Standards Committee Implementation Guides, adopted under HIPAA, available at http://store.x12.org/store/. CMS will make available Companion Guides for all applicable transactions, which specify certain situational data elements necessary.

(3) QHPI agrees to abide by the Standard Companion Guide Transaction Information Instructions related to the ASC X12 Benefit Enrollment and Maintenance (834) transaction, based on the 005010X220 Implementation Guide and its associated 005010X220A1 addenda for the Federally facilitated Marketplace (FFM) Companion Guide Version most recently released by CMS and in effect at the time the transactions are sent, and the CMS Instructions related to the ASC X12 820 transaction as specified in the ASC X12 005010X306 Health Insurance Exchange Related Payments (820) Implementation Guide.

(4) QHPI agrees to submit test transactions to the Hub prior to the submission of any transactions to the FFE production system, to determine that the transactions and responses comply with all requirements and specifications approved by the CMS and/or the CMS contractor.[1]

---

[1] While CMS owns data in the FFE, other contractors operate the FFE system in which the enrollment and financial management data flow. Contractors provide the pipeline network for the transmission of electronic data, including

4

(5) QHPI agrees that prior to the submission of any additional transaction types to the FFE production system, or as a result of making changes to an existing transaction type or system, it will submit test transactions to the Hub in accordance with paragraph (1) above.

(6) If QHPI enters into relationships with other affiliated entities, or their authorized designees, for submitting and receiving FFE data, it must execute contracts with such entities that stipulate that such entities and any subcontractors or affiliates of such entities, must be bound by the terms of this Agreement, test software, and receive QHPI's approval of software as being in the proper format and compatible with the FFE system.

(7) Incident and Breach Reporting Policies and Procedures. QHPI agrees to report any Incident or Breach of PII to the CMS IT Service Desk by telephone at (410)786-2580 or 1-800-562-1963 or via email notification at cms_it_service_desk@cms.hhs.gov within seventy-two (72) to ninety-six (96) hours after discovery of the Incident or Breach.

## III. CMS Obligations

a. CMS will undertake all reasonable efforts to implement systems and processes that will support QHPI functions. In the event of a major failure of CMS systems and/or processes, CMS will work with QHPI in good faith to mitigate any harm caused by such failure.

b. As part of a monthly payments and collections reconciliation process, CMS will recoup or net payments due to QHPI against amounts owed to CMS by QHPI or any entity operating under the same tax identification number as QHPI (including overpayments previously made) with respect to offering of QHPs, including the following types of payments: APTCs, advance payments of CSRs, and payment of Federally-facilitated Exchange user fees.

## IV. Effective Date; Term; Renewal

a. Effective Date and Term. This Agreement becomes effective on the date the last of the two Parties executes this Agreement and terminates on December 31, 2015.

b. Renewal. This Agreement may be renewed upon the mutual written consent of both parties for subsequent and consecutive one (1) year periods.

---

the transport of Exchange data to and from the Hub and QHPI so that QHPI may discern the activity related to enrollment functions of persons they serve. QHPI may also use the transported data to receive descriptions of financial transactions from CMS.

## IV. Termination

a. This Agreement shall terminate automatically upon QHPI's ceasing to provide all coverage under any QHPs that were offered through an FFE in the State(s) QHPI offered them.

b. CMS acknowledges that QHPI has developed its products for the FFE based on the assumption that APTCs and CSRs will be available to qualifying Enrollees. In the event that this assumption ceases to be valid during the term of this Agreement, CMS acknowledges that Issuer could have cause to terminate this Agreement subject to applicable state and federal law.

c. Termination with Notice by CMS. CMS may terminate this Agreement for cause upon sixty (60) Days' written notice to QHPI if QHPI materially breaches any term of this Agreement as determined at the sole but reasonable discretion of CMS, unless QHPI commences curing such breach(es) within such 60-Day period to the reasonable satisfaction of CMS in the manner hereafter described in this subsection, and thereafter diligently prosecutes such cure to completion. A QHPI's inability to perform due to a CMS error will not be considered a material breach. The 60-Day notice from CMS shall contain a description of the material breach and any suggested options for curing the breach(es), whereupon QHPI shall have seven (7) Days from the date of the notice in which to propose a plan and a time frame to cure the material breach(es), which plan and time frame may be rejected, approved, or amended in CMS' sole but reasonable discretion. The Agreement shall not be terminated if QHPI cures the cause for termination within 30 Days of the written notice to the satisfaction of CMS, which satisfaction shall be in CMS' sole discretion but shall not be unreasonably withheld. Notwithstanding the foregoing, QHPI shall be considered in "Habitual Default" of this Agreement in the event that it has been served with a 60-Day notice under this subsection more than three (3) times in any calendar year, whereupon CMS may, in its sole discretion, immediately thereafter terminate this Agreement upon notice to QHPI without any further opportunity to cure or propose cure.

d. QHPI acknowledges that termination of this Agreement 1) may affect its ability to continue to offer QHPs through the FFE; 2) does not relieve QHPI of applicable obligations to continue providing coverage to enrollees; and 3) specifically does not relieve QHPI of any obligation under applicable State law to continue to offer coverage for a full plan year. This Agreement does not impose any independent obligation on QHPI, after termination of this Agreement, to continue enrollment or treat those enrolled as being contracted for coverage.

6

A-33

V.    Miscellaneous

a.  Notice. All notices specifically required under this Agreement shall be given in writing and shall be delivered as follows:

If to QHPI: To the contact identified in QHPI's QHP Application using the contact information provided in QHPI's QHP Application.

If to CMS:

> Centers for Medicare & Medicaid Services (CMS)
> Center for Consumer Information & Insurance Oversight (CCIIO)
> Attn: Office of the Director – Issuer Agreement
> Room 739H
> 200 Independence Avenue, SW
> Washington, DC 20201

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, provided that notices not given on a business day (i.e., Monday – Friday excluding Federal holidays) between 9:00 a.m. and 5:00 p.m. local time where the recipient is located shall be deemed to have been given at 9:00 a.m. on the next business day for the recipient. QHPI or CMS to this Agreement may change its contact information for notices and other communications by providing thirty (30) Days' written notice of such change in accordance with this provision.

b.  Assignment and Subcontracting. QHPI shall assume ultimate responsibility for all services and functions including those that are assigned or subcontracted to other entities and must ensure that subcontractors and assignees will perform all functions in accordance with all applicable requirements. QHPI shall further be subject to such compliance actions for functions assigned to subcontractors or assignees as may otherwise be provided for under applicable law. Notwithstanding any assignment of this Agreement or subcontracting of any responsibility hereunder, QHPI shall not be released from any of its performance or compliance obligations hereunder, and shall remain fully bound to the terms and conditions of this Agreement as unaltered and unaffected by such assignment or subcontracting.

c.  Amendment. CMS may amend this Agreement for purposes of reflecting changes in applicable law or regulations, with such amendments taking effect upon sixty (60) Days' written notice to QHPI ("CMS notice period"), unless a different effective date is required by law. Any amendments made under this provision will only have

7

- prospective effect and will not be applied retrospectively unless required by law. QHPI may reject such amendment, by providing to CMS, during the CMS notice period, thirty (30) Days' written notice of its intent to reject the amendment ("rejection notice period"). Any such rejection of an amendment made by CMS shall result in the termination of this Agreement upon expiration of the rejection notice period.

d. Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. In the event that any provision of this Agreement is determined to be invalid, unenforceable or otherwise illegal, such provision shall be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intention of the parties, and the remainder of the Agreement shall be in full force and effect.

e. Disclaimer of Joint Venture. Neither this Agreement nor the activities of the QHPI contemplated by and under this Agreement shall be deemed or construed to create in any way any partnership, joint venture or agency relationship between CMS and QHPI. Neither QHPI nor CMS is, nor shall either QHPI or CMS hold itself out to be, vested with any power or right to bind the other Party contractually or to act on behalf of the other Party, except to the extent expressly set forth in ACA and the regulations codified thereunder, including as codified at 45 CFR part 155.

f. Remedies Cumulative. No remedy herein conferred upon or reserved to CMS under this Agreement is intended to be exclusive of any other remedy or remedies available to CMS under operative law and regulation, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy now or hereafter existing at law or in equity or otherwise.

g. Governing Law. This Agreement will be governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies, without regard to any conflict of laws statutes or rules. QHPI further agrees and consents to the jurisdiction of the Federal Courts located within the District of Columbia and the courts of appeal therefrom, and waives any claim of lack of jurisdiction or forum *non conveniens*.

h. Audit. QHPI agrees that CMS, the Comptroller General, the Office of the Inspector General of HHS or their designees have the right to audit, inspect, evaluate, examine, and make excerpts, transcripts, and copies of any books, records, documents, and other evidence of QHPI's compliance with the requirements of this Agreement, upon

8

reasonable notice to QHPI and during QHPI's regular business hours and at QHPI's regular business location. QHPI further agrees to allow reasonable access to the information and facilities requested by CMS, the Comptroller General, the Office of the Inspector General of HHS or their designees for the purpose of such an audit.

[remainder of page intentionally blank]

9

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated by each signature.

**FOR OHPI**

Signature of Person Authorized to Enter Agreement
on behalf of QHPI

Jason Montrie, President

Type or printed Name and Title of Person
Authorized to Enter into Agreement for QHPI

Land of Lincoln Mutual Health Insurance Company

Issuer Name

79763

Issuer HIOS ID

222 South Riverside Plaza, Suite 1900, Chicago, Illinois 60604

Entity Address

10/21/2014

Date

10

A-37

**FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)**

The undersigned are officials of CMS who are authorized to represent CMS for purposes of this Agreement.

_____                    $10/29/14$
Kevin J. Counihan                                 Date
Marketplace Chief Executive Officer and Director
Center for Consumer Information & Insurance Oversight
Centers for Medicare & Medicaid Services

_____                    $10/28/14$
David J. Nelson                                   Date
Deputy Chief Operating Officer and Chief Information Officer
Centers for Medicare & Medicaid Services

_____                    $10-29-14$
Todd A. Lawson                                    Date
Acting Director, Office of E-Health Standards and Services
and Acting Senior Official for Privacy
Centers for Medicare & Medicaid Services

11

# Appendix 5

## QUALIFIED HEALTH PLAN CERTIFICATION AGREEMENT AND PRIVACY AND SECURITY AGREEMENT BETWEEN QUALIFIED HEALTH PLAN ISSUER AND
## THE CENTERS FOR MEDICARE & MEDICAID SERVICES

THIS QUALIFIED HEALTH PLAN ("QHP") ISSUER AGREEMENT ("Agreement") is entered into by and between THE CENTERS FOR MEDICARE & MEDICAID SERVICES "(CMS"), as the party responsible for the management and oversight of the Federally-facilitated Exchange ("FFE"), including the Federally-facilitated Small Business Health Options Program ("FF-SHOP") and CMS Data Services Hub ("Hub"), and
Land of Lincoln Mutual Health Insurance Company ("QHPI"), an Issuer that provides Health Insurance Coverage through QHPs offered through the FFE and FF-SHOP to Enrollees; and provides customer service. CMS and QHPI each are hereinafter referred to as a "Party" or, collectively, the "Parties."

### WHEREAS:

1. Section 1301(a) of the Affordable Care Act ("ACA") provides that QHPs are health plans that are certified by an Exchange and, among other things, comply with the regulations developed by the Secretary of the Department of Health and Human Services under section 1311(d) and other requirements that an applicable Exchange may establish.

2. QHPI is an entity licensed by an applicable State Department of Insurance ("DOI") as an Issuer and seeks to offer through the FFE in such State one or more plans that are certified to be QHPs.

3. It is anticipated that periodic APTCs, advance payments of CSRs, and payments of FFE user fees will be due between CMS and QHPI.

4. QHPI and CMS are entering into this Agreement to satisfy the requirements under 45 CFR 155.260(b)(2).

Now, therefore, in consideration of the promises and covenants herein contained, the adequacy of which the Parties acknowledge, QHPI and CMS agree as follows:

I.  Definitions

   a. **Affordable Care Act (ACA)** means the Patient Protection and Affordable Care Act (Public Law 111-148), as amended by the Health Care and Education Reconciliation Act of 2010 (Public Law 111-152), which are referred to collectively as the Affordable Care Act.

   b. **Advance Payments of the Premium Tax Credit (APTC)** has the meaning set forth in 45 CFR 155.20.

1

c. **Applicant** has the meaning set forth in 45 CFR 155.20.

d. **Breach** has the meaning contained in OMB Memoranda M-07-16 (May 22, 2007), and means the compromise, unauthorized disclosure, unauthorized acquisition, unauthorized access, loss of control, or any similar term or phrase that refers to situations where persons other than authorized uses or for an other than authorized purpose have access or potential access to Personally Identifiable Information (PII), whether physical or electronic.

e. **CMS Companion Guides** means a CMS-authored guide, available on the CMS web site, which is meant to be used in conjunction with and supplement relevant implementation guides published by the Accredited Standards Committee.

f. **CMS Data Services Hub (Hub)** is the CMS Federally-managed service to interface data among connecting entities, including HHS, certain other Federal agencies, and State Medicaid agencies.

g. **CMS Data Services Hub Web Services (Hub Web Services)** means business and technical services made available by CMS to enable the determination of certain eligibility and enrollment or Federal financial payment data through the Federally-facilitated Exchange web site, including the collection of personal and financial information necessary for Consumer, Applicant, Qualified Individual, Qualified Employer, Qualified Employee, or Enrollee account creations; Qualified Health Plan (QHP) application submissions; and Insurance Affordability Program eligibility determinations.

h. **Consumer** means a person who, for himself or herself, or on behalf of another individual, seeks information related to eligibility or coverage through a Qualified Health Plan (QHP) or other Insurance Affordability Program, or whom an agent or broker (including Web-brokers), Navigator, Issuer, Certified Application Counselor, or other entity assists in applying for a coverage through QHP, applying for APTCs and CSRs, and/or completing enrollment in a QHP through its web site for individual market coverage.

i. **Cost-sharing Reduction (CSR)** has the meaning set forth in 45 CFR 155.20.

j. **Day or Days** means calendar days unless otherwise expressly indicated in this Agreement.

k. **Enrollee** has the meaning set forth in 45 CFR 155.20.

l. **Federally-facilitated Exchange (FFE)** means an **Exchange** (or **Marketplace**) established by HHS and operated by CMS under Section 1321(c)(1) of the ACA for individual or small group market coverage, including the Federally-facilitated Small Business Health Options Program (**FF-SHOP**).

m. **Health Insurance Coverage** has the meaning set forth in 45 CFR 155.20.

2

n. **Health Insurance Portability and Accountability Act (HIPAA)** means the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, as amended, and its implementing regulations.

o. **Incident,** or **Security Incident,** means the act of violating an explicit or implied security policy, which includes attempts (either failed or successful) to gain unauthorized access to a system or its data, unwanted disruption or denial of service, the unauthorized use of a system for the processing or storage of data; and changes to system hardware, firmware, or software characteristics without the owner's knowledge, instruction, or consent.

p. **Issuer** has the meaning set forth in 45 CFR 144.103.

q. **Personally Identifiable Information (PII)** has the meaning contained in OMB Memoranda M-07-16 (May 22, 2007), and means information which can be used to distinguish or trace an individual's identity, such as their name, social security number, biometric records, *etc.*, alone, or when combined with other personal or identifying information that is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, *etc.*

r. **Qualified Employee** has the meaning set forth in 45 CFR 155.20.

s. **Qualified Employer** has the meaning set forth in 45 CFR 155.20.

t. **Qualified Health Plan (QHP)** has the meaning set forth in 45 CFR 155.20.

u. **Qualified Individual** has the meaning set forth in 45 CFR 155.20.

v. **State** means the State that has licensed the Issuer that is a party to this Agreement.

II. Acceptance of Standard Rules of Conduct

a. Standards regarding Personally Identifiable Information

QHPI and CMS are entering into this Agreement to satisfy the requirements under 45 CFR 155.260(b)(2). QHPI hereby acknowledges and agrees to accept and abide by the standard rules of conduct set forth herein, and to require that its employees, officers, directors, contractors, agents, and representatives strictly adhere to the same, in order to gain and maintain access to the CMS Data Services Hub Web Services ("Hub Web Services"). QHPI agrees that it will create, collect, disclose, access, maintain, use, or store PII that it receives directly from Exchange applicants and from Hub Web Services only in accordance with all laws as applicable, including HIPAA and section 1411(g) of the ACA.

(1) Safeguards. QHPI agrees to monitor, periodically assess, and update its security controls and related system risks to ensure the continued effectiveness of those controls in accordance with 155.260(a)(5); and to inform the Exchange of any material change in its administrative, technical, or operational environments, or

3

that would require an alteration of the privacy and security standards within this Agreement.

(2) Downstream Entities QHPI will satisfy the requirement in 45 CFR 155.260(b)(2)(v) to bind downstream entities by entering into written agreements, including where appropriate, Business Associate Agreements (as such term is defined under HIPAA), with any downstream entities that will have access to PII as defined in this Agreement.

b. Standards for Communication with the Hub

(1) QHPI must complete testing for each type of transaction it will implement and shall not be allowed to exchange data with CMS in production mode until testing is satisfactorily passed as determined by CMS in its sole discretion. Satisfactorily passed testing generally means the ability to pass all HIPAA compliance standards, and to process electronic healthcare information transmitted by QHPI to the Hub. This capability to submit test transactions will be maintained by QHPI throughout the term of this Agreement.

(2) As applicable, all transactions must be formatted in accordance with the Accredited Standards Committee Implementation Guides, adopted under HIPAA, available at http://store.x12.org/store/. CMS will make available Companion Guides for all applicable transactions, which specify certain situational data elements necessary.

(3) QHPI agrees to abide by the Standard Companion Guide Transaction Information Instructions related to the ASC X12 Benefit Enrollment and Maintenance (834) transaction, based on the 005010X220 Implementation Guide and its associated 005010X220A1 addenda for the Federally facilitated Marketplace (FFM) Companion Guide Version most recently released by CMS and in effect at the time the transactions are sent, and the CMS Instructions related to the ASC X12 820 transaction as specified in the ASC X12 005010X306 Health Insurance Exchange Related Payments (820) Implementation Guide.

(4) QHPI agrees to submit test transactions to the Hub prior to the submission of any transactions to the FFE production system, to determine that the transactions and responses comply with all requirements and specifications approved by the CMS and/or the CMS contractor.[1]

---

[1] While CMS owns data in the FFE, other contractors operate the FFE system in which the enrollment and financial management data flow. Contractors provide the pipeline network for the transmission of electronic data, including

4

(5) QHPI agrees that prior to the submission of any additional transaction types to the FFE production system, or as a result of making changes to an existing transaction type or system, it will submit test transactions to the Hub in accordance with paragraph (1) above.

(6) If QHPI enters into relationships with other affiliated entities, or their authorized designees, for submitting and receiving FFE data, it must execute contracts with such entities that stipulate that such entities and any subcontractors or affiliates of such entities, must be bound by the terms of this Agreement, test software, and receive QHPI's approval of software as being in the proper format and compatible with the FFE system.

(7) Incident and Breach Reporting Policies and Procedures. QHPI agrees to report any Incident or Breach of PII to the CMS IT Service Desk by telephone at (410)786-2580 or 1-800-562-1963 or via email notification at cms_it_service_desk@cms.hhs.gov within seventy-two (72) to ninety-six (96) hours after discovery of the Incident or Breach.

III. CMS Obligations

a. CMS will undertake all reasonable efforts to implement systems and processes that will support QHPI functions. In the event of a major failure of CMS systems and/or processes, CMS will work with QHPI in good faith to mitigate any harm caused by such failure.

b. As part of a monthly payments and collections reconciliation process, CMS will recoup or net payments due to QHPI against amounts owed to CMS by QHPI or any entity operating under the same tax identification number as QHPI (including overpayments previously made) with respect to offering of QHPs, including the following types of payments: APTCs, advance payments of CSRs, and payment of Federally-facilitated Exchange user fees.

IV. Effective Date; Term; Renewal

a. Effective Date and Term. This Agreement becomes effective on the date the last of the two Parties executes this Agreement and terminates on December 31, 2016.

b. Renewal. This Agreement may be renewed upon the mutual written consent of both parties for subsequent and consecutive one (1) year periods.

---

the transport of Exchange data to and from the Hub and QHPI so that QHPI may discern the activity related to enrollment functions of persons they serve. QHPI may also use the transported data to receive descriptions of financial transactions from CMS.

5

IV. Termination.

a. This Agreement shall terminate automatically upon QHPI's ceasing to provide all coverage under any QHPs that were offered through an FFE in the State(s) QHPI offered them.

b. CMS acknowledges that QHPI has developed its products for the FFE based on the assumption that APTCs and CSRs will be available to qualifying Enrollees. In the event that this assumption ceases to be valid during the term of this Agreement, CMS acknowledges that Issuer could have cause to terminate this Agreement subject to applicable state and federal law.

c. Termination with Notice by CMS. CMS may terminate this Agreement for cause upon sixty (60) Days' written notice to QHPI if QHPI materially breaches any term of this Agreement as determined at the sole but reasonable discretion of CMS, unless QHPI commences curing such breach(es) within such 60-Day period to the reasonable satisfaction of CMS in the manner hereafter described in this subsection, and thereafter diligently prosecutes such cure to completion. A QHPI's inability to perform due to a CMS error will not be considered a material breach. The 60-Day notice from CMS shall contain a description of the material breach and any suggested options for curing the breach(es), whereupon QHPI shall have seven (7) Days from the date of the notice in which to propose a plan and a time frame to cure the material breach(es), which plan and time frame may be rejected, approved, or amended in CMS' sole but reasonable discretion. The Agreement shall not be terminated if QHPI cures the cause for termination within 30 Days of the written notice to the satisfaction of CMS, which satisfaction shall be in CMS' sole discretion but shall not be unreasonably withheld. Notwithstanding the foregoing, QHPI shall be considered in "Habitual Default" of this Agreement in the event that it has been served with a 60-Day notice under this subsection more than three (3) times in any calendar year, whereupon CMS may, in its sole discretion, immediately thereafter terminate this Agreement upon notice to QHPI without any further opportunity to cure or propose cure.

d. QHPI acknowledges that termination of this Agreement 1) may affect its ability to continue to offer QHPs through the FFE; 2) does not relieve QHPI of applicable obligations to continue providing coverage to enrollees; and 3) specifically does not relieve QHPI of any obligation under applicable State law to continue to offer coverage for a full plan year. This Agreement does not impose any independent obligation on QHPI, after termination of this Agreement, to continue enrollment or treat those enrolled as being contracted for coverage.

6

V.    Miscellaneous

a.  Notice. All notices specifically required under this Agreement shall be given in
    writing and shall be delivered as follows:

    If to QHPI: To the contact identified in QHPI's QHP Application using the contact
    information provided in QHPI's QHP Application.

    If to CMS:

                Centers for Medicare & Medicaid Services (CMS)
                Center for Consumer Information & Insurance Oversight (CCIIO)
                Attn: Office of the Director – Issuer Agreement
                Room 739H
                200 Independence Avenue, SW
                Washington, DC 20201

    Notices sent by hand or overnight courier service, or mailed by certified or registered
    mail, shall be deemed to have been given when received, provided that notices not
    given on a business day (i.e., Monday – Friday excluding Federal holidays) between
    9:00 a.m. and 5:00 p.m. local time where the recipient is located shall be deemed to
    have been given at 9:00 a.m. on the next business day for the recipient. QHPI or
    CMS to this Agreement may change its contact information for notices and other
    communications by providing thirty (30) Days' written notice of such change in
    accordance with this provision.

b.  Assignment and Subcontracting. QHPI shall assume ultimate responsibility for all
    services and functions including those that are assigned or subcontracted to other
    entities and must ensure that subcontractors and assignees will perform all functions
    in accordance with all applicable requirements. QHPI shall further be subject to such
    compliance actions for functions assigned to subcontractors or assignees as may
    otherwise be provided for under applicable law. Notwithstanding any assignment of
    this Agreement or subcontracting of any responsibility hereunder, QHPI shall not be
    released from any of its performance or compliance obligations hereunder, and shall
    remain fully bound to the terms and conditions of this Agreement as unaltered and
    unaffected by such assignment or subcontracting.

c.  Amendment. CMS may amend this Agreement for purposes of reflecting changes in
    applicable law or regulations, with such amendments taking effect upon sixty (60)
    Days' written notice to QHPI ("CMS notice period"), unless a different effective date
    is required by law. Any amendments made under this provision will only have

                                          7

prospective effect and will not be applied retrospectively unless required by law. QHPI may reject such amendment, by providing to CMS, during the CMS notice period, thirty (30) Days' written notice of its intent to reject the amendment ("rejection notice period"). Any such rejection of an amendment made by CMS shall result in the termination of this Agreement upon expiration of the rejection notice period.

d. Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. In the event that any provision of this Agreement is determined to be invalid, unenforceable or otherwise illegal, such provision shall be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intention of the parties, and the remainder of the Agreement shall be in full force and effect.

e. Disclaimer of Joint Venture. Neither this Agreement nor the activities of the QHPI contemplated by and under this Agreement shall be deemed or construed to create in any way any partnership, joint venture or agency relationship between CMS and QHPI. Neither QHPI nor CMS is, nor shall either QHPI or CMS hold itself out to be, vested with any power or right to bind the other Party contractually or to act on behalf of the other Party, except to the extent expressly set forth in ACA and the regulations codified thereunder, including as codified at 45 CFR part 155.

f. Remedies Cumulative. No remedy herein conferred upon or reserved to CMS under this Agreement is intended to be exclusive of any other remedy or remedies available to CMS under operative law and regulation, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy now or hereafter existing at law or in equity or otherwise.

g. Governing Law. This Agreement will be governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies, without regard to any conflict of laws statutes or rules. QHPI further agrees and consents to the jurisdiction of the Federal Courts located within the District of Columbia and the courts of appeal therefrom, and waives any claim of lack of jurisdiction or forum *non conveniens*.

h. Audit. QHPI agrees that CMS, the Comptroller General, the Office of the Inspector General of HHS or their designees have the right to audit, inspect, evaluate, examine, and make excerpts, transcripts, and copies of any books, records, documents, and other evidence of QHPI's compliance with the requirements of this Agreement, upon

8

reasonable notice to QHPI and during QHPI's regular business hours and at QHPI's regular business location. QHPI further agrees to allow reasonable access to the information and facilities requested by CMS, the Comptroller General, the Office of the Inspector General of HHS or their designees for the purpose of such an audit.

[remainder of page intentionally blank]

9

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated by each signature.

**FOR QHPI**

Signature of Person Authorized to Enter Agreement
on behalf of QHPI

Jason Montrie, President

Typed or printed Name and Title of Person
Authorized to Enter into Agreement for QHPI

Land of Lincoln Mutual Health Insurance*

Issuer Name

79763

Issuer HIOS ID

222 S. Riverside Plaza, Suite 1600

Entity Address

09/21/2015

Date

*Full Legal Name: Land of Lincoln Mutual Health Insurance Company

10

## FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS)

The undersigned are officials of CMS who are authorized to represent CMS for purposes of this Agreement.

Kevin J. Counihan
Marketplace Chief Executive Officer and Director
Center for Consumer Information & Insurance Oversight
Centers for Medicare & Medicaid Services

_Aug 30, 2015_
Date

David J. Nelson
Deputy Chief Operating Officer and Chief Information Officer
Centers for Medicare & Medicaid Services

$10.8.15$
Date

# Appendix 6

§155.20 of this subchapter) provided that such differences are tied directly and exclusively to Federal or State requirements or prohibitions on the coverage of benefits that apply differently to plans depending on whether they are offered through or outside an Exchange.

*Risk corridors* means any payment adjustment system based on the ratio of allowable costs of a plan to the plan's target amount.

*Target amount* means, with respect to a QHP, an amount equal to the total premiums earned with respect to a QHP, including any premium tax credit under any governmental program, reduced by the allowable administrative costs of the plan.

*Taxes and regulatory fees* mean, with respect to a QHP, Federal and State licensing and regulatory fees paid with respect to the QHP as described in §158.161(a) of this subchapter, and Federal and State taxes and assessments paid with respect to the QHP as described in §158.162(a)(1) and (b)(1) of this subchapter.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15530, 15550, Mar. 11, 2013; 78 FR 54133, Aug. 30, 2013]

§ 153.510   Risk corridors establishment and payment methodology.

(a) *General requirement.* A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.

(b) *HHS payments to health insurance issuers.* QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

(1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

(2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(c) *Health insurance issuers' remittance of charges.* QHP issuers must remit charges to HHS in the following amounts, under the following circumstances:

(1) If a QHP's allowable costs for any benefit year are less than 97 percent but not less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to 50 percent of the difference between 97 percent of the target amount and the allowable costs; and

(2) When a QHP's allowable costs for any benefit year are less than 92 percent of the target amount, the QHP issuer must remit charges to HHS in an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the difference between 92 percent of the target amount and the allowable costs.

(d) *Charge submission deadline.* A QHP issuer must remit charges to HHS within 30 days after notification of such charges.

[77 FR 17248, Mar. 23, 2012, as amended at 78 FR 15530, Mar. 11, 2013]

§ 153.520   Attribution and allocation of revenue and expense items.

(a) *Attribution to QHP.* Each item of revenue or expense in the target amount with respect to a QHP must be reasonably attributable to the operation of the QHP, with the attribution based on a generally accepted accounting method, consistently applied. To the extent that an issuer utilizes a specific method for allocating expenses for purposes of §158.170 of this subchapter, the method used for purposes of this paragraph must be consistent.

(b) *Allocation across plans.* Each item of revenue or expense in the target amount must be reasonably allocated across a QHP issuer's plans, with the allocation based on a generally accepted accounting method, consistently applied. To the extent that an issuer utilizes a specific method for allocating expenses for purposes of §158.170 of this subchapter, the method used for purposes of this paragraph must be consistent.

# Appendix 7

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| ID | 26002 | SelectHealth | $ 24,386,583.14 | $ 1,574,917.17 | $ 3,077,066.51 | $ 198,720.95 |
| ID | 44648 | Regence Blue Shield of Idaho | $ - | $ - | $ - | $ - |
| ID | 59765 | BridgeSpan Health Company | $ 27,918.21 | $ - | $ 3,522.68 | $ - |
| ID | 60597 | PacificSource Health Plans | $ 2,242,712.26 | $ - | $ 282,982.44 | $ - |
| ID | 61589 | Blue Cross of Idaho Health Service, Inc. | $ 39,437,313.04 | $ 600,529.29 | $ 4,976,147.52 | $ 75,773.98 |

**Table 14 – Illinois**

| STATE | HIOS ID | HIOS INPUTTED INSURANCE COMPANY NAME | HHS RISK CORRIDOR AMOUNT (INDIVIDUAL MARKET) | HHS RISK CORRIDOR AMOUNT (SMALL GROUP MARKET) | PRORATED AMOUNT (INDIVIDUAL MARKET) | PRORATED AMOUNT (SMALL GROUP MARKET) |
|---|---|---|---|---|---|---|
| IL | 20129 | Health Alliance Medical Plans, Inc. | $ 2,759,245.94 | $ 14,837.77 | $ 348,157.97 | $ 1,872.21 |
| IL | 35670 | Coventry Health & Life Company | $ 338,246.81 | $ - | $ 42,679.53 | $ - |
| IL | 36096 | Blue Cross Blue Shield of Illinois | $ 193,846,813.95 | $ 3,325,244.33 | $ 24,459,332.25 | $ 419,574.89 |
| IL | 58288 | Humana Health Plan, Inc. | $ 800,982.85 | $ - | $ 101,066.95 | $ - |
| IL | 68303 | Humana Insurance Company | $ 4,801,295.28 | $ - | $ 605,821.03 | $ - |
| IL | 72547 | Aetna Life Insurance Company | $ 156,532.35 | $ - | $ 19,751.04 | $ - |
| IL | 79763 | Land of Lincoln Mutual Health Insurance Company | $ 4,165,273.75 | $ 326,970.05 | $ 525,568.68 | $ 41,256.64 |
| IL | 96601 | Coventry Health Care of Illinois, Inc. | $ 3,177,608.98 | $ - | $ 400,946.46 | $ - |

# Appendix 8

## Company Information

| | Value |
|---|---|
| **Company Name:** | Land of Lincoln Mutual Health Insurance Company |
| **Group Affiliation:** | Land of Lincoln Mutual Health Insurance Company |
| **Federal EIN:** | 900962741 |
| **A.M. Best Number:** | |
| **NAIC Group Code:** | |
| **NAIC Company Code:** | |
| **DBA / Marketing Name:** | Land of Lincoln Mutual Health Insurance Company |
| **HIOS Issuer ID:** | 79763 |
| **Business in the State of:** | Illinois |
| **Domiciliary State:** | Illinois |
| **Address:** | 222 South Riverside Plaza, Suite 1600 Chicago, IL 60606 |
| **Federal Tax Exempt:** | Yes |
| **Not-For-Profit:** | Yes |
| **Benefit Year:** | 2015 |

**Cell Keys for Parts 1 - 3:**
White cells accept input from the issuer
Grey cells require no data input – input will result in an upload failure
Green cells require no data input – fields will be auto-calculated for the user
Asterisk (*) denotes a field that will be auto-populated for the user

PRA Disclosure Statement
According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.  The valid OMB control number for this information collection is 0938-1164.  The time required to complete this information collection is estimated to average 6 hours per response, including the time to review instructions, search existing data resources, gather the data needed and complete and review the information collection.  If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.

**Risk Corridors Plan Level Data - Individual**

**1.Non-Grandfathered ACA-compliant plans**

| | A. Individual Total Premium Earned | B. Individual Proportion of Market Premium |
|---|---|---|
| All non-Grandfathered ACA-compliant plans | $ 127,889,883 | 100.0% |

**2. Exchange QHPs** / **3. Off-Exchange QHPs**

| C. Plan Name* | D. HIOS Plan ID* | E. Individual Total Premium Earned | F. Individual Proportion of Market Premium in Table 1 | G. Plan Name* | H. HIOS Plan ID* | I. Individual Total Premium Earned | J. Individual Proportion of Market Premium in Table 1 |
|---|---|---|---|---|---|---|---|
| Swedish Covenant Land of Lincoln Gold | 79763IL0430001 | $ 3,164,333 | 2.5% | Swedish Covenant Land of Lincoln Gold | 79763IL0430001 | $ 464,198 | 0.4% |
| Swedish Covenant Land of Lincoln Silver | 79763IL0430002 | $ 4,354,958 | 3.4% | Swedish Covenant Land of Lincoln Silver | 79763IL0430002 | $ 568,049 | 0.4% |
| Swedish Covenant Land of Lincoln Platinum | 79763IL0430004 | $ 2,884,539 | 2.3% | Swedish Covenant Land of Lincoln Platinum | 79763IL0430004 | $ 204,495 | 0.2% |
| Land of Lincoln Champion PPO Gold | 79763IL0440001 | $ 272,489 | 0.2% | Land of Lincoln Champion PPO Gold | 79763IL0440001 | $ 173,582 | 0.1% |
| Land of Lincoln Champion PPO Platinum | 79763IL0440004 | $ 523,422 | 0.4% | Land of Lincoln Champion PPO Platinum | 79763IL0440004 | $ 236,830 | 0.2% |
| Illinois Health Partners Land of Lincoln Gold | 79763IL0450001 | $ 1,373,561 | 1.1% | Illinois Health Partners Land of Lincoln Gold | 79763IL0450001 | $ 285,426 | 0.2% |
| Illinois Health Partners Land of Lincoln Silver | 79763IL0450002 | $ 3,120,721 | 2.4% | Illinois Health Partners Land of Lincoln Silver | 79763IL0450002 | $ 363,213 | 0.3% |
| Illinois Health Partners Land of Lincoln Platinum | 79763IL0450004 | $ 1,359,434 | 1.1% | Illinois Health Partners Land of Lincoln Platinum | 79763IL0450004 | $ 226,074 | 0.2% |
| Presence Health Land of Lincoln Gold PPO | 79763IL0460001 | $ 18,337 | 0.0% | Presence Health Land of Lincoln Gold PPO | 79763IL0460001 | $ 16,750 | 0.0% |
| Presence Health Land of Lincoln Silver PPO | 79763IL0460002 | $ 369,408 | 0.3% | Presence Health Land of Lincoln Silver PPO | 79763IL0460002 | $ 64,742 | 0.1% |
| Presence Health Land of Lincoln Platinum PPO | 79763IL0460004 | $ 140,810 | 0.1% | Presence Health Land of Lincoln Platinum PPO | 79763IL0460004 | $ 31,570 | 0.0% |
| Centegra Land of Lincoln Health Plan - Gold | 79763IL0480001 | $ 672,330 | 0.5% | Centegra Land of Lincoln Health Plan - Gold | 79763IL0480001 | $ 232,075 | 0.2% |
| Centegra Land of Lincoln Health Plan - Silver | 79763IL0480002 | $ 4,027,135 | 3.1% | Centegra Land of Lincoln Health Plan - Silver | 79763IL0480002 | $ 477,991 | 0.4% |
| Centegra Land of Lincoln Health Plan - Platinum | 79763IL0480004 | $ 2,032,101 | 1.6% | Centegra Land of Lincoln Health Plan - Platinum | 79763IL0480004 | $ 530,583 | 0.4% |
| Adventist Land of Lincoln Gold PPO 500 | 79763IL0500001 | $ 561,341 | 0.4% | Adventist Land of Lincoln Gold PPO 500 | 79763IL0500001 | $ 162,857 | 0.1% |
| Adventist Land of Lincoln Silver PPO 3000 | 79763IL0500002 | $ 577,109 | 0.5% | Adventist Land of Lincoln Silver PPO 3000 | 79763IL0500002 | $ 64,518 | 0.1% |
| Adventist Land of Lincoln Bronze PPO 5000 | 79763IL0500003 | $ 877,740 | 0.7% | Adventist Land of Lincoln Bronze PPO 5000 | 79763IL0500003 | $ 314,138 | 0.2% |
| Adventist Land of Lincoln Platinum PPO 250 | 79763IL0500004 | $ 2,925,108 | 2.3% | Adventist Land of Lincoln Platinum PPO 250 | 79763IL0500004 | $ 647,569 | 0.5% |
| LLH Family Health Network Silver 3100 | 79763IL0510002 | $ 31,407,481 | 24.6% | LLH Family Health Network Silver 3100 | 79763IL0510002 | $ 291,411 | 0.2% |

**Risk Corridors Plan Level Data - Small Group**

**1.Non-Grandfathered ACA-compliant plans**

| | A. Small Group Total Premium Earned | B. Small Group Proportion of Market Premium |
|---|---|---|
| All non-Grandfathered ACA-compliant plans | $ 29,968,02# | 100.0% |

| 2. Exchange QHPs | | | | | 3. Off-Exchange QHPs | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | C. Plan Name* | D. HIOS Plan ID* | E. Small Group Total Premium Earned | F. Small Group Proportion of Market Premium in Table 1 | G. Plan Name* | H. HIOS Plan ID* | I. Small Group Total Premium Earned | J. Small Group Proportion of Market Premium in Table 1 |
| 1 | SBAC Land of Lincoln Gold 2000 HSA | 79763IL0420001 | $ 40,335 | 0.1% | SBAC Land of Lincoln Gold 2000 HSA | 79763IL0420001 | $ 276,954 | 0.9% |
| 2 | Swedish Covenant Land of Lincoln Gold | 79763IL0550001 | $ 98,165 | 0.3% | Swedish Covenant Land of Lincoln Gold | 79763IL0550001 | $ 210,805 | 0.7% |
| 3 | Swedish Covenant Land of Lincoln Silver | 79763IL0550002 | $ 59,766 | 0.2% | Swedish Covenant Land of Lincoln Silver | 79763IL0550002 | $ 298,755 | 1.0% |
| 4 | Swedish Covenant Land of Lincoln Platinum | 79763IL0550004 | $ 59,078 | 0.2% | Swedish Covenant Land of Lincoln Platinum | 79763IL0550004 | $ 50,390 | 0.2% |
| 5 | Land of Lincoln Champion PPO Platinum | 79763IL0560004 | $ 8,676 | 0.0% | Land of Lincoln Champion PPO Platinum | 79763IL0560004 | $ 480,106 | 1.6% |
| 6 | Illinois Health Partners Land of Lincoln Gold | 79763IL0570001 | $ 23,440 | 0.1% | Illinois Health Partners Land of Lincoln Gold | 79763IL0570001 | $ 76,437 | 0.3% |
| 7 | Illinois Health Partners Land of Lincoln Silver | 79763IL0570002 | $ 50,763 | 0.2% | Illinois Health Partners Land of Lincoln Silver | 79763IL0570002 | $ 51,681 | 0.2% |
| 8 | Illinois Health Partners Land of Lincoln Platinum | 79763IL0570004 | $ 9,726 | 0.0% | Illinois Health Partners Land of Lincoln Platinum | 79763IL0570004 | $ 329,717 | 1.1% |
| 9 | Presence Health Land of Lincoln Gold PPO | 79763IL0580001 | $ 12,445 | 0.0% | Presence Health Land of Lincoln Gold PPO | 79763IL0580001 | $ 10,148 | 0.0% |
| 10 | Presence Health Land of Lincoln Platinum PPO | 79763IL0580004 | $ 9,412 | 0.0% | Presence Health Land of Lincoln Platinum PPO | 79763IL0580004 | $ 60,782 | 0.2% |
| 11 | Centegra Land of Lincoln Health Plan Platinum | 79763IL0600004 | $ 115,937 | 0.4% | Centegra Land of Lincoln Health Plan Platinum | 79763IL0600004 | $ 378,745 | 1.3% |
| 12 | Adventist Land of Lincoln Bronze PPO 5000 | 79763IL0620003 | $ 6,053 | 0.0% | Adventist Land of Lincoln Bronze PPO 5000 | 79763IL0620003 | $ 108,704 | 0.4% |
| 13 | Adventist Land of Lincoln Platinum PPO 250 | 79763IL0620004 | $ 48,055 | 0.2% | Adventist Land of Lincoln Platinum PPO 250 | 79763IL0620004 | $ 1,072,592 | 3.6% |
| 14 | Land of Lincoln Preferred PPO Gold | 79763IL0700001 | $ 113,550 | 0.4% | Land of Lincoln Preferred PPO Gold | 79763IL0700001 | $ 1,936,046 | 6.5% |
| 15 | Land of Lincoln Preferred PPO Silver | 79763IL0700002 | $ 10,600 | 0.0% | Land of Lincoln Preferred PPO Silver | 79763IL0700002 | $ 340,716 | 1.1% |
| 16 | Land of Lincoln Preferred PPO Bronze | 79763IL0700003 | $ 16,483 | 0.1% | Land of Lincoln Preferred PPO Bronze | 79763IL0700003 | $ 471,377 | 1.6% |
| 17 | CO-OPtions Land of Lincoln National Elite Gold, a Multi-State Plan | 79763IL0710001 | $ 455,916 | 1.5% | CO-OPtions Land of Lincoln National Elite Gold, a Multi-State Plan | 79763IL0710001 | $ 5,220,816 | 17.4% |
| 18 | CO-OPtions Land of Lincoln National Elite Silver, a Multi-State Plan | 79763IL0710002 | $ 56,457 | 0.2% | CO-OPtions Land of Lincoln National Elite Silver, a Multi-State Plan | 79763IL0710002 | $ 1,819,721 | 6.1% |
| 19 | Land of Lincoln Freedom PPO Gold | 79763IL0720001 | $ 504,266 | 1.7% | Land of Lincoln Freedom PPO Gold | 79763IL0720001 | $ 11,628,962 | 38.8% |
| 20 | Land of Lincoln Freedom PPO Silver | 79763IL0720002 | $ 88,620 | 0.3% | Land of Lincoln Freedom PPO Silver | 79763IL0720002 | $ 2,199,610 | 7.3% |

## Risk Corridors Payment or Charge Calculation

| | A. Individual | B. Small Group |
|---|---|---|
| 1 - Total percentage of market premium in QHPs<br>For Ind (Tab 1, Column F + Column J + Column N), or<br>For SmGrp (Tab 2, Column F + Column J + Column N) | 100.0% | 96.1% |
| 2 - Risk corridors allowable costs<br>(MLR Reporting Form, Part 3, Line 3.1) | $173,704,777 | $38,988,274 |
| 3 - Risk corridors adjusted target amount<br>(MLR Reporting Form, Part 3, Line 3.5) | $94,656,573 | $21,943,790 |
| 4 - Adjusted risk corridors ratio<br>(Line 2 / Line 3) | 183.5% | 177.7% |
| 5 - Risk corridors aggregate payment or charge calculation by market | $59,546,957 | $12,779,779 |
| 6 - **Risk corridors payment expected from HHS or charge payable to HHS** (Line 1 x Line 5) | $59,546,957 | $12,286,294 |
| 7 - [FOR MLR] Risk corridors unadjusted target amount<br>(MLR Reporting Form, Part 3, Line 3.7) | $97,083,665 | $22,506,452 |
| 8 - [FOR MLR] Unadjusted risk corridors ratio<br>(Line 2/ Line 7) | 178.9% | 173.2% |
| **9 - [FOR MLR] Risk corridors aggregate payment or charge calculation by market without adjustment** | $57,510,627 | $12,307,706 |
| **10 - [FOR MLR] Risk corridors payment or charge amount used for MLR calculation** (Line 1 x Line 9) | $57,510,627 | $11,832,450 |

**Attestation Statement**

The party submitting this form attests as follows:  (1) he or she is a duly authorized officer of the reporting issuer, and (2) this Risk Corridors Plan-level Data form, the Company/Issuer Associations, and any supplemental submission or related filings for the Risk Corridors benefit year are true, complete, and accurate statements, to the best of his or her knowledge, information and belief, of all the elements therein.


_____

Chief Executive Officer/President


_____

Chief Financial Officer

# Appendix 9

## Department of Health & Human Services

Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR CONSUMER INFORMATION & INSURANCE OVERSIGHT**

**Date:** November 19, 2015

**Subject:** Risk Corridors Payment and Charge Amounts for Benefit Year 2014

### Background:

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace. The program, which was modeled after a similar program implemented as part of the Medicare Part D prescription drug benefit program, encourages issuers to keep their rates stable as they adjust to the new health insurance reforms in the early years of the Marketplaces.

HHS has previously stated that if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall.[1] On October 1, 2015, HHS announced the payment proration rate for 2014 will be approximately 12.6 percent, reflecting risk corridors charges of $362 million and payments of $2.87 billion requested by issuers.[2] This proration rate was based on the most current risk corridors data submitted by issuers and assumes full collection of charges from issuers.

Today, HHS is releasing issuer-level risk corridors payments and charges based on the most current risk corridors data submitted by issuers and assuming full collection of charges from issuers, by market and state, for the 2014 benefit year. The tables below include the risk corridors payment or charge amounts for the individual and small group markets, respectively, and the prorated risk corridors payment, if applicable. **Risk corridors charges payable to HHS are not prorated, and the full risk corridors charge amounts are noted in the chart below. Only risk corridors payment amounts are prorated.** HHS will begin collection of risk corridors charges in November 2015 and will begin remitting risk corridors payments to issuers starting in December 2015.[3]

---

[1] "Risk Corridors and Budget Neutrality", published April 11, 2014 and posted at
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf

[2] The exact proration rate for 2014 is 12.6178665287897%.

[3] We note that the risk corridor payment and charge amounts published in this bulletin do not reflect any payment or charge adjustments due to resubmissions after September 15, 2015 or any amount held back for appeals.

AR 262

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



| **Date:** | November 19, 2015 |
| **From:** | Center for Consumer Information & Insurance Oversight (CCIIO), Centers for Medicare & Medicaid Services (CMS) |
| **Subject:** | **Risk Corridors Payments for the 2014 Benefit Year** |

On October 1, 2015, the Centers for Medicare & Medicaid Services (CMS) announced that for the first year of the three year risk corridors program, qualified health plan (QHP) issuers will pay charges of approximately $362 million, and QHP issuers have requested $2.87 billion of 2014 payments, based on current data for the 2014 benefit year.[1]  Consistent with prior guidance, assuming full collections of risk corridors charges for the 2014 benefit year, insurers will be paid an amount that reflects a proration rate of 12.6% of their 2014 benefit year risk corridors payment requests.[2]  The remaining 2014 risk corridors payments will be made from 2015 risk corridors collections, and if necessary, 2016 collections.

In the event of a shortfall for the 2016 program year, the Department of Health and Human Services (HHS) will explore other sources of funding for risk corridors payments, subject to the availability of appropriations.  This includes working with Congress on the necessary funding for outstanding risk corridors payments.

HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers, and HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligation of the United States Government for which full payment is required.

---

[1] *"Risk Corridors Payment Proration Rate for 2014."* October 1, 2015. https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf
[2] *"Risk Corridors and Budget Neutrality."* April 11, 2014. https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf.  *"Risk Corridors Payment Proration Rate."* October 1, 2015. https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf

AR 293

*Response:* We are maintaining the policy finalized in the 2015 Payment Notice under § 153.500 and § 153.530, which provides, for 2014, that the effect of the transitional adjustment will vary according to the member-month enrollment in a State, such that the 3 percent profit floor and 20 percent allowable administrative cost ceiling will apply in States that did not adopt the Federal transitional policy (QHP issuers in these States will receive a risk corridors transitional adjustment equal to zero). We believe that issuers in States that did not adopt the Federal transitional policy will not require the transitional adjustment to help mitigate mispricing that may have occurred due to unexpected changes in the risk pool resulting from the Federal transitional policy. We note that the adjustment will account for the effect of the Federal transitional policy in the entire market within a State that adopted the transitional policy, such that a QHP issuer in a transitional State will be eligible to receive an adjustment to its risk corridors calculation even if the issuer has not issued transitional policies.

b. Risk Corridors Payments for 2016

On April 11, 2014, we issued a bulletin titled "Risk Corridors and Budget Neutrality," which described how we intend to administer risk corridors over the 3-year life of the program.[26] Specifically, we stated that if any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year. We also stated that we would establish in future guidance how we would calculate risk corridors payments in the event that cumulative risk corridors collections do not equal cumulative risk corridors payment requests.

In the proposed 2016 Payment Notice, we proposed that if, for the 2016 benefit year, cumulative risk corridors collections exceed cumulative risk corridors payment requests, we would make an adjustment to our administrative expense definitions (that is, the profit margin floor and the ceiling for allowable administrative costs) to account for the excess funds. That is, if, when the risk corridors program concludes, cumulative risk corridors collections exceed both 2016 payment

requests under the risk corridors formula and any unpaid risk corridors amounts from previous years, we would increase the administrative cost ceiling and the profit floor in the risk corridors formula by a percentage calculated to pay out all collections to QHP issuers. The administrative cost ceiling and the profit floor would be adjusted by the same percentage.

We proposed to determine the percentage adjustment to the administrative cost ceiling and profit margin floor by evaluating the amount of excess risk corridors collections (if any) available after risk corridors payments for benefit year 2016 have been calculated. As stated in our bulletin on risk corridors and budget neutrality, after receiving charges from issuers for the 2016 benefit year, we would first prioritize payments to any unpaid risk corridors payments remaining from the 2015 benefit year. We would then calculate benefit year 2016 risk corridors payments for eligible issuers based on the 3 percent profit floor and 20 percent allowable administrative cost ceiling, as required by regulation. If, after making 2015 payments and calculating (but not paying) risk corridors payments for benefit year 2016, we determine that the aggregate amount of collections (including any amounts collected for 2016 and any amounts remaining from benefit years 2014 and 2015) exceed what is needed to make 2016 risk corridors payments, we would implement an adjustment to the profit floor and administrative cost ceiling to increase risk corridors payments for eligible issuers for benefit year 2016. We would examine data that issuers have submitted for calculation of their 2016 risk corridors ratios (that is, allowable costs and target amount) and determine, based on the amount of collections available, what percentage increase to the administrative cost ceiling and profit floor could be implemented for eligible issuers while maintaining budget neutrality for the program overall. Although all eligible issuers would receive the same percentage adjustment, we proposed that the amount of additional payment made to each issuer would vary based on the issuer's allowable costs and target amount. We proposed that, once HHS calculated the adjustment and applied it to eligible issuers' risk corridors formulas, it would make a single risk corridors payment for benefit year 2016 that would include any additional, adjusted payment amount.

Because risk corridors collections are a user fee to be used to fund premium stabilization under risk corridors and no

other programs, we proposed to limit this adjustment to excess amounts collected. We also proposed to apply this adjustment to allowable administrative costs and profits for the 2016 benefit year only to plans whose allowable costs (as defined at § 153.500) are at least 80 percent of their after-tax premiums, because issuers under this threshold would generally be required to pay out MLR rebates to consumers.[27] For plans whose ratio of allowable costs to after-tax premium is below 80 percent, we proposed that the 3 percent risk corridors profit margin and 20 percent allowable administrative cost ceiling would continue to apply. Furthermore, we proposed that, to the extent that applying the proposed adjustment to a plan could increase its risk corridors payment and affect its MLR calculation, the MLR calculation would ignore these adjustments.

As previously stated, we anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments. HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In the unlikely event that risk corridors collections, including any potential carryover from the prior years, are insufficient to make risk corridors payments for the 2016 program year, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations.

We are finalizing this policy as proposed.

*Comment:* We received one comment on the proposed approach for allocating excess risk corridors collections at the end of the program. The commenter supported our approach. Another commenter supported language in the proposed Payment Notice that reaffirmed HHS's commitment to make full risk corridors payments if collections are insufficient to fund payments.

*Response:* We are finalizing the policy regarding allocation of excess risk corridors collections for 2016 as proposed.

---

[26] The Centers for Medicare and Medicaid Services, Center for Consumer Information and Insurance Oversight "Risk Corridors and Budget Neutrality," April 11, 2014 Available at: *https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf.*

[27] Because of some differences in the MLR numerator and the definition of allowable costs that applies with respect to the risk corridors formula, in a small number of cases, an issuer with allowable costs that are at least 80 percent of after-tax premium, may be required to pay MLR rebates to consumers.

AR 431

# Appendix 10

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**CENTER FOR CONSUMER INFORMATION**
**& INSURANCE OVERSIGHT**

**Date: September 9, 2016**

**Subject: Risk Corridors Payments for 2015**

Section 1342 of the Affordable Care Act directs the Secretary of the Department of Health and Human Services (HHS) to establish a temporary risk corridors program that provides issuers of qualified health plans (QHPs) in the individual and small group markets additional protection against uncertainty in claims costs during the first three years of the Marketplace. This program, which was modeled after a similar program used in the Medicare prescription drug benefit, encouraged issuers to keep their rates stable as they adjusted to the new health insurance reforms in the early years of the Marketplaces.

Under the risk corridors program, the federal government shares risk with QHP issuers – collecting charges from the issuer if the issuer's QHP premiums exceed claims costs of QHP enrollees by a certain amount, and making payments to the issuer if the issuer's premiums fall short by a certain amount, subject to certain adjustments for taxes, administrative expenses, and other costs and payments. On April 11, 2014, HHS issued a bulletin titled "Risk Corridors and Budget Neutrality," which described how we intend to administer risk corridors over the three-year life of the program. We stated that if risk corridors collections for a particular year are insufficient to make full risk corridors payments for that year, risk corridors payments for the year will be reduced pro rata to the extent of any shortfall.

Today, HHS is announcing preliminary information about risk corridors for the 2015 benefit year.  Risk corridors submissions are still undergoing review and complete information on payments and charges for the 2015 benefit year is not available at this time.  However, based on our preliminary analysis, HHS anticipates that all 2015 benefit year collections will be used towards remaining 2014 benefit year risk corridors payments, and no funds will be available at this time for 2015 benefit year risk corridors payments.  HHS expects to begin collection of risk corridors charges and remittance of risk corridors payments on the same schedule as last year. Collections from the 2016 benefit year will be used first for remaining 2014 benefit year risk corridors payments, then for 2015 benefit year risk corridors payments, then for 2016 benefit year risk corridors payments.

As we have said previously, in the event of a shortfall for the 2016 benefit year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments. HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required.

1

We know that a number of issuers have sued in federal court seeking to obtain the risk corridors amounts that have not been paid to date. As in any lawsuit, the Department of Justice is vigorously defending those claims on behalf of the United States.  However, as in all cases where there is litigation risk, we are open to discussing resolution of those claims.  We are willing to begin such discussions at any time.

# Appendix 11



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

B-325630

September 30, 2014

The Honorable Jeff Sessions
Ranking Member
Committee on the Budget
United States Senate

The Honorable Fred Upton
Chairman
Committee on Energy and Commerce
House of Representatives

Subject: *Department of Health and Human Services—Risk Corridors Program*

This responds to your February 7, 2014, request for our opinion regarding the availability of appropriations to make payments to qualified health plans pursuant to section 1342 of the Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148, title I, subtitle D, part V, § 1342, 124 Stat. 119, 211, 212 (Mar. 23, 2010), *classified at* 42 U.S.C. § 18062. Section 1342 directs the Department of Health and Human Services (HHS) to establish a temporary risk corridors program to limit the profits and losses of qualified health plans in the individual and small group markets.[1]

In accordance with our regular practice, we contacted HHS to obtain additional factual information and its legal views on this matter. GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/legal/lawresources/resources.html. HHS provided us with information and its legal views. Letter from General Counsel, HHS, to Assistant General Counsel for Appropriations Law, GAO (May 20, 2014) (HHS Letter).

---

[1] The phrase "risk corridors," as used in section 1342, is generally understood to mean a mechanism for limiting an insurer's losses or gains because costs are higher or lower than expected.

AR 114

BACKGROUND

PPACA required the establishment of American Health Benefit Exchanges (Exchanges) in each state for the purchase of insurance in the individual and small group markets. Pub. L. No. 111-148, §§ 1311(b), 1321(c). Insurers that choose to participate in the Exchanges must meet certain requirements to offer qualified health plans. *See* 45 C.F.R. § 155.1000. Qualified health plans offered through the Exchanges are subject to the risk corridors program. 42 U.S.C. § 1342(a).

The risk corridors program is part of what the Centers for Medicare and Medicaid Services (CMS) refers to as the "premium stabilization programs." CMS, *Premium Stabilization Programs, available at* www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/index.html (last visited Sept. 30, 2014). The premium stabilization programs "are designed to provide consumers with affordable health insurance coverage, to reduce incentives for health insurance issuers to avoid enrolling sicker people, and to stabilize premiums in the individual and small group health insurance markets inside and outside the Marketplaces."[2] *Id.*

Generally, insurers set premiums based upon their past experience and anticipated costs related to their pool of enrollees. However, individuals seeking coverage through the Exchanges may have potential health risks that are different than those historically handled by an insurer, resulting in a health plan having higher costs than anticipated. *See* 77 Fed. Reg. 17220, 17221 (Mar. 23, 2012). Because health insurance issuers may be uncertain about the proportion of high-cost enrollees under the new Exchanges, they may include a margin in their pricing to offset the potential expenses of these enrollees, especially during the first few years of the Exchanges. *Id.* at 17221. HHS expects that this uncertainty will decrease as the issuers gain actual claims experience with this new population. *Id.* In order to minimize the possible negative effects of this uncertainty during the initial years of operation of the Exchanges, section 1342 of PPACA directs the Secretary of HHS to operate a temporary risk corridors program. Pub. L. No. 111-148, § 1342(a). This program is intended to protect against uncertainty in rates for qualified health plans by limiting the extent of issuer losses and gains for calendar years 2014, 2015, and 2016. 77 Fed. Reg. at 17221.

Section 1342(a) provides that qualified health plans that choose to participate in the Exchanges "shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums." Pub. L. No. 111-148, § 1342(a). Section 1342(b) sets forth the payment methodology. Under this system, HHS will make payments to qualified health plans experiencing losses above a set amount; conversely, plans realizing gains above a set amount will make payments to HHS. Section 1342(b)(1) provides that "the Secretary shall

---

[2] CMS uses the term "Marketplaces" to refer to the American Health Benefit Exchanges (Exchanges) required to be established by PPACA.

pay" to the qualified health plan a given amount to compensate for certain losses the plan incurs as a result of its allowable costs exceeding its premiums.[3]  *Id.* § 1342(b)(1).  Section 1342(b)(2), in contrast, provides that a qualified health plan "shall pay to the Secretary" a given amount to account for certain gains the plan recognizes because the amounts it collects in premiums exceed its allowable costs. *Id.* § 1342(b)(2).

The Secretary of HHS has delegated authority for section 1342 to the CMS Administrator.[4]  76 Fed. Reg. 53903 (Aug. 30, 2011).  HHS informed us that as of May 20, 2014, it had not made or received any payments under section 1342. HHS Letter, at 3.  HHS intends to begin collections and payments for this purpose in fiscal year (FY) 2015.  *Id.*

## DISCUSSION

At issue here is whether appropriations are available to the Secretary of HHS to make the payments specified in section 1342(b)(1).  Agencies may incur obligations and make expenditures only as permitted by an appropriation.  U.S. Const., art. I, § 9, cl. 7; 31 U.S.C. § 1341(a)(1); B-300192, Nov. 13, 2002, at 5.  Appropriations may be provided through annual appropriations acts as well as through permanent legislation.  *See, e.g.*, 63 Comp. Gen. 331 (1984).  The making of an appropriation must be expressly stated in law. 31 U.S.C. § 1301(d).  It is not enough for a statute to simply require an agency to make a payment.  B-114808, Aug. 7, 1979. Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1).  In such cases, we next determine whether there are other appropriations available to an agency for this purpose.

### CMS Program Management Appropriation

We first examined the availability of the CMS Program Management (PM) appropriation for FY 2014, which provides:

"For carrying out, except as otherwise provided, titles XI, XVIII, XIX, and XXI of the Social Security Act, titles XIII and XXVII of the PHS Act, the Clinical Laboratory Improvement Amendments of 1988, and *other*

---

[3] The payments required under section 1342(b) are calculated based upon the ratio of the allowable costs of the plan to the "target amount" of the plan.  This target amount "is an amount equal to the total premiums (including any premium subsidies under any governmental program) reduced by the administrative costs of the plan." Pub. L. No. 111-148, § 1342(c)(2).

[4] In the same delegation of authority, the Secretary delegated several responsibilities established by PPACA to CMS, including authorities vested in the Secretary by certain provisions of titles I, II, and X of PPACA. 76 Fed. Reg. 53903.

> *responsibilities of the Centers for Medicare and Medicaid Services*, not
> to exceed $3,669,744,000, to be transferred from the Federal Hospital
> Insurance Trust Fund and the Federal Supplementary Medical
> Insurance Trust Fund, as authorized by section 201(g) of the Social
> Security Act; together with all funds collected in accordance with
> section 353 of the PHS Act and section 1857(e)(2) of the Social
> Security Act, funds retained by the Secretary pursuant to section 302
> of the Tax Relief and Health Care Act of 2006; *and such sums as may
> be collected from authorized user fees and the sale of data, which shall
> be credited to this account and remain available until September 30,
> 2019.*"

Pub. L. No. 113-76, div. H, title II, 128 Stat. 5, 374 (Jan. 17, 2014) (emphasis
added).

When interpreting any statute, we begin by looking to the language of the statute
itself. B-316533, July 31, 2008, at 5. The CMS PM appropriation is available for the
expenses that CMS incurs to carry out its responsibilities. The CMS PM
appropriation for FY 2014 provided funds for carrying out a list of enumerated
statutes, as well as "other responsibilities of [CMS]." Pub. L. No. 113-176, 128 Stat.
at 374. Under the purpose statute, 31 U.S.C. § 1301(a), appropriated funds may be
used only to achieve the objects for which they were appropriated. However, we do
not read the purpose statute to require that every item of expenditure be specified in
an appropriations act. B-323449, Aug. 14, 2012, at 4. Further, we have long held
that existing agency appropriations that generally cover the type of expenditure
involved are available for expenses of new or additional duties imposed by proper
legal authority. *See, e.g.,* B-290011, Mar. 25, 2002; 15 Comp. Gen. 167 (1935).
Section 1342(b)(1) directs the Secretary to make payments to qualified health plans,
but that section neither designates nor identifies a source of funds. The CMS PM
appropriation for FY 2014 made funds available to CMS to carry out its
responsibilities, which, with the enactment of section 1342, include the risk corridors
program. Consequently, the CMS PM appropriation for FY 2014 would have been
available for making the payments pursuant to section 1342(b)(1).

### Amounts Collected Under Section 1342

In addition to the general lump sum of $3.6 billion, the CMS PM appropriation for
FY 2014 provides that "such sums as may be collected from authorized user fees ...
shall be credited to this account and remain available until September 30, 2019."
Pub. L. No. 113-176, 128 Stat. at 374. This language includes amounts collected
from qualified health plans pursuant to section 1342(b)(2).

AR 117

A user fee (often referred to as a user charge) is defined as "[a] fee assessed to users for goods or services provided by the federal government."[5] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005), at 100. User fees "apply to federal programs or activities that provide special benefits to identifiable recipients above and beyond what is normally available to the public." *Glossary*, at 100. *See also Analytical Perspectives, Budget of the United States Government for Fiscal Year 2015*, ch. 13, "Offsetting Collections and Offsetting Receipts," at 192 (defining user charges as fees, charges, or assessments "levied on individuals or organizations directly benefiting from . . . a Government program or activity, where the payers do not represent a broad segment of the public").

The Supreme Court and GAO have recognized OMB Circular No. A-25[6] as guidance for agencies administering user fee programs. *See Federal Power Commission v. New England Power Co.*, 415 U.S. 345, 349–351 (1974); B-307319, Aug. 23, 2007, at 9. OMB Circular No. A-25 defines what constitutes a special benefit and provides some examples. Specifically:

> "[A] special benefit will be considered to accrue . . . when a Government service: (a) enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those that accrue to the general public (e.g., receiving a patent, insurance, or guarantee provision, or a license to carry on a specific activity or business or various kinds of public land use); or (b) *provides business stability or contributes to public confidence in the business activity of the beneficiary* (e.g., insuring deposits in commercial banks)."

OMB Cir. No. A-25, at § 6a (emphasis added).

Insurers may choose to offer plans in the Exchanges and in doing so, must offer qualified health plans as defined by 45 C.F.R. § 153.500. The risk corridors program applies only to this specific group of qualified health plans offered through the Exchanges. Accordingly, if an insurer chooses not to offer coverage through the Exchanges, then it is not subject to the risk corridors program established by

---

[5] Agencies have general statutory authority to charge fees under the Independent Offices Appropriations Act of 1952, codified at 31 U.S.C. § 9701, commonly known as the User Charge Statute, to offset the government's provision of a "service or thing of value." The User Charge Statute does not authorize a federal agency to retain and obligate collected fees. B-307319, Aug. 23, 2007. However, the User Charge Statute does not supersede more specific statutes providing for the setting, collection, and/or use of user fees, such as section 1342(b)(2). 31 U.S.C. § 9701(c).

[6] OMB Circular No. A-25, *User Charges* (July 8, 1993).

section 1342. When an insurer offers qualified health plans through the Exchanges, the risk corridors program provides these plans with a special benefit—specifically, the program provides business stability by balancing risks among the qualified health plans. 77 Fed. Reg. 17220, 17221 (Mar. 23, 2012). When a qualified health plan makes a payment under section 1342(b)(2), it is paying for the certainty that any potential losses related to its participation in the Exchanges are limited to a certain amount, thus minimizing risk and maximizing business stability for the plan. Pursuant to OMB guidance, therefore, payments under the risk corridors program are properly characterized as user fees.

Section 1342(b)(2) directs the Secretary to collect certain amounts from qualified health plans. The CMS PM appropriation for FY 2014 appropriated funds including "such sums as may be collected from authorized user fees." Consequently, any amounts collected in FY 2014 pursuant to section 1342(b)(2) would have been available, along with the general CMS PM lump-sum appropriation, for making the payments pursuant to section 1342(b)(1).[7]

Appropriations acts, by their nature, are considered nonpermanent legislation. B-319414, June 9, 2010. Language appropriating funds for "other responsibilities of the Centers for Medicare and Medicaid Services" would need to be included in the CMS PM appropriation for FY 2015 in order for it to be available for payments to qualified health plans under section 1342(b)(1). Similarly, language appropriating "such sums as may be collected from authorized user fees" would need to be included in the CMS PM appropriation for FY 2015 in order for any amounts CMS collects in FY 2015 pursuant to section 1342(b)(2) to be available to CMS for making the payments pursuant to section 1342(b)(1).[8]

In accordance with our regular practice, we asked HHS for its legal views regarding the availability of appropriations to make payments to qualified health plans pursuant to section 1342(b)(1). While HHS did not identify the PM appropriation's lump sum as available, HHS asserted that section 1342 "authorizes the collection and payment of user fees to and from the [qualified health plans]" and that the CMS PM appropriation for FY 2014 would have appropriated these user fees. HHS Letter, at 1-2. HHS's description of the amounts collected as user fees is consistent with our conclusion.

---

[7] HHS informed us that it intends to begin collections and payments for this purpose in FY 2015. HHS Letter, at 3.

[8] The terms and conditions of the CMS PM appropriation for FY 2014 continue during the pendency of the Continuing Appropriations Resolution, 2015. Pub. L. No. 113-76, 128 Stat. at 374, *as carried forward by* Pub. L. No. 113-164, div. A, §§ 101(a)(8), 103, __Stat. __ (Sept. 19, 2014).

A-74

AR 119

CONCLUSION

Section 1342 of PPACA directs the Secretary of HHS to collect from and make payments to qualified health plans. The CMS PM appropriation for FY 2014 would have been available to CMS to make the payments specified in section 1342(b)(1). The CMS PM appropriation for FY 2014 also would have appropriated to CMS user fees collected pursuant to section 1342(b)(2) in FY 2014. HHS stated that it intends to begin collections and payments under section 1342 in FY 2015. However, as discussed above, for funds to be available for this purpose in FY 2015, the CMS PM appropriation for FY 2015 must include language similar to the language included in the CMS PM appropriation for FY 2014.

If you have any questions, please contact Edda Emmanuelli Perez, Managing Associate General Counsel, at (202) 512-2853 or Julie Matta, Assistant General Counsel, at (202) 512-4023.

*Sa Poling*

Susan A. Poling
General Counsel

B-325630

A-75

AR 120

# Appendix 12



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Office of the Secretary

The General Counsel
Washington, D.C. 20201

MAY 2 0 2014

Julia C. Matta
Assistant General Counsel
for Appropriations Law
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Ms. Matta:

This is in response to your April 15, 2014 letter requesting information regarding budget
authority available to operate the risk corridors program established in section 1342 of the
Patient Protection and Affordable Care Act (PPACA)[1]. The responses to your questions are set
forth below.

1.  *Agencies may incur obligations and make expenditures only as permitted by an
    appropriation. U.S. Const., art. I, § 9, cl. 7; 31 U.S.C. §1341(a)(1); B-300192, Nov. 13,
    2002. The making of an appropriation must be expressly stated in law. 31 U.S.C.
    §1301(d). A direction to an agency to pay funds without a designation of funds to be used
    for the payment does not make an appropriation. B-114808, Aug. 7. 1979. PPACA section
    1342(b)(1) provides that, under some circumstances, HHS "shall pay" specified amounts to
    participating plans. Does any provision of law, be it PPACA section 1342 or another
    provision, currently provide HHS with an appropriation necessary to obligate and expend
    the payments specified in PPACA section 1342(b)(1)? Please explain.*

    Response: Section 1342 of PPACA requires the Secretary of Health and Human Services
    (HHS) to establish a temporary risk corridors program that provides for the sharing in gains
    or losses resulting from inaccurate rate setting from 2014 through 2016 between the Federal
    government and qualified health plans (QHPs). The risk corridors program applies only to
    participating plans defined to be qualified health plans (QHPs) at 45 CFR 153.500. Section
    1342(b)(1) and (2) establishes the payment methodology for the payments in and the
    payments out, thereby establishing the formula to determine the amounts the QHPs must pay
    to the Secretary of HHS and the amounts the Secretary must pay to the QHPs if the risk
    corridors threshold is met.

    As section 1342 of PPACA requires the Secretary to establish and administer the risk
    corridors program and requires the Secretary to collect payments from and make payments
    to certain QHPs, section 1342 authorizes the collection and payment of user fees to and from

---

[1]  Pub. L. No. 111-148, §1342, 124 Stat. 119, 211-212 (Mar.23, 2010), codified at 42 U.S.C. § 18062.

AR 1482

Julia C. Matta – Page 2

the QHPs. QHPs enjoy a special benefit resulting from the operation of the risk corridors program, in that the fees charged are ultimately utilized to balance risks among the QHPs, thus promoting stability in this sector of the market. This is consistent with OMB Circular A-25[2], which is intended to provide guidance to agencies regarding their assessment of user fees pursuant to 31 U.S.C. § 9701 and other statutes. Further, we view it as consistent with the definition of user fees as set forth in OMB's Fiscal Year 2015, *Analytical Perspectives*[3] and GAO's *Glossary of Terms Used in the Federal Budget Process*[4].

Section 1342 of PPACA requires the collection and payment of risk corridor user fees. The Centers for Medicare & Medicaid Services (CMS) Program Management (PM) appropriation for fiscal year 2014[5], which states ". . .such sums as may be collected from authorized user fees and the sale of data, which shall be credited to this account and remain available until September 30, 2019: . . .",  appropriates the section 1342 user fees. Together, section 1342

---

[2] "General policy: A user charge, as described below, will be assessed against each identifiable recipient for special benefits derived from Federal activities beyond those received by the general public. When the imposition of user charges is prohibited or restricted by existing law, agencies will review activities periodically and recommend legislative changes when appropriate. Section 7 gives guidance on drafting legislation to implement user charges.

a. Special benefits

1. Determining when special benefits exist. When a service (or privilege) provides special benefits to an identifiable recipient beyond those that accrue to the general public, a charge will be imposed (to recover the full cost to the Federal Government for providing the special benefit, or the market price). For example, a special benefit will be considered to accrue and a user charge will be imposed when a Government service:

(a) enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those that accrue to the general public (e.g., receiving a patent, insurance, or guarantee provision, or a license to carry on a specific activity or business or various kinds of public land use); or

(b) provides business stability or contributes to public confidence in the business activity of the beneficiary (e.g., insuring deposits in commercial banks); or . . ." Office of Mgmt. & Budget, Exec. Office of the President, OMB Cir. A-25, User Charges, section 6(1)(a)-(b)(2010).

[3] "In this chapter, user charges refer to fees, charges, and assessment levied on individuals or organizations directly benefiting from or subject to regulation by a Government program or activity, where the payers do not represent a broad segment of the public as those who pay taxes." Fiscal Year 2015 Analytical Perspectives, Budget of the U.S. Government, Office of Management and Budget, p. 192. Available on the Internet at
*http://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/spec.pdf.*

[4] "A fee assessed to users for goods or services provided by the federal government. User fees generally apply to federal programs or activities that provide special benefits to identifiable recipients above and beyond what is normally available to the public. U.S. Government Accountability Office, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (2005), p. 100.

[5] Consolidated Appropriations Act, 2014, Div. H, Pub. L.113-76 (2014).

AR 1483

Julia C. Matta -- Page 3

of PPACA and the CMS PM appropriation allows for the collection, retention, obligation and expenditure of the section 1342 user fees until September 30, 2019.

2. *PPACA section 1342(b)(2) provides that, under some circumstances, HHS will receive payments from participating plans. Absent specific statutory authority, agencies must deposit money for the government into the Treasury without deduction for any charge or claim, and such deposits are available for obligation and expenditure only as permitted by an appropriation. 31 U.S.C. §3302(b); B-271894, July 24, 1987; 22 Comp. Dec. 379 (1916). May HHS obligate and expend amounts that participating plans pay to HHS under PPACA section 1342(b)(2)?  If so, please explain the statutory authority that permits HHS to obligate and expend these amounts and the permissible purposes of such obligations and expenditures.*

Response:  The CMS PM appropriation permits HHS to collect, retain, obligate, and expend the user fees in a manner consistent with section 1342.

3. *Has HHS made or received any payments under PPACA section 1342?  If so, please explain the amount and source of any payments made or the amount and disposition of any payments received.*

Response:  To date, HHS has not made or received any payments under section 1342 of PPACA.  HHS intends to begin collections and payments in fiscal year 2015 pursuant to continued CMS PM user fee authority.

Thank you for the opportunity to provide the Department's views on this matter.

Sincerely,

William B. Schultz
General Counsel

AR 1484

# Appendix 13

-----Original Message-----
**From:** Counihan, Kevin J. (CMS/CCIIO) [Kevin.Counihan@cms.hhs.gov]
**Sent:** Monday, November 02, 2015 04:17 PM Eastern Standard Time
**To:** Brad Wilson
**Subject:** 2014 Risk Corridors Payments

Mr. Wilson,

As we have discussed with your team, please find enclosed a letter from CMS reiterating that risk corridors payments are an obligation of the U.S. Government. Thank you again for your continued participation in the risk corridors program.

Kevin J. Counihan
Chief Executive Officer
Health Insurance Marketplaces
Director, CCIIO
202-260-6085



Learn about the
Health Insurance
Marketplace & your
new coverage options

**GET ANSWERS NOW**

1

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information & Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR CONSUMER INFORMATION
& INSURANCE OVERSIGHT**

November 2, 2015

J. Bradley Wilson
Chief Executive Officer
Blue Cross Blue Shield of North Carolina
5901 Chapel Hill Road
Durham, NC 27707

Dear Mr. Wilson:

Thank you for your active, constructive participation in our recent discussions around Blue Cross Blue Shield of North Carolina's risk corridors payment.

As you know, on October 1, the Centers for Medicare & Medicaid Services (CMS) issued guidance stating that, based on current data for 2014, the first year of the three-year risk corridors program, issuers will pay 2014 risk corridors charges of approximately \$362 million, and insurers have requested \$2.87 billion of 2014 risk corridors payments. As a result, consistent with our prior guidance, insurers will be paid approximately 12.6% of their risk corridors payment requests at this time. We reiterated that the remaining 2014 risk corridors claims will be paid out of 2015 risk corridors collections, and if necessary, 2016 collections.

As I have previously written to you, we will not know the total loss or gain for the program until the fall of 2017, when the data from all three years of the program can be analyzed and verified. In the event of a shortfall for the 2016 program year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments.

According to our calculations, Blue Cross Blue Shield of North Carolina requested \$147,421,876.38 in 2014 risk corridors payments for its individual market qualified health plans (QHPs), and requested approximately \$53,091.97 in 2014 risk corridors payments for its small group QHPs. We estimate that, beginning in December 2015, we will pay out \$18,601,495.60 in 2014 risk corridors payments for your individual market QHPs, and approximately \$6,699.07 in

2014 risk corridors payments for your small group QHPs, with the shortfall being paid out of 2015 and, if necessary, 2016 risk corridors collections, as outlined above.

I wish to reiterate to you that the Department of Health and Human Services (HHS) recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers, and that HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligations of the United States Government for which full payment is required.

Thank you again for your participation in these discussions to date. Please do not hesitate to contact me if there is anything further we can do to support you in these efforts.

Sincerely,

Kevin J. Counihan
Chief Executive Officer, Health Insurance Marketplaces
Director, Center for Consumer Information & Insurance Oversight

# Appendix 14



# FEDERAL REGISTER

| Vol. 78 | Monday, |
|---|---|
| No. 47 | March 11, 2013 |

Part II

## Department of Health and Human Services

45 CFR Parts 153, 155, 156, et al.
Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014 and Amendments to the HHS Notice of Benefit and Payment Parameters for 2014; Final Rules; Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans; Small Business Health Options Program; Proposed Rule

AR 703

programs when practicable so that similar concepts in the two programs are handled in a similar manner, and similar policy goals are reflected. Consequently, our treatment of taxes for risk corridors purposes follows the approach of the MLR program, as outlined in section 3C of the model MLR regulation published by the National Association of Insurance Commissioners (NAIC).[23] We note that, because of the way profits is defined for the risk corridors calculation, no such circularity will occur with profits.

*Comment:* One commenter asked whether reinsurance contributions could be considered as "taxes and regulatory fees" when determining "allowable administrative costs" in the denominator of the risk corridors calculation.

*Response:* We note that other provisions of this final rule amend the MLR calculation so that reinsurance contributions are included in Federal and State licensing and regulatory fees paid with respect to the QHP as described in § 158.161(a), and are deducted from premiums for MLR purposes. Our proposed definition of "taxes" for purposes of the risk corridors program cross-referenced § 158.161(a) and similarly included reinsurance contributions. Thus, in response to these comments, and to maintain consistency with the MLR calculation and our proposed definition, which we are finalizing as proposed, we are making a conforming amendment to § 153.530(b)(1). In this final rule, we are deleting § 153.530(b)(1)(ii) and clarifying that reinsurance contributions are included in Federal and State licensing and regulatory fees paid with respect to the QHP as described in § 158.161(a), and thus are included in allowable administrative costs for risk corridors purposes. We are also making a conforming change to § 153.520(d) to remove the requirement that a QHP issuer must attribute reinsurance contributions to allowable costs for the benefit year. In addition, we are making a conforming modification to the proposed definition of "taxes" in § 153.500, by replacing the term "taxes" with "taxes and regulatory fees."

*Comment:* Nearly all those that commented on the risk corridors profit margin agreed with the 3 percent profit

margin set in the proposed rule. One commenter suggested that a 2 percent profit margin would be more appropriate.

*Response:* Based on the comments received and the policy arguments outlined in our proposed rule, we are finalizing the definition of "profits" in § 153.500 as proposed.

*Comment:* One commenter expressed concern that an allowance for up to 3 percent profit could disrupt the budget neutrality of the risk corridors program, and asked for clarification on HHS's plans for funding risk corridors if payments exceed receipts.

*Response:* The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.

*Comment:* One commenter stated that the risk corridors calculation does not account for the credibility adjustment that is part of the MLR formula, and recommended setting maximum allowable administrative costs at 20 percent plus the allowed credibility adjustment for the carrier's block of business. The commenter believed that this change would be consistent with the MLR formula and make it more viable for carriers to maintain their smaller blocks of business, given the higher claims volatility that often characterizes these smaller blocks of business.

*Response:* Although we seek consistency with MLR where the risk corridors and MLR formulas contain similar parameters, we believe that the credibility adjustment is a unique parameter in the MLR formula. The MLR statute provides for a credibility adjustment through "methodologies * * * designed to take into account the special circumstances of smaller plans, different types of plans, and newer plans" at section 2718(c) of the Affordable Care Act. No similar reference appears in section 1342 of the Affordable Care Act.

*Comment:* One commenter requested clarification on whether community benefit expenses would be included in the taxes of non-profit entities for the purposes of calculating the risk corridors target amount.

*Response:* We believe that accounting for these expenses as taxes when calculating the target amount would appropriately align the risk corridors formula with the MLR calculation. Our proposed definition of "taxes" in § 153.500 includes Federal and State taxes defined in § 158.162(b), which describes payments made by a tax-exempt issuer for community benefit

expenditures. Consequently, we are clarifying that non-profit entities may account for community benefit expenditures as "taxes and regulatory fees" in a manner consistent with the MLR reporting requirements set forth in § 158.162 for the purposes of calculating the risk corridors target amount.

**2. Risk Corridors Establishment and Payment Methodology**

We proposed to add paragraph (d) to § 153.510, which would specify the due date for QHP issuers to remit risk corridors charges to HHS. Under this provision, an issuer would be required to remit charges within 30 days after notification of the charges. By June 30 of the year following an applicable benefit year, under § 153.310(e), QHP issuers will have been notified of risk adjustment payments and charges for the applicable benefit year. By that same date, under § 153.240(b)(1), QHP issuers also will have been notified of all reinsurance payments to be made for the applicable benefit year. As such, we proposed in § 153.530(d) that the due date for QHP issuers to submit all information required under § 153.530 of the Premium Stabilization Rule is July 31 of the year following the applicable benefit year. We also proposed that the MLR reporting deadline be revised to align with this schedule. We are finalizing this provision as proposed.

*Comment:* We received several supportive comments on our proposal to require issuers to submit risk corridors information by July 31 of the year following the applicable benefit year.

*Response:* We are finalizing § 153.530(d) as proposed, so that the due date for QHP issuers to submit all risk corridors information is July 31 of the year following the applicable benefit year. In section III.I.1. of this final rule, we also finalize our proposal to align the MLR reporting deadline with this schedule.

*Comment:* One commenter asked how payments made under the State supplemental reinsurance payment parameters are taken into account in the risk corridors calculation. Another commenter requested that HHS clarify the treatment of State "wrap-around" reinsurance payments under the risk corridors calculation, and asked for information on the way in which HHS analyzed the impact of the administrative burden associated with removing these costs.

*Response:* Under section 1342(c)(1)(B) of the Affordable Care Act, allowable costs are to be reduced by any risk adjustment and reinsurance payments received under sections 1341 and 1343. Supplemental reinsurance payments

---

[23] Section 3C of the NAIC model regulation, available at *http://www.naic.org/documents/committees_ex_mlr_reg_asadopted.pdf* states, "[a]ll terms defined in this Regulation, whether in this Section or elsewhere, shall be construed, and all calculations provided for by this Regulation shall be performed, as to exclude the financial impact of any of the rebates provided for in sections 8, 9, and 10 [rebate calculation sections]."

# Appendix 15




United States Government Accountability Office

Report to Congressional Requesters

**April 2015**

# PATIENT PROTECTION AND AFFORDABLE CARE ACT

## Despite Some Delays, CMS Has Made Progress Implementing Programs to Limit Health Insurer Risk

**GAO-15-447**

target amount. When an issuer's costs are within 3 percent of its target amount, between 97 and 103 percent, the issuer makes no payments and receives no payments. Issuers whose profit or loss is greater than 3 percent of its target amount share in that profit or loss with CMS. An issuer whose profit or loss is greater than 8 percent of its target amount will pay a greater portion of its profit or will be reimbursed for a greater portion of its loss. (See fig. 1.)

**Figure 1: PPACA Risk Corridors Program Payment Thresholds for Issuers of Qualified Health Plans**



Difference between actual medical spending and expected medical spending (as a precent of expected medical spending)

Source: © 2013 American Academy of Actuaries, Used with permission.  |  GAO-15-447

## Risk Mitigation Programs in Medicare

PPACA directed HHS to consider the design of the Medicare risk mitigation programs in developing the PPACA risk mitigation programs, although it also set requirements that differed from the Medicare programs.[27] While PPACA established the risk corridors and reinsurance

---

[27]PPACA indicates that for risk adjustment, HHS "may utilize" criteria and methods similar to those used under Medicare Advantage and Medicare Part D. For the risk corridors program, PPACA indicates that the risk corridors program "shall be based on" that used in Medicare Part D. See PPACA, Pub. L. No. 111-148, §§ 1342(a) and 1343(b), 124 Stat. 211, 212 (codified at 42 U.S.C. §§ 18062(a) and 18063(b)) (pertaining to risk corridors and risk adjustment, respectively).

programs as temporary programs for the 3-year period 2014 through 2016, the Medicare Part D programs were not required to be temporary and have operated since 2006. In addition, according to CMS, the PPACA risk adjustment and reinsurance programs are budget neutral, in that payments to issuers will be adjusted to reflect, and not exceed, contributions. CMS originally indicated that the PPACA risk corridors program would not be operated in a budget neutral manner but subsequently indicated its intent to operate the program as budget neutral in 2014 and 2015, and then in 2016, if collections are insufficient to make payments, it would use other sources of funding subject to availability. For the Medicare Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to issuers are not limited to issuer contributions.

## CMS Considered Market Characteristics and Program Duration When Designing PPACA's Three Risk Mitigation Programs

CMS considered a range of insurance market characteristics—such as demographics and the availability of market data—in making decisions about how to design PPACA's three risk mitigation programs. CMS's design decisions also reflected the temporary status of the reinsurance and risk corridors programs.

GAO-15-447  CMS Programs to Limit Insurer Risk

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23rd day of September 2016, a copy of the foregoing was filed electronically.  As I understand, pursuant to RCFC Appendix E, V.12.(c), the Court's Notice of Electronic Filing satisfies the service requirement of RCFC 5 and the proof of service requirement of RCFC 5.3 via operation of the Court's electronic filing system.

s/ Daniel P. Albers

Daniel P. Albers