IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAND OF LINCOLN MUTUAL HEALTH
INSURANCE COMPANY,

           Plaintiff,

    v.

THE UNITED STATES OF AMERICA,

           Defendant.

No. 16-744C
Judge Charles F. Lettow

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD ON COUNTS II-V

Daniel P. Albers
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606
Telephone: (312)357-1313
Fax: (312) 759-5646
Email: dalbers@btlaw.com

*Of Counsel:*

Scott E. Pickens
BARNES & THORNBURG LLP
1717 Pennsylvania Avenue N.W.
Suite 500
Washington, DC 20006
Telephone: (202) 371-6349
Fax: (202) 289-1330
Email: scott.pickens@btlaw.com

*Counsel for Plaintiff Land of Lincoln
Mutual Insurance Company*

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...................................................................... 1

II.  STATEMENT OF THE QUESTIONS PRESENTED ....................................... 2

III.  STATEMENT OF THE CASE........................................................................ 2

IV.  ARGUMENT ............................................................................................... 6

A.  The Court Has Jurisdiction Under the Tucker Act. ............................... 6

    1.  The Applicable Standard For Jurisdiction is Met Here. ................. 6

B.  Lincoln's Claims for the 2014 and 2015 Benefit Years Are "Ripe." ...... 9

C.  The ACA Requires Annual RCPs To Be Paid in the Full Amounts Owed. .......... 12

    1.  The Statute's Plain Meaning Requires Full, Annual Payments. ............... 13

        a.  Section 1342 and the Broader ACA Provide for an Annual Risk Corridors Program. ............................................... 14

        b.  The ACA Risk Corridors Program is Required to be "Based on" The Part D Medicare Program, Which Requires Full, Annual Payments. ............................................................. 15

        c.  The Government Identifies No Plain Language in Any Statute Supporting Its "Three-Year Payment Framework." ..................... 16

    2.  The Legislative History Demonstrates That HHS Must Make Full, Annual Risk Corridors Payments.......................................... 18

    3.  The Purpose of the Risk Corridors Program is to Prevent Exactly What Has Now Occurred Due to the Government's Failure to Pay RCPs.......... 19

    4.  HHS's Post-Hoc "Three-Year Payment Framework" is Owed No Deference. ......................................................................... 20

D.  The Court Can Grant Relief Notwithstanding That Congress Has Not Appropriated Sufficient Funds For Payment of RCPs to All QHPs Entitled to RCPs. .................................................................................. 23

E.  Congress's Post-ACA Enactments Did Not Negate Lincoln's Entitlement To RCPs and Lincoln Is Entitled to Judgment on the AR........................... 25

F.  Lincoln Is Also Entitled to Judgment for 2016 Risk Corridors Amounts To Be Determined As Incidental to Its Money Damages Claims for 2014 and 2015. ...... 30

G.  Lincoln's Alternative Claims for Relief Under Sections II-V of Its Complaint State Viable Claims and Are Each a Proper Alternative Basis for Judgment on the Merits. ................................................................................... 31

    1.  There Was Mutuality of Intent.................................................. 33

        a.  Express Contract. ........................................................ 33

|       | b.   | Implied Contract. ........................................................................ 35 |

| 2. | There Was Consideration............................................................................39 |
| 3. | There Is No Ambiguity in Offer and Acceptance. .....................................39 |
| 4. | The Secretary of HHS Had Actual Authority to Contract. .........................41 |
| 5. | Congress Cannot Exercise Its Appropriation Authority to Curtail the Government's Contractual Liability. ..........................................................43 |
| 6. | The Government Has Not Acted In Good Faith and Fair Dealing. ...........44 |
| 7. | The Government Has Taken Lincoln's Right to Payment and Lincoln is Entitled to Judgment For This Taking Under The Fifth Amendment....46 |

| V. | CONCLUSION.................................................................................................... 47 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & D Fire Prot., Inc. v. United States,*
   72 Fed. Cl. 126 (2006) .................................................................................25, 31

*AAA Pharmacy, Inc. v. United States,*
   108 Fed. Cl. 321 (2012) ................................................................................38, 39

*Abramson v. United States,*
   42 Fed. Cl. 621 (1998) ..................................................................................13, 14

*Adams v. United States,*
   391 F.3d 1212 (Fed. Cir. 2004)....................................................................32, 46

*Advanced Concepts Enters., Inc. v. United States,*
   No. 15-75C, 2015 U.S. Claims LEXIS 1115 (Fed. Cl. Sept. 2, 2015) ....................25

*Alexander v. Sandoval,*
   532 U.S. 275 (2001).............................................................................................13

*Alliant Techsystems, Inc. v. United States,*
   178 F.3d 1260 (Fed. Cir. 1999)............................................................................8

*Am. Fed. of Gov't Employees, AFL-CIO v. United States,*
   46 Fed. Cl. 586 (2000) ..................................................................................16, 18

*Annuity Transfers Ltd. v. United States,*
   86 Fed. Cl. 173 (2009) ....................................................................................9, 31

*Army & Air Force Exch. Serv. v. Sheehan,*
   456 U.S. 728 (1982)............................................................................................37

*ARRA Energy Co. I v. United States,*
   97 Fed. Cl. 12 (2011) ....................................................................................33, 38

*Aycock-Lindsey Corp. v. United States,*
   171 F. 2d 518 (5th Cir. 1948) .............................................................................38

*Baker v. United States,*
   50 Fed. Cl. 483 (2001) ..................................................................................37, 38

*Balt. & Ohio R.R. Co. v. United States,*
   261 U.S. 592 (1923)............................................................................................35

*Bannum, Inc. v. United States*,
    404 F.3d 1346 (Fed. Cir. 2005)..................................................................................25

*Barlow & Haun, Inc. v. United States*,
    118 Fed. Cl. 597 (2014) .................................................................................11, 12

*Bath Iron Works Corp. v. United States*,
    20 F.3d 1567 (Fed. Cir. 1994).................................................................................27

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
    527 F.3d 1278 (Fed. Cir. 2008)...............................................................................10

*Cathedral Candle Co. v. United States Int'l Trade Comm'n*,
    400 F.3d 1352 (Fed. Cir. 2005)...............................................................................21

*CBY Design Builders v. United States*,
    105 Fed. Cl. 303 (2012) ..........................................................................................10

*Centex Corp. v. United States*,
    395 F.3d 1283 (Fed. Cir. 2005)...............................................................................44

*Cherokee Nation of Okla. v. Leavitt*,
    543 U.S. 631, 125 S.Ct. 1172 (2005).................................................24, 25, 29, 43

*Christopher v. SmithKline Beecham Corp.*,
    132 S. Ct. 2156 (2012)............................................................................................22

*City of Cincinnati v. United States*,
    153 F.3d 1375 (Fed. Cir. 1998)...............................................................................35

*Coalition for Common Sense in Gov't Procurement v. Sec. of Veteran Affairs*,
    464 F.3d 1306 (Fed. Cir. 2006)...............................................................................11

*Cobell v. Norton*,
    428 F.3d 1070 (D.C. Cir. 2005) ..............................................................................17

*Cohen v. United States*,
    105 Fed. Cl. 733 (2012), *aff'd*, 528 F. App'x 996 (Fed. Cir. 2013) ........................18

*Dakota, Minnesota & Eastern R.R. Corp. v. Schieffer*,
    648 F.3d 935 (8th Cir. 2011) ..................................................................................14

*Dougherty v. United States*,
    18 Ct. Cl. 496 (1883) ..............................................................................................43

*Engage Learning, Inc. v. Salazar*,
    660 F.3d 1346 (Fed. Cir. 2011)..........................................................6, 24, 25, 43

iv

*Excelsior Ambulance Serv., Inc. v. United States,*
    124 Fed. Cl. 581 (2015) ........................................................................................25

*Ferris v. United States,*
    27 Ct. Cl. 542 ...............................................................................................24, 43

*Firebaugh Canal Co. v. United States,*
    203 F.3d 568 (9th Cir. 2000) ..............................................................................27

*Fisher v. United States,*
    402 F.3d 1167 (Fed. Cir. 2005)................................................................6, 7, 8, 20

*Greenlee Cnty. v. United States,*
    487 F.3d 871 (Fed. Cir. 2007).......................................................................*passim*

*H. Landau & Co. v. United States,*
    886 F.2d 322 (Fed. Cir. 1989).............................................................................41

*Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States,*
    48 F.3d 1166 ......................................................................................................28

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ...........................................................................................46

*House v. United States,*
    99 Fed. Cl. 342 (2011) .........................................................................................8

*Hughes Communications Galaxy, Inc. v. United States,*
    998 F.2d 953 (Fed. Cir. 1993)...............................................................................7

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Donovan,*
    746 F.2d 855 (D.C. Cir. 1984)..............................................................................42

*Inter-Tribal Council of Arizona, Inc. v. United States,*
    125 Fed. Cl. 493 (2016) ......................................................................................11

*James v. Caldera,*
    159 F.3d 573 (Fed. Cir. 1998)..............................................................................31

*Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.,*
    525 F.3d 1299 (Fed. Cir. 2008)..............................................................................6

*Johnson v. United States,*
    105 Fed. Cl. 85 (2012) .........................................................................................9

*Kanemoto v. Reno,*
    41 F.3d 641 (Fed. Cir. 1994)..................................................................................7

*Karuk Tribe of Cal. v. Ammon,*
    209 F.3d 1366 (Fed. Cir. 2000) ............................................................... 46

*King v. Burwell,*
    135 S. Ct. 2480 (2015) .......................................................... 18, 20, 21, 22

*Leider v. United States,*
    301 F.3d 1290 (Fed. Cir. 2002) ............................................................... 32

*Lewis v. United States,*
    70 F.3d 597 (Fed. Cir. 1995) ................................................................... 32

*Lorillard v. Pons,*
    434 U.S. 575 (1978) ................................................................................ 16

*Lummi Tribe v. United States,*
    99 Fed. Cl. 584 (2011) .............................................................................. 7

*M & J Coal Co. v. United States,*
    47 F.3d 1148 (Fed. Cir. 1995) ................................................................. 46

*M. Maropakis Carpentry, Inc. v. United States,*
    609 F.3d 1323 (Fed. Cir. 2010) ................................................................. 6

*Michael v. United States,*
    2014 U.S. Claims LEXIS 1416 (Fed. Cl. December 15, 2014) ................ 31

*Miller v. United States,*
    119 Fed. Cl. 717 (2015) ............................................................................ 8

*Nat'l Educ. Ass'n—Rhode Island v. Ret. Bd. Of the Rhode Island Employees' Ret.*
*Sys.,*
    172 F.3d 22 (1st Cir. 1999) ..................................................................... 46

*Nevada v. Dep't of Energy,*
    400 F.3d 9 (D.C. Cir. 2005) .................................................................... 42

*New York Airways, Inc. v. United States,*
    177 Ct. Cl. 800, 369 F.2d 743 (1966) ............................................. *passim*

*Norfolk Dredging Co. v. United States,*
    375 F.3d 1106 (Fed. Cir. 2004) ............................................................... 13

*Overall Roofing & Const. Inc. v. United States,*
    929 F.2d 687 (Fed. Cir. 1991), *superseded by statute* ............................ 8

*Posadas v. Nat'l City Bank,*
    296 U.S. 497 (1936) ................................................................................ 28

*Prairie Cty. Mont. v. United States*,
    113 Fed. Cl. 194 (2013) ..................................................................................29, 30

*Radium Mines, Inc. v. United States*,
    153 F. Supp. 403 (Ct. Cl. 1957)..............................................................36, 37, 39, 41

*Republic Airlines, Inc. v. United States Dep't of Transp.*,
    849 F.2d 1315 (10th Cir. 1988) ..........................................................................29

*Reynolds v. Army & Air Force Exch. Serv.*,
    846 F.2d 746 (Fed. Cir. 1988)..............................................................................6

*Salazar v. Ramah Navajo Chapter*,
    132 S.Ct. 2181 (2012)..........................................................................24, 29, 43

*Shelden v. United States*,
    7 F.3d 1022 (Fed. Cir. 1993)...............................................................................8

*Slattery v. United States*,
    635 F.3d 1298 (Fed. Cir. 2011) (*en banc*) ..........................................................17

*Tippett v. United States*,
    98 Fed. Cl. 171 (2011) ........................................................................................8

*Todd v. United States*,
    386 F.3d 1091(Fed. Cir. 2004)............................................................................8

*Trauma Serv. Group v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997)..........................................................................31

*United States v. Bowen*,
    527 F.3d 1065 (10th Cir. 2008) ........................................................................26

*United States v. Dickerson*,
    310 U.S. 554 (1940).....................................................................................26, 27

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)............................................................................................21

*United States v. Mitchell*,
    463 U.S. 206 (1983)..................................................................................7, 8, 9

*United States v. Testan*,
    424 U.S. 392 (1976)......................................................................................7, 8

*United States v. Will*,
    449 U.S. 200 (1980)....................................................................................27, 28

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) .................................................................................26

*W.E. Partners II, LLC v. United States*,
   119 Fed. Cl. 684 (2015) ............................................................................21

*Wood v. United States*,
   214 Ct. Cl. 744 (1977) (unpublished) .........................................................8

**Statutes**

28 U.S.C. § 1491 .......................................................................................7, 8

31 U.S.C. § 1341(a)(1)(B) ............................................................................42

42 U.S.C. § 1395w-115(e) ............................................................................16

42 U.S.C. § 18031 .......................................................................................19

42 U.S.C. § 18062 .................................................................................*passim*

Affordable Care Act ..............................................................................*passim*

Social Security Act, part D, 42 U.S.C. 1395w–101 *et seq.* ..........................*passim*

128 Stat. 2491 ...........................................................................................27

129 Stat. 2624 ...........................................................................................27

**Other Authorities**

42 C.F.R. § 423.336 ...............................................................................16, 19

45 C.F.R. 153.510 ................................................................................*passim*

45 C.F.R. § 156.200 ...............................................................................40, 41

77 C.F.R. 17219 ............................................................................15, 22, 36, 45

78 C.F.R. 15409 ....................................................................................23, 36

U.S. Const. amend. V, cl. 4 ............................................................................46

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND MOTION FOR JUDGMENT ON
THE ADMINISTRATIVE RECORD AND CROSS-MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD ON COUNTS II-V**

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims

("RCFC"), and the Court's August 12, 2016 Order, Plaintiff Land of Lincoln Mutual Health

Insurance Company ("Lincoln") responds to the Defendant's Motion to Dismiss and Motion for

Judgment on the AR on Count I.  It also cross moves for judgment on the administrative record

on Counts II through V.[1]

## I.    PRELIMINARY STATEMENT

Defendant United States (the "Government") has filed a motion to dismiss claiming that

the Court lacks subject matter jurisdiction over Lincoln's claim, filed in 2016, for unpaid Risk

Corridors Payments ("RCPs") for Benefit Years 2014 and 2015, and that those claims are not

"ripe."   As discussed below, those assertions are without factual or legal basis.  As recently as

September 9, 2016, HHS, in offering to consider settlements of pending RCP litigation, stated

"HHS recognizes the Affordable Care Act requires the Secretary to make full payment [of RCPs]

to issuers.  HHS will record risk corridors payments due as an obligation of the United States

Government for which full payment is required."   Appendix 10 to Lincoln's Motion for

Judgment on the Administrative Record ("Lincoln's Motion" and "Lincoln App.").

Summary resolution of Lincoln's claims on an expedited basis is appropriate because the

essential and material facts are undisputed, and the law supports payment at this time:   (a)

Lincoln is owed RCPs for 2014 and 2015 in specific amounts, (b) the amounts are objectively

determined and are not disputed, (c) the Government (acting through the U.S. Department of

---

[1] In its opposition to the motion for leave to file an amicus brief, the Government argued Lincoln has only moved for judgment on Count I of its Complaint.  Lincoln's motion is not so limited and should be granted on every count for which there is factual and legal support.  As argued below, that includes all counts.  In an abundance of caution, Lincoln explicitly cross moves here for judgment on Counts II through V so there is no question about what it seeks.

Health & Human Services ("HHS") and its Centers for Medicare & Medicaid Services ("CMS"))
has acknowledged that it must pay RCPs to Qualified Health Plans Issuers ("QHPs") like
Lincoln, in those determined amounts, and (d) the only reason that the Government has not paid
Lincoln is because the Government claims to lack sufficient appropriated funds to pay the RCPs
which are concededly owed.

As discussed below, lack of appropriated funds does not equate to lack of jurisdiction or a
lack of ripeness, and a lack of such funds is legally insufficient to avoid payment of RCPs now.
This Court should reject the Government's unfounded positions and grant Lincoln judgment,
directing defendant to pay the RCPs for calendar years 2014 and 2015, which are owed now, and
deny the Government's motion to dismiss and motion for judgment on the record.

## II.    STATEMENT OF THE QUESTIONS PRESENTED

The issues before the Court are more properly characterized as follows:

1.    Whether, as plainly specified in the ACA and its implementing regulation,
Lincoln is owed RCPs and is entitled to judgment for the owed amounts.

2.    Whether the Court has jurisdiction to enter a judgment providing for
payment of the RCPs owed to Lincoln.

## III.   STATEMENT OF THE CASE

Lincoln objects to the Government's Statement of the Case to the extent it is unsupported
by proper citation and because it is incomplete.  Lincoln refers the Court to its own Statement of
the Case in Lincoln's Motion and rebuts the Government's statements below.

It is undisputed that Section 18062 of the ACA directs that the Government "shall pay"
risk corridors payments.  That same statute also plainly states that the risk corridors amount
owed for "payments in" and "payments out" shall be determined per "plan year."  Despite the
identical, plain statutory language, HHS has required risk corridors payments in to be made
yearly, within 30 days of submission, but now claims it does not have to make payments out

2

annually, only after the full three years of the program. The Government cites no statutory or regulatory basis for that reading other than it did not have enough money to make full annual "payments out."

The Government appears to now argue it was always the legislative intent to only pay out risk corridors payments after three years and only if the risk corridor program was budget neutral. If it were not, per the Government, there was no intent to pay the difference. Once again, however, there is no evidentiary support for these propositions. No insurer who entered the ACA Exchanges thought it would have to wait three years to get RCPs, nor did it understand such payments were "budget neutral" and would not ever be paid if there were insufficient risk corridors payments in. Instead, they treated the risk corridors program as an annual Government obligation, submitting annual accounting and payment calculations for risk corridors. The Government also treated risk corridors as an annual program, soliciting annual statements, analyzing those statements annually, and receiving and attempting to make RCPs annually. HHS has consistently admitted, on an annual basis, that risk corridors payments are an ongoing Government obligation and will be paid.

Congress has, consistent with HHS, also treated risk corridors as an annual, ongoing obligation of the Government. It has not repealed the ACA nor the risk corridors portion of the ACA. The entire law, including risk corridors, has continued to operate. Risk corridors payments in were made and accepted for 2014 and 2015, and at least partial 2014 risk corridors payments out were made. Congress cannot receive the benefit of RCPs in without the concomitant statutory burden of RCPs out, without clearly and directly changing the law—which it has not done.

3

The Government made a general appropriation in 2014 for HHS and the ACA, without any risk corridors restrictions, for $3.6 billion to pay from 2014-2019. Administrative Record ("AR") 262 (Lincoln App. 9). The Government also collected risk corridors user fees for fiscal year 2014 in amounts far in excess of the amounts needed to pay Lincoln in full for its RCPs due for 2014 and 2015. AR 262, 263; AR 270 (Lincoln App. 7). The Government claims, however, without citation, Government's Motion to Dismiss ("Gov. Br.") p.1, that "Congress has limited risk corridors payments to the amounts of risk corridors collected." There is no such language in any Congressional act. Rather, Congress late in 2014 restricted sources for payments in 2015 for risk corridors so that they could not be made from certain funds, but allowed ongoing use of user fees (risk corridors, risk adjustment and reinsurance user fees could be used). It did the same in 2015 for 2016. AR 1429, 1482, 114, 117 (Lincoln App. 11).

It is also undisputed that the 3Rs of the ACA—risk adjustment, reinsurance and risk corridors—are intended to operate together. AR 11, 35. The Government provides no explanation or evidence for how the 3Rs can operate together to have their intended effect when risk corridors are not paid annually or are limited so as to be budget neutral from year to year. They cannot.

It is also undisputed that RCPs are directed by the statute so they "shall be based" on the Medicare Part D risk corridors program. That program makes RCPs payments annually. The Government cites no evidence of any administrative decision-making where this was ever considered, much less rejected.

The Government simply concludes, again without citation, (Gov. Br. at 1) that "HHS established a three-year [risk corridors] payment framework" which is budget neutral for any

4

benefit year. The AR does not show any administrative deliberation for such a program. The Government cites to none. There is none. It was arbitrarily announced after the fact.

The Government states, without citation (Gov. Br. at 3), that "because the final [risk corridors] amounts are unknown and cannot be determined at this time," Lincoln's claims are not ripe. But HHS itself finalized the 2014 risk corridors amounts in 2015 and admitted they are due and payable. Lincoln submitted the 2015 amounts in July 2016 and there is nothing in the AR to show these sworn amounts are not accurate (notably, HHS made no change to the risk corridor amounts Lincoln submitted for 2014; AR 262, 270 and 1255). HHS stated it will pay these amounts in December 2016. AR 1251, p.10; 1498. In fact, HHS states it already distributed RCPs for 2015 on August 1, 2016. AR 1251, p.19. HHS itself admits it has paid or will pay now. The Government also admits the RCPs are "due" on an annual basis. Gov. Br. at 8 ("using these [annual plan year] data, HHS calculates the charges and payments due [emphasis added] to and from each issuer for the preceding benefit year.") *Id.* Gov. Br. at 10 (AR 47 – "HHS will record RCPs due as an obligation of the United States Government for which full payment is required"). The Government now states even though they are presently due, it will make no 2015 RCPs in 2016. Lincoln App. 10. The issue is ripe.

The Government, again without citation, states (Gov. Br. at 2) that "Section 1342 does not require HHS to make RCPs beyond those funded from collections." The statute says "shall pay" without reference to or restriction by appropriations or collections.

The Government, again without citation, (Gov. Br. at 2) argues that Lincoln's contract claims fail because "RCPs are a statutory benefit, not a contractual obligation." They are not a "benefit." They are part of an overall statutory program. The statutory *quid pro quo* for becoming a QHP on an exchange and operating to provide insurance in that program is RCPs.

5

## IV.   ARGUMENT

### A.   The Court Has Jurisdiction Under the Tucker Act.

The Government asserts that the Court lacks jurisdiction under the Tucker Act because Lincoln has no substantive right to "presently due money damages." Gov. Br. at 14-22. The Court plainly has jurisdiction for this action and the Government's motion should be denied.

#### 1.   The Applicable Standard For Jurisdiction is Met Here.

When considering motions under RCFC 12(b)(1) and 12(b)(6), this Court distinguishes between its inquiries into jurisdiction and the merits. *See Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011). A court deciding a motion under 12(b)(1) must determine whether jurisdiction is proper and does not reach the merits. *See Greenlee Cnty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007). "Only after this initial inquiry is completed and the Court of Federal Claims takes jurisdiction over the case does it consider the facts specific to the plaintiff's case to determine 'whether on the facts [the plaintiff's] claim f[alls] within the terms of the statutes.'" *Id.* (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *see also Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1306 (Fed. Cir. 2008).

When assessing a motion to dismiss under RCFC 12(b)(1), the court will "normally consider the facts alleged in the complaint to be true and correct." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). "A plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *Reynolds*, 846 F.2d at 748).

Lincoln has more than met its burden. Jurisdiction is proper under the Tucker Act, which confers jurisdiction on the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for

6

liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Lincoln

has identified "a separate source of substantive law that creates the right to money damages." *Fisher*,

402 F.3d at 1172. That law is Section 1342 of the Affordable Care Act ("ACA") and its

implementing regulation, 45 C.F.R. § 153.510. That statute and regulation are plainly money-

mandating.[2] There is no doubt here that this substantive law "'can be fairly interpreted as mandating

compensation by the Federal Government for the damages sustained.'" *United States v. Mitchell*, 463

U.S. 206, 216-17 (1983) (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)); *see also*

*Fisher*, 402 F.3d at 1173.

As explained in Lincoln's Motion, if this Court concludes that the statute or regulation

meets the money-mandating test, it has jurisdiction. *Fisher v. United States*, 402 F.3d 1167,

1173-74 (Fed. Cir. 2005). Under *Fisher*, Lincoln need only show that the statute or regulation

"can fairly be interpreted as mandating compensation for damages sustained as a result of the

breach of the duties [it] impose[s]," and (2) is "reasonably amenable to the reading that it

mandates a right to recovery in damages." *Id.* (citations omitted). The Federal Circuit confirms

that a "fair inference" that the statute is amenable to such a reading is sufficient. *Id.*

The Federal Circuit has specifically rejected the Government's argument here that money

must be "presently due" for this Court to have jurisdiction. In *Kanemoto v. Reno*, 41 F.3d 641,

644 (Fed. Cir. 1994), the Federal Circuit stated:

> There is no requirement in the Tucker Act that there must be a finding that money
> is due before the Court of Federal Claims can exercise its jurisdiction. The Court
> of Federal Claims has the power to make a determination of liability that will give
> rise to a remedy of monetary relief by finding, for example, that a breach of
> contract has occurred, *Hughes Communications Galaxy, Inc. v. United States*, 998
> F.2d 953 (Fed. Cir. 1993), that a taking without compensation has occurred,

---

[2] ACA Section 1342 expressly provides that the Government "shall pay" RCPs to QHPs like Lincoln, and is a money-mandating statute. The ACA is implemented by a money-mandating regulation also requiring payment to QHPs. 45 C.F.R. § 153.510(b). *See Lummi Tribe v. United States*, 99 Fed. Cl. 584, 593-94 (2011) (use of word "shall" generally makes a statute money-mandating); *Id. Greenlee Cnty. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007).

*Shelden v. United States,* 7 F.3d 1022 (Fed. Cir. 1993), or that an agency has misinterpreted its statutory mandate to pay out monies, *Mitchell,* 930 F.2d at 895-97.

Lincoln has asserted that an agency, HHS, has misinterpreted its statutory mandate to pay out monies, RCPs, on an annual basis and has breached its contractual obligations and made a taking without compensation. The cases relied upon by the Government for its lack of jurisdiction argument either predate the *Fisher* opinion which clarified the rules concerning this Court's jurisdiction, or are simply inapposite based on the facts of the cited decisions. For example, the Government relies on *Todd v. United States,* 386 F.3d 1091(Fed. Cir. 2004) which denied jurisdiction because money damages were not "presently due" under the specific facts of that case. However, in its subsequent *Fisher* opinion, the Federal Circuit clarified the rules surrounding this Court's jurisdiction, none of which include a "presently due" requirement. *Fisher,* 402 F.3d at 1173-74. Since then, this Court has repeatedly recognized that "presently due" is not the test for subject matter jurisdiction. *See, e.g., House v. United States,* 99 Fed. Cl. 342, 347 (2011) (rejecting the Government's attempt to invoke a "presently due" jurisdictional step, and finding jurisdiction under *Fisher* because the statute at issue was money-mandating); *Miller v. United States,* 119 Fed. Cl. 717, 729 (2015) (noting erosion of presently due analysis by the Federal Circuit's more recent decision in *Fisher.*"); *Tippett v. United States,* 98 Fed. Cl. 171, 179 n.10 (2011) (*Fisher* "altered the jurisdictional inquiry for Tucker Act suits").[3] *See also,*

---

[3] Other case law relied upon by the Government (Gov. Br. at 16-20) does not support its argument. Many of the claims held to be beyond the court's jurisdiction in the Government's citations sought <u>non-monetary relief</u> rather than money damages, which is a requirement for Tucker Act jurisdiction. *See Todd,* 386 F.3d at 1094 (no jurisdiction over lawsuit that effectively constituted a challenge to the Government's failure retroactively to change the status of an airport); *Overall Roofing & Const. Inc. v. United States,* 929 F.2d 687, 687-88 (Fed. Cir. 1991) (no jurisdiction over lawsuit challenging Government contract termination without an accompanying claim for damages), *superseded by statute* 28 U.S.C. § 1491(a)(2), as recognized in *Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1268 (Fed. Cir. 1999); *United States v. Testan,* 424 U.S. 392, 407 (1976) (no Tucker Act jurisdiction over challenge to Government's employee classification decision). Another of the Government's primary "presently due" citations focused on a plaintiff who was not even statutorily eligible for payment for another eight years. *See Wood v. United States,* 214 Ct. Cl. 744, 745 (1977) (unpublished) (42-year-old Government employee sought a declaratory judgment

*United States v. Mitchell*, 463 U.S. 206, 228 (1983) (finding Tucker Act jurisdiction because "the statutes and regulations at issue here can fairly be interpreted as mandating compensation").

Based on Federal Circuit precedent, any claim for money to which a plaintiff is statutorily entitled falls within this Court's jurisdiction and is properly the subject of an action for money damages. Lincoln has identified a money-mandating statute creating an unqualified obligation of payment and an unqualified right to payment and, therefore, a remedy is necessarily available in this Court. The Government's Motion to Dismiss for lack of jurisdiction should be denied.

**B.      Lincoln's Claims for the 2014 and 2015 Benefit Years Are "Ripe."**

The Government next argues a tautology that Lincoln's claims are not "ripe" because "HHS has not yet finally determined the total amount of payments" that Lincoln (or any other QHP) will receive under the risk corridors program. Gov. Br. at 21. The Government states:

> Land of Lincoln's claims are not ripe because HHS has not yet finally determined the total amount of payments that Land of Lincoln (or any other issuer) will receive under the risk corridors program. HHS has not completed its data analysis for benefit year 2015, and benefit year 2016 is still underway. Whether sufficient funds will be available to make full payment of claims for any particular benefit year, and for all three years combined, is unknown. HHS may collect sufficient funds in future years to pay risk corridors claims in full. Alternatively, Congress may appropriate additional funds for the program in future years to pay all risk corridors amounts as calculated under section 1342(b).

Gov. Br. at 21. The Government argues "it is too soon to determine whether Land of Lincoln will receive less than the full amount of its risk corridors claims, much less the extent of any such underpayment" and therefore, Lincoln's case is not ripe and should be dismissed. *Id.* at 22.

---

or "$95,760.00 for the loss of his retirement benefits" even though he would not become eligible for a retirement program until age 50). The Government cites *Johnson v. United States*, 105 Fed. Cl. 85, 94 (2012) at Gov. Br. at 15, but that case found no jurisdiction under the APA because the relevant statute did not provide for payment to the plaintiff of any damages, just discharge of his debt. Its citation to *Annuity Transfers Ltd.*, 86 Fed. Cl. at 179, is also unhelpful here because there the plaintiff was not owed any money under its contract – the Government was current on required payments – she just wanted to change the contract to get a lump sum. That is not the case here.

The Government's argument ignores benefit year 2014, for which Lincoln has been paid only 12.6% of the amount owed.  It also ignores benefit year 2015 for which it admits no payments will be made in 2016 and it incorrectly presumes that the Government need not pay full risk corridors amounts annually, which, for the reasons discussed in Lincoln's Motion and in this brief (*infra* at IV.C-G), is incorrect.  The Government's argument also fails because it misapplies the law in the Federal Circuit on ripeness:

> Whether an action is "ripe" requires an evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." As to the first prong, an action is fit for judicial review where further factual development would not "significantly advance [a court's] ability to deal with the legal issues presented." As to the second prong, withholding court consideration of an action causes hardship to the plaintiff where the complained of conduct has an "immediate and substantial impact" on the plaintiff.

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, (Fed. Cir. 2008) (internal citations omitted). "These two prongs are typically [and respectively] referred to as fitness and hardship." *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 331 (2012).

With respect to first prong of fitness, the undisputed facts show that Lincoln has already suffered massive compensable risk corridors losses for both the 2014 and 2015 plan years for which it has not received RCPs in full (2014) and which it will not receive (2015) (*See* Lincoln App. 10) (Government unable to pay any 2015 RCPs in 2016).  The Government does not actually contest these facts or their consequences, but fallaciously argues that it is "too soon" to determine whether Lincoln will be underpaid, because it might be paid some day.  The Government argues that because it is "unknown" when and if HHS will make full payment for a particular benefit year, the impacts are "hypothetical" and should not be adjudicated now.  Gov. Br. at 21.  This is exactly why Lincoln seeks judgment for payment here and now.

This argument strains credulity. Lincoln has already suffered enormous compensable risk corridors losses, and has already fully complied with its statutory obligations for both 2014 and 2015 by submitting its data to the Government in accordance with the risk corridors program (*e.g.* 45 C.F.R. § 153.530(d)). The Government already owes the risk corridors amounts for 2014 and 2015 and already admits that sufficient appropriated funds are not currently available to pay the amounts owed to Lincoln.

This is not an abstract disagreement and no "further fact development" is needed to resolve Lincoln's current claims or affect the Court's ability to deal with the legal issues currently presented. The claim is ripe. *See, e.g., Inter-Tribal Council of Arizona, Inc. v. United States*, 125 Fed. Cl. 493, 504 (2016) (plaintiffs' breach of trust claim ripe because government's attempts to secure sufficient collateral to secure payment obligations did not change initial failure to obtain sufficient collateral).

Lincoln also satisfies the "hardship" prong. The Government owes Lincoln tens of millions of dollars and the Government's failure to timely pay has driven Lincoln into receivership. That status, in and of itself, plainly establishes hardship for ripeness purposes. *See Coalition for Common Sense in Gov't Procurement v. Sec. of Veteran Affairs*, 464 F.3d 1306, 1316 (Fed. Cir. 2006) (finding claim ripe where government would lose "hundreds of millions of dollars" annually if currently-pending stay continued, and plaintiff would have to pay "millions" if stay was lifted).

A plaintiff's Tucker Act claim is ripe when it chooses to treat the Government's affirmative repudiation of its contractual (or statutory) obligations as a present breach. *See, e.g., Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 615-16 (2014). Lincoln has made that choice in bringing this suit. Here, because the Government has (a) already failed to pay Lincoln

11

amounts owed for the 2014 plan year, and (b) affirmatively repudiated its obligation to pay Lincoln the full amounts owed for the 2015 plan year, Lincoln's claims are ripe. *Id.*

### C.     The ACA Requires <u>Annual</u> RCPs To Be Paid in the Full Amounts Owed.

The ACA's risk corridors program specifically mandates that if a QHP's allowable costs "for any plan year" exceed the target amount, the Government ("HHS") "shall pay to the plan" the amounts set forth in the ACA.   The only significant precondition for the Government's payment obligation is the submission of revenue and cost data for the plan year to the Government by QHPs.

Because the purpose of the risk corridors program was to induce QHP participation in the health insurance exchanges on an annual basis by mitigating their risk of loss, it is evident that the ACA's intention was that RCP payment obligations were also to be implemented on an annual or plan year basis.   Everything about the RCP program is annual.   RCPs that were not annual would not serve the intended Congressional purpose of risk mitigation if QHP's losses were not confined to the risk corridors on an annual basis.   To the contrary, absent timely payment of RCPs, QHPs would then encounter potentially enormous and unbudgeted losses over a plan year, which could then not be collected even though the accounting for the plan year had been finalized and the RCPs owed had been established.

The Government has not made full, timely (annual) RCPs because it did not have the funds to do so for apparently two reasons.   First, Congress subsequently limited the Government's ability to fund the RCPs with certain appropriations while leaving the obligation to pay RCPs intact.   Second, in the absence of additional appropriations or statutory direction, the Government, acting through CMS and HHS, has attempted to manage the RCPs in a "budget neutral" fashion by paying them from receipts (payments in) from QHPs under the risk corridors program.   The Government treated these payments it collected under the "payments in" portion

of the risk corridors program as user fees, which it determined could be used to fund RCPs. *See* AR at 114, 1482 (Lincoln App. 11, 12). However, the "payments in" were far less than the funds needed to make the RCPs "out" to QHPs that experienced significant losses, and Congress failed to appropriate additional funds that would have allowed the Government to make the full payments. As a result, under the Government's arbitrary and self-serving interpretation, it paid only a tiny portion (12.6%) of the RCPs due to Lincoln and other QHPs.[4] In making only 12.6% of required RCPs to QHPs for 2014 and in announcing it will make no 2015 RCPs in 2016, the Government has violated its statutory and regulatory mandate to timely make RCPs.

According to the Government, neither section 1342 nor its implementing regulations impose any "deadline by which risk corridors payments must be made" and therefore HHS has complete discretion over when such payments may be made. Gov. Br. at 1, 16-20. This interpretation is incorrect based upon the plain language of the risk corridors provisions and ACA, incorrect based upon the risk corridors provisions' legislative history, inconsistent with the very purpose and structure of the provisions and ACA, and contrary to the statutory construction rules established by the Supreme Court specifically in the context of the ACA.[5]

### 1.     The Statute's Plain Meaning Requires Full, Annual Payments.

"A court derives the plain meaning of the statute from its text and structure." *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004) (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)). "In construing a statute, courts should not attempt to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless, or superfluous." *Abramson v. U.S.*, 42 Fed. Cl. 621, 629 (1998). Thus, "when

---

[4] It was not until October 2015, long after QHPs had set premiums and agreed to participate for the last year of the risk corridors program, that the Government *first* indicated that it would pay only 12.6 percent of its obligations under the risk corridors program for the 2014 benefit year.

[5] It is also inconsistent with HHS' own conduct in requiring QHPs to pay risk corridors payments in within 30 days of notification of amounts due for benefit years 2014 and 2015.

reviewing the statute at issue in this case, the court must construe each section of the statute in connection with each of the other sections, so as to produce a harmonious whole." *Id.* at 629.

<strong>a.      Section 1342 and the Broader ACA Provide for an Annual<br>Risk Corridors Program.</strong>

In the very first sentence of Section 1342, Congress mandated that HHS establish "a program of risk **corridors** for calendar years 2014, 2015, and 2016." 42 U.S.C. § 18062(a) (emphasis added). Absent contrary evidence, the use of the plural is deemed intentional, *see Dakota, Minnesota & Eastern R.R. Corp. v. Schieffer*, 648 F.3d 935, 938 (8th Cir. 2011) ("Congress's use of the plural is evidence of its intent."), which is revealing here because it indicates there are *multiple* risk corridors—one for each calendar year—and that there are separate payment obligations for each.

That there is a new risk corridors every year makes sense, given that everything about the program is annual. The ACA mandates payment based on premiums and costs *for each plan year* from 2014-2016; all calculations are made on a plan year basis. *See* 42 U.S.C. §§ 18062(c)(1)(A) ("The amount of allowable costs of a plan for any year..."), 18062(c)(2) ("The target amount of a plan for any year..."); *see also* 42 U.S.C. § 18062(b) (calculating risk corridors "payments out" and "payments in" based on ratio of allowable costs to target amounts "for any plan year") (emphasis added). QHP issuers must submit their data to HHS annually for the preceding year, so that HHS may calculate annual risk corridors amounts based on that annual data. 45 C.F.R. § 153.530(d). All QHPs are certified for an Exchange just one year at a time. *See, e.g.*, 45 C.F.R. § 155.1045 (mandating that accreditation for QHPs occur before each year the QHP is offered); and *see* Complaint, Exs. 2-4, Lincoln App. 3-5. Payment into the risk corridors by QHP issuers is annual as administered by HHS; RCPs out to QHP issuers have also been annual, just limited to the extent HHS has had money to make the payments. The other 3Rs

14

(risk adjustment and reinsurance) are also both paid annually (in and out) even though neither program's establishing statute specifically mandates annual Government payments.

There is no dispute that the only reason HHS has not made full, annual RCPs is because Congress specifically limited the use of funds that would have allowed it to do so. That is the only reason the Government now contends HHS should be able to "administer" the mandatory risk corridors payment program by paying only what it can, when it can. But that was not HHS' original understanding of, and position on, the payment regime.

In 2011, HHS admitted that "*QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers.*" 77 F.R. 17219, 17238 (Mar. 23, 2012) (emphasis added) (AR 950, 969). QHP issuers are required to pay in their risk corridors amounts 30 days after the Government provides its final calculations. 45 C.F.R. § 153.510(d). HHS knows it should pay risk corridors amounts out at the same time, so it has paid what it can for 2014 (12.6% of the total owed amount) and intended to do the same for 2015 and 2016. The Government, for its part, does not offer any real answer for how or when the mandatory payment will be made other than it is supposedly only due sometime after 2017, at which time Congress will hopefully change its mind and appropriate the money so HHS can finally meet its payment obligations. But that is not a legal basis to withhold payment or to avoid liability now. It is also not a basis to misread the relevant statutory provisions of the ACA, particularly because the entire point of the Tucker Act is to provide aggrieved plaintiffs the ability to obtain a judgment for a payment the Government is obligated to make, but has not.

        **b.**      **The ACA Risk Corridors Program is Required to be "Based on" The Part D Medicare Program, Which Requires Full, Annual Payments.**

Supporting this interpretation is Part D, which Congress required HHS to use as the basis

the ACA risk corridors program. *See* 42 U.S.C. § 18062(a). Part D specifically notes that each "risk corridors" is specific to the plan year. *See* 42 U.S.C. § 1395w-115(e) (***"For each plan year*** the Secretary shall establish *a risk corridor* for each prescription drug plan and each MA–PD plan. The *risk corridor for a plan for a year* shall be equal to a range as follows…"); 42 C.F.R. § 423.336(a)(2)(i) (***"For each year***, CMS establishes *a risk corridor* for each Part D plan. The *risk corridor for a plan for a coverage year* is equal to a range as follows…") (emphasis added).

Part D requires full payment for each risk corridors in the year following the corridor. *See* 42 C.F.R. § 423.336(c)(2) ("CMS at its discretion makes either lump-sum [risk corridors] payments or adjusts monthly [risk corridors] payments *in the following payment year*…") (emphasis added). Where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the [administrative or judicial] interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).[6] Thus, the ACA required HHS (just as Part D does) to establish a program to make and receive full payments in the year following each risk corridors. HHS understood this requirement as it applies to QHP issuers, who must submit their risk corridors data for the prior year by July 31, and then pay any owed amounts based on that data 30 days after notification of any charges owed to the Government. 45 C.F.R. § 153.510(d).[7] The annual payment requirement applies equally to risk corridors payments out.

        c.      **The Government Identifies No Plain Language in Any Statute Supporting Its "Three-Year Payment Framework."**

The Government's primary counter-position relies on the assumption that payments for

---

[6] *See also Am. Fed. of Gov't Employees, AFL-CIO v. United States*, 46 Fed. Cl. 586, 599-600 (2000) (applying interpretation given to statute with "the same purposes" as statute at issue in the present case).

[7] For the 2014 plan year, the Government notified QHP issuers of their charge amounts on November 19, 2015, thus requiring them to pay those charges by December 19, 2015. *See* CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014," (Nov. 19, 2015) AR 262 at 1.

each risk corridors may be collectively spread across the three-year length of the ACA risk corridors program. Gov. Br. at 13, 16-20. For this interpretation, however, the Government identifies no actual statutory language permitting such a result, nor any reason that (in light of risk corridors' annual purpose and structure) such a payment framework would be consistent with the statute's plain meaning. While Section 1342 of the ACA does allow for reductions that can affect a QHP issuer's risk corridors amounts related to the other 3R programs (demonstrating the interrelatedness of these annual programs), it does not provide for risk corridors payment reductions or increases based on risk corridors amounts from other plan years. *See* 42 U.S.C. § 18062(c)(1)(B) (reducing allowable costs "by any risk adjustment and reinsurance payments received under section 18061 and 18063 of this title").

The Government next argues that the 2015 and 2016 Spending Bills somehow indicate HHS has the discretion to set a three-year payment schedule because the Bills prohibit HHS from making payments from certain funds. Gov. Br. at 19. While it appears that HHS lacks the ability to pay all the money it owes to all QHPs now because of the Spending Bills, the *ex post* restriction on appropriations of funds by Congress that are necessary to satisfy the Government's monetary obligations is not relevant to the interpretation of the underlying statute, nor does it absolve the Government of the RCP obligation. This is the whole purpose of Tucker Act jurisdiction. *See, e.g., Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (*en banc*) ("[T]he jurisdictional foundation of the Tucker Act is not limited by the appropriation status of the agency's funds or the source of funds by which any judgment may be paid."). The Government's own cited authority negates its assertion that the post-ACA 2015 and 2016 Spending Bills provide any insight into the statute's original meaning. *See, e.g., Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) (cited in Gov. Br. at 19) ("The significance of

appropriations bills is of course limited and the associated legislative history even more so. ... [P]ost-enactment legislative history is not only oxymoronic but inherently entitled to little weight.").

### 2. The Legislative History Demonstrates That HHS Must Make Full, Annual Risk Corridors Payments.

While there is little legislative history on the ACA,[8] the risk corridors program of the ACA is, by statute, required to be "based on" Part D.  42 U.S.C. § 18062(a) ("Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w–101 *et seq.*].").  Therefore, Part D's statutory language, implementing regulations and legislative history are directly relevant here. *See, e.g., Cohen v. United States*, 105 Fed. Cl. 733, 753 (2012), *aff'd*, 528 F. App'x 996 (Fed. Cir. 2013) (analyzing older law's legislative history when interpreting new law that incorporated portions of the older law); *Am. Fed. of Gov't Employees, AFL-CIO*, 46 Fed. Cl. at 598-600 (same).

In the legislative history of Part D, Congressional testimony provided as follows:  "The Federal Government has large-scale experience with the use of risk corridors," and that such a program "can limit both the downside risk and upside gain for an insurance organization." Expanding Coverage of Prescription Drugs in Medicare: Hearing before the Committee on Ways and Means, House of Representatives, 108th Congress, 2003 WL 23996388, at *116-117 (Apr. 9, 2003).  This testimony identified *annual* risk corridors.  *Id.*  Following debate, Congress reported that it agreed to enact a risk corridors program that proceeded in phases, with the first risk corridors in 2006-2007 and then a subsequent phase from 2008-2011, in which the corridors would be broadened and plans would be at full risk for a greater portion of their gains and losses.

---

[8] "Congress wrote key parts of the Act behind closed doors, rather than through 'the traditional legislative process.'" *King*, 135 S.Ct. at 2492.

149 Cong. Rec. H. 11877, 12000 (Nov. 20, 2003).  Just as with the ACA, all amounts for these risk corridors calculations were annual.  *Id.*  HHS then demonstrated its understanding of Congress' intent with respect to the Part D risk corridors program by requiring annual payments from all parties.  42 C.F.R. § 423.336(c).  It is this history that informed Congress when enacting the ACA and further supports the fact that the risk corridors program only works if it is annual.

> **3.     The Purpose of the Risk Corridors Program is to Prevent Exactly What Has Now Occurred Due to the Government's Failure to Pay RCPs.**

The risk corridors program's purpose (as demonstrated by the ACA's other interrelated provisions) also supports the conclusion that risk corridors amounts must be paid annually.  As the Government admits, the 3Rs are meant to provide "premium stabilization" in the highly risky, early years of the ACA exchanges.  Gov. Br. at 7.  If risk corridors amounts are not paid annually, then the program will fail – as it has to date, because of the deferred payments – to provide any stabilization at all.

Insurance premiums are set on an annual basis.  *See* 42 U.S.C. § 18031(c)(6)(B) (providing for "annual open enrollment periods" in advance of "calendar years" for plans on the Exchanges); 42 U.S.C. § 18031(e)(2) (providing for review of premiums for certification of Exchange plans).  If a QHP issuer's target amount for a plan year was too low vis-à-vis its allowable costs, it will lose a substantial amount of money.

The risk corridors program was meant to counteract this market uncertainty and instability by providing risk mitigation to QHP issuers so they could participate in the Exchanges during the first few years, when the market demographics are unknown and/or little understood.  Profits and losses for each year are restricted to a narrow "corridor" so that issuers can learn the market pricing models and to "to assist insurers through the transition period, and to create a

19

stable, competitive and fair market for health insurance."[9]  Key to this approach is ensuring that any misjudgments in setting premiums one year do not impact a QHP issuer too heavily in the next.  *See* HHS March 2012 Regulatory Impact Analysis, AR 46, 88 (the risk corridors program is meant to "protect against inaccurate rate setting in the early years of the Exchanges by limiting the extent of issuer losses and gains").  If the RCP is not made in the following year, this non-payment could cause the issuer to go out of business, or force it to dramatically raise premiums and/or limit insurance coverage (effectively raising the price per insurance benefit).  This is particularly true year to year for ACA Exchanges, where the Government requires insurers to include risk corridors amounts in their annual assumptions when setting premiums, not three years later.

Given this annual structure and purpose, there is no reasonable interpretation that permits anything other than risk corridors must be paid in each year following the plan year.  *See King*, 135 S.Ct. at 2492-93 ("the statutory scheme compels us to reject petitioners' interpretation because it would destabilize the individual insurance market...and likely create the very 'death spirals' that Congress designed the Act to avoid").

### 4.    HHS's *Post-Hoc* "Three-Year Payment Framework" is Owed No Deference.

To the extent the Government argues (Gov. Br. at 17-18) that the Court should defer to HHS's decision to implement a three-year payment framework, this is also incorrect.  *See Fisher*, 402 F.3d at 1173 (noting that a Tucker Act plaintiff need not be one the government has decided it must pay, because "[i]f the Government official's determinations under the [money-mandating] statute are in error, the court is there to correct the matter, and to have the proper determinations made.").  The Government attempts to invoke the "*Chevron* deference" doctrine

---

[9]  CMS, The Three Rs: An Overview (October 1, 2015), App. 1.

(Gov. Br. 17-18), which affords heightened deference to an agency's positions "if Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" *Cathedral Candle Co. v. United States Int'l Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)).[10] Congress did neither here.

The ACA did not grant HHS unfettered discretion to make risk corridors payments in any amount it wants, whenever it wants. The ACA said HHS shall pay and it must follow Part D that requires full, annual payments. By failing to make such payments, HHS has destabilized the very ACA Exchanges HHS and the 3Rs were designed to protect. This important consideration negated *Chevron* deference because the Supreme Court, in the context of the ACA, declined to apply the doctrine where the interpretation implicated "the [Affordable Care] Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people." *King*, 135 S.Ct. at 2489. That ruling applies with equal force here. As in *King*, this is "a question of deep 'economic and political significance' that is central to this statutory scheme," and "had Congress wished to assign the question to an agency ... it surely would have done so expressly." *Id.* Thus, the Government cannot invoke the "explicit authorization" path to *Chevron* deference. Congress, in fact, explicitly told HHS what to do.

---

[10] Where the *Chevron* doctrine does not apply, a lower standard of deference to an agency's actions may still apply under the *Skidmore* doctrine but this depends on circumstances not present here. *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 691 (2015). "The application of *Skidmore* deference depends upon the circumstances of the case and requires courts to give some deference to informal agency interpretations of ambiguous statutory dictates." *Id.* (internal quotations omitted). The exact level of deference – which varies from "great respect ... to near indifference," *id.* - depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* For the reasons discussed at length above, the Government's current interpretation of the statute is inconsistent with its earlier positions and is invalid based on the statute's plain meaning and inherent purpose, and because there is absolutely nothing in the AR - besides the inability to pay - to justify withholding RCPs for those years.

Nor does the statute implicitly allow HHS to pay risk corridors on whatever schedule it prefers. Again, Congress explicitly required full, annual payments. The Government's proposed interpretation of the risk corridors provisions is not compatible with the rest of the ACA and is the same type of statutory interpretation expressly rejected by the Supreme Court in *King v. Burwell.* "Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them. If at all possible, we must interpret the Act in a way that is consistent with the former, and avoids the latter." *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015).

The only deference that should be given is to HHS's original position that it make risk corridors payments on an annual basis, on the same timeframe as payments to HHS from QHPs. *See e.g.*, 77 F.R. 17219, 17238 (Mar. 23, 2012), AR 950, 969. This is the only rational interpretation with any support in the administrative record. HHS's revised interpretation is a *post hoc* rationalization for litigation motivated entirely by the position in which Congress put the agency with the 2015 and 2016 Spending Bills, and is not entitled to any deference. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) ("And [*Chevron*] deference is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. This might occur when the agency's interpretation conflicts with a prior interpretation[.]") (internal citations and quotations omitted).[11]

---

[11] The Government's reliance on *McCarthy v. Madigan* and *Contreras v. United States* is misplaced. (Gov. Br. at 17-18.) In *Contreras v. United States*, the statute at issue stated the "agency *may* pay a cash award." 64 Fed. Cl. 583, 592-933 (2005) (emphasis added) ("Unlike the use of 'shall' or 'must,' which very obviously connotes mandatory action, laws employing 'may' have been held on occasion to admit of some ambiguity."). Here, the ACA states the Secretary "*shall* establish and administer a program of risk corridors," which "*shall* be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act." *See* 42 U.S.C. § 18062(a) (emphasis added). *McCarthy* is similarly inapposite because it only addresses whether a prisoner must exhaust his administrative remedies before bringing a *Bivens* action. 503 U.S. 140, 145 (1993). The case did not involve a Tucker Act claim nor an analysis of whether a statute was money-mandating. *Id.*

**D.   The Court Can Grant Relief Notwithstanding That Congress Has Not Appropriated Sufficient Funds For Payment of RCPs to All QHPs Entitled to RCPs.**

Section 1342 does not establish a fund into which QHP issuers must make payments due or from which payments must be made under the risk corridors program.  The statute does not create a single account to service both payments in and payments out.  The statute also does not provide that the risk corridors program must be budget neutral – in other words, payments out are not subject to payments in, and vice versa.  Indeed, in its Notice of Benefit and Payment Parameters, issued March 11, 2013, HHS conceded this, stating that "[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will remit payments as required under Section 1342 of the Affordable Care Act."  78 Fed. Reg. 15409, 15473, AR 703, 767 (Lincoln App. 14).

The prohibitions enacted by Congress in the 2015 Spending Bill and the 2016 Spending Bill restricting CMS and HHS from using certain accounts to fund the RCPs the Government was obligated to pay under the ACA did not otherwise restrict availability of federal funds and did not amend Section 1342 to limit or eliminate the Government's RCP obligations to QHPs under the ACA.  As discussed at pp. 3-4 above, sufficient funds were available to the Government to pay the RCPs owed to Lincoln.   Further, the undisputed sequence of events demonstrates Congress understood HHS/CMS would also use risk corridors user fees as appropriated funds to make RCPs. Congress asked HHS by what authority it could make RCPs.  AR 1429.  HHS told Congress it had authority to pay out of risk corridors user fees.  AR 1482 (Lincoln App. 12).  The GAO also told Congress risk corridors user fees could be used in 2014 and in 2015 and in 2016 if the Government's appropriations bill for those years included the language "such funds as may be collected from authorized user fees." AR 114, 117 (Lincoln App. 11).  Congress then included that very language in

both the 2015 and 2016 appropriation acts and the AR contains no further objection by Congress to use of risk corridors user fees to make RCPs.

Additionally, Congress itself has confirmed that the risk corridors program is not required to be budget neutral. Congress stated expressly in Section 1342 that the risk corridors program is to be modeled after the Medicare Part D risk mitigation program, which is not budget neutral. *See* United States Government Accountability Office, GAO Report GAO15-447 (April 2015) at 14 (Lincoln App. 15) ("for the Medicare Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to issuers is not limited to issuer contributions.").

Under the Supreme Court's decision in *Salazar v. Ramah Navajo Chapter*, 132 S.Ct. 2181 (2012), it is a well-established principle that where a party is one of several persons to be paid out of a larger appropriation sufficient in itself to pay that party, the Government is responsible to that party for the full amount due, even if the agency exhausts the appropriation in service of other permissible ends. The Court noted:

> When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends. See *Ferris v. United States, 27 Ct. Cl. 542, 546.* That is so "even if an agency's total lump-sum appropriation is insufficient to pay all" of its contracts. *Cherokee Nation, 543 U. S., at 637, 125 S. Ct. 1172, 161 L. Ed. 2d 66.*

132 S.Ct. at 2184.

The Court in *Salazar* concluded the result there was dictated by its prior decision in *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 125 S.Ct. 1172 (2005), citing it for its conclusion that once:

> Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations', even if the contract uses language such as 'subject to the

24

> availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay <u>all</u> the contracts the agency has made.

543 U.S. at 637 (emphasis original).

Under *Salazar* and *Cherokee Nation*, the Government had sufficient funds of over $360 million to pay the $76 million in RCPs owed to Lincoln. AR 262 (Lincoln App. 9). This Court should enter judgment accordingly.

### E.    Congress's Post-ACA Enactments Did Not Negate Lincoln's Entitlement To RCPs and Lincoln Is Entitled to Judgment on the AR.

Lincoln has moved for judgment on the AR pursuant to RCFC 52.1(c). In ruling on this motion, the Court asks "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the AR." *Bannum, 404 F.3d at 1356*. *Excelsior Ambulance Serv., Inc. v. United States*, 124 Fed. Cl. 581, 585 (2015). "The existence of a material issue of fact does not prohibit the Court from granting a motion for judgment on the AR, even if the Court has not conducted an evidentiary proceeding." *Advanced Concepts Enters., Inc. v. United States*, No. 15-75C, 2015 U.S. Claims LEXIS 1115 at *16 (Fed. Cl. Sept. 2, 2015), citing *Bannum*, 404 F.3d at 1357.

The AR before the Court shows that, as part of its obligations under Section 1342 of the ACA and its obligations under 45 C.F.R. § 153.510(b), the Government is required to pay QHPs certain amounts exceeding the target costs the QHP incurred in 2014 and 2015 as RCPs. Lincoln is a QHP under the ACA and, based on its adherence to the ACA and its submission of allowable costs and target costs to CMS, satisfies the requirements for payment from the Government

under Section 1342 of the ACA and 45 C.F.R. § 153.510(b). The AR further shows that the Government has failed, without legal justification, to perform its obligations under Section 1342 of the ACA and 45 C.F.R. § 153.510(b). The Government has affirmatively stated that it will not perform as required. Finally, the AR shows that the Government's failure to provide timely RCPs to Lincoln is a violation of Section 1342 of the ACA and 45 C.F.R. § 153.510(b) and Lincoln has been substantially harmed by these failures. *See New York Airways, Inc. v. United States*, 177 Ct. Cl. 800, 369 F.2d 743 (1966) (once services were rendered in accordance with a statutory mandate, failure to appropriate did not relieve government of its obligation to pay); *Greenlee Cnty. v. United States*, 487 F.3d 871 (Fed. Cir. 2002) *cert. den.* 552 U.S. 1142 (mere failure to appropriate without modifying or repealing expressly or by clear implication does not defeat a government obligation); *see also United States v. Winstar Corp.*, 518 U.S. 839 (1996) (compliance with earlier statutory reserve requirements created contract right that overrode later statutory change to reserve requirement and justified damages award).

Based on the foregoing, Lincoln has met its burden of proof based on evidence in the record and is entitled to judgment.

Throughout its brief, the Government cites several cases which purportedly bolster its position that Congress amended the ACA via subsequent appropriation legislation. Despite how the Government may characterize these cases, they do not support its position.[12]  The Government relies upon and discusses at length *United States v. Dickerson*, 310 U.S. 554 (1940). Gov. Br. at 26-27. But the statutes and background facts adjudicated in *Dickerson* bear little resemblance to the ACA and the 2015 and 2016 Appropriations Acts, so the court's analysis in that case does not advance the Government's arguments. First, as other courts have recognized,

---

[12] *See e.g. United States v. Bowen*, 527 F.3d 1065, 1077 n. 9 (10th Cir. 2008) ("Abraham Lincoln once posed the following riddle: 'How many legs does a dog have if you call the tail a leg?' The answer is, of course, 'four' because 'calling a tail a leg doesn't make it a leg.'").

the appropriation statute at issue in *Dickerson* was unambiguous in its intent to repeal prior enabling legislation. *Dickerson*, 310 U.S. at 555; *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1584 (Fed. Cir. 1994) ("In *Dickerson*, the legislative history expressly discloses that Congress intended the statute to suspend the substantive right to payment of re-enlistment allowances otherwise made available by statute because it expressly applied to all appropriations acts."); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 576 (9th Cir. 2000) (recognizing "direct conflict" between statute in *Dickerson* and subsequent appropriation acts).

The appropriations language analyzed in *Dickerson* expressly directed, in absolute terms, that "no part *of any appropriation* contained in this *or any other Act* for the fiscal year ending June 30, 1939, shall be available for payment" of any enlistment allowance for "re-enlistments made during the fiscal year ending June 30, 1939, notwithstanding the applicable portions of...[the basic military pay act]." *Dickerson*, 310 U.S. at 555 (emphasis added by court). By contrast, the 2015 and 2016 Appropriations Acts cannot be read as a wholesale defunding analogous to the *Dickerson* appropriation statute. Instead, they limit only certain *sources* of moneys to be used in funding the RCPs, namely those "from the Federal Hospital Insurance Trust Fund," the "Federal Supplemental Medical Insurance Trust Fund," or "funds transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services— Program Management' account." 128 Stat. 2491; 129 Stat. 2624. They do not apply to *all* appropriations or funding, as was the case in *Dickerson*.

This same reasoning makes the Government's reliance on *United States v. Will* misplaced. As even the Government's brief recognizes, that case turned on a statute calling for a wholesale prohibition on *all* funding, providing that "[n]o part of the funds appropriated for the fiscal year ending September 30, 1979...may be used to pay" certain salary increases previously

27

mandated by Congress. *United States v. Will*, 449 U.S. 200, 205-06 (1980); Gov. Br. at 27. There, the appropriations language found to repeal prior legislation contained the expansive language "in this Act *or any other Act*" and therefore manifested an express intent to amend the prior legislation. *Will*, 449 U.S. at 205-206. This language is conspicuously absent in the 2015 and 2016 Appropriations Acts. Other language which the Supreme Court found to manifest an express intent to repeal included the direction that the previous statutory pay increase "shall not take effect" which the court found to be "plain words of the statute" which "reveal an intention to repeal" together with accompanying legislation. *Id.* at 222. No such plain words in the 2015 and 2016 Appropriations Acts exist. And as the Supreme Court in *Will* instructs, "repeals by implication are not favored," a rule which "applies with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill." *Id.* at 221-22 (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)).

The Government also claims that the Federal Circuit in *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, "gave effect to congressional intent in an earmarked appropriation that limited and modified previously enacted statutory directions for the payment of money." Gov. Br. at 28. That may be true, but what the Government does not disclose is that from its inception, the Impact Aid Act – the enabling legislation analyzed in *Highland Falls* –"recognizes that Congress may choose to appropriate less money for entitlements under the Act than is required to fund those entitlements fully." No such recognition appears in the ACA and the ACA does not provide for RCPs as entitlements. Moreover, the earmark appropriation in *Highland Falls* contained express directions to the Department of Education, including that "15,000,000 shall be for entitlements under section 2 of said Act." *Id.* at 1171. The 2015 and 2016 Appropriations Acts contain no such direct or

28

unequivocal language. Unlike the ACA itself, they contain no affirmative and express "*shall*" language directing how, or even whether, the RCPs should be disbursed. Instead, they merely limit certain sources of those payments.

For this same reason, the Government's discussion of *Republic Airlines, Inc. v. United States Dep't of Transp.* does not advance its argument that the Appropriations Acts of 2015 and 2016 repealed the RCPs. Gov. Br. at 28. The appropriations statute at issue in *Republic Airlines* expressly directed that "none of the funds appropriated by this Act shall be expended under section 406 [of the Federal Aviation Act of 1958] for [certain] services provided after ninety five days following the date of the enactment of this Act." *Republic Airlines, Inc. v. United States Dep't of Transp.*, 849 F.2d 1315, 1317 (10th Cir. 1988). Other language was equally unequivocal that Congress intended to amend the subsidy program at issue. *See id.* at 1319. Given this express prohibition, the Tenth Circuit found that Congress's language in the appropriation legislation amended section 406 of the Federal Aviation Act of 1958. *Id.* at 1319-22. Congress did not use such language in the Appropriation Acts of 2015 and 2016. It limited use of only certain funds made available by the Act but permitted RCPs to be made from user fees.

In an effort to distinguish *Salazar v. Ramah Navajo Chapter* and *Cherokee Nation of Oklahoma v. Leavitt*, the Government invokes both *Prairie Cty. Mont. v. United States* and *Greenlee Cty. v. United States*, claiming that "the rule of *Ramah Navajo* is confined to obligations based in contract." Gov. Br. at 30. While *Ramah*, as is the case here, involved government contracting so does the case here. The true value of both *Prairie County* and *Greenlee*, as it relates to the question of the Government's liability, turns on the particular language Congress chose in enacting, and then amending, payment legislation. Both cases

analyzed the Payment in Lieu of Taxes Act ("PILT"), which expressly provided from its inception that "[a]mounts are available only as provided in appropriation laws." *Prairie Cty. Mont. v. United States*, 113 Fed. Cl. 194, 197 (2013); *Greenlee Cty. v. United States*, 487 F.3d 871, 874 (Fed. Cir. 2007). This, as both cases recognize, provides "little functional difference" between language "subject to the availability appropriations" language that limits government liability. *Prairie Cty.*, 113 Fed. Cl. at 199; *Greenlee Cty.*, 487 F.3d at 878. There is no such language in the ACA.

Thus, regardless of whether the Government's failure to pay Lincoln is a violation of federal statute and regulation (as alleged in Count I), a breach of contract (as alleged in Counts II and III), a violation of an obligation to act in good faith and fair dealing (Count IV) or an unconstitutional taking without compensation (Count V), the result is the same: the 2015 and 2016 Appropriations Act do not amend the ACA and do not excuse the Government's refusal to compensate Lincoln.

**F.   Lincoln Is Also Entitled to Judgment for 2016 Risk Corridors Amounts To Be Determined As Incidental to Its Money Damages Claims for 2014 and 2015.**

The Government's position on this issue is tied to its overall jurisdiction argument. It argues, Gov. Br. at 44, that "because the Court lacks jurisdiction over Land of Lincoln's monetary claims and such claims are currently non-justiciable", the Court has no basis upon which to exercise jurisdiction over the claims for declaratory relief. But the Government's jurisdiction argument fails, as discussed above. If Lincoln is entitled to judgment for RCPs for fiscal years 2014 and/or 2015, its legal basis for such payments for 2016 is exactly the same and a declaration of a right to judgment for that amount is entirely appropriate. Otherwise, Lincoln would be forced to relitigate an issue already determined between the parties. To prevent that unnecessary multiplication of actions, the Court does have jurisdiction to provide declaratory

relief for the fiscal year 2016 RCP because it is tied and subordinate to the prior money judgment for the prior fiscal years. *See, e.g., James v. Caldera*, 159 F.3d 573 (Fed. Cir. 1998) and *Michael v. United States*, 2014 U.S. Claims LEXIS 1416 at 9 (Fed. Cl. December 15, 2014) (court has power to grant affirmative non-monetary relief where it is tied and subordinate to a money judgment). This is exactly the type of case for which such relief was designed.

The Government's citations are distinguishable on their facts. In *Pucciarello*, the court found no underlying basis for monetary claims and therefore had no basis to exercise jurisdiction over claims for injunctive or declaratory relief. The same was true in *Nat'l Air Traffic Controllers Ass'n*, 160 F.3d at 716 (no claim for monetary relief before the court and therefore no jurisdiction for equitable relief), *Thorndike*, 72 Fed. Cl. at 582, and *Annuity Transfers, Ltd.*, 86 Fed. Cl. at 181-182.

The Court has jurisdiction over Lincoln's claims with respect to the 2016 RCP and should declare Lincoln is entitled to judgment in the amount of such payment when it is determined by CMS in 2017.

### G. Lincoln's Alternative Claims for Relief Under Sections II-V of Its Complaint State Viable Claims and Are Each a Proper Alternative Basis for Judgment on the Merits.

The Government contends that Section 1342 established merely a "benefits" program for QHPs, and not an express or implied contract. This unsupported view turns the parties' course of dealings and relationship on their head. In failing to pay the required RCPs, the Government received an unwarranted benefit from QHPs like Lincoln – health coverage for millions of Americans -- without adhering to its side of the bargain – making RCPs – even though the promise of such payments was essential to inducing health insurers into the new marketplaces.

"The general requirements for a binding contract with the United States are identical for both express and implied contracts." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325

(Fed. Cir. 1997).  There must be "mutuality of intent to contract," "consideration," "lack of ambiguity in offer and acceptance," and "actual authority . . . [of] the [G]overnment representative 'whose conduct is relied upon . . . to bind the [G]overnment in contract.'" *Lewis v. United States,* 70 F.3d 597, 600 (Fed. Cir. 1995) (citation omitted).  All of these elements are met here for both an express or implied contract.

The Government moves only to dismiss Counts II through V under RCFC 12(b)(6).  It does not move for judgment on those counts.  Lincoln, however, has moved for judgment on the AR.  Such a judgment can be based on any recognized legal cause of action in the record.  Count I provides that legal basis because the Government has violated the ACA and its relevant regulations in failing to make full, timely RCPs to Lincoln.  Counts II through V provide additional, alternative bases for judgment and judgment should be entered for Lincoln on all counts.

With respect to the Government's Rule 12(b)(6) motion, dismissal is only proper when a plaintiff can prove no set of facts in support of its claim which would entitle it to relief.  *Leider v. United States,* 301 F.3d 1290, 1295 (Fed. Cir. 2002).  In considering a 12(b)(6) motion, the court assumes all well-pled factual allegations in the complaint are true and all reasonable inferences in favor of the non-movant.  *Adams v. United States,* 391 F.3d 1212, 1218 (Fed. Cir. 2004).

Counts II through V of Lincoln's pleading, when so considered, more than pass muster and, as there is no question of fact on the AR that Lincoln is entitled to the relief requested in those counts, judgment should be entered, in the alternative to Count I, in Lincoln's favor on Counts II through V.

1.     **There Was Mutuality of Intent.**

a.     **Express Contract.**

In order for the Court to find that the Government has entered into a contract there must be "language . . . *or* . . . *conduct* on the part of the government that allows a reasonable inference that the government intended to enter into a contract." *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 27 (2011) (emphasis added).  The Government entered three consecutive express contracts for Lincoln to be a QHP under the ACA.  Complaint, Exs. 2-4 and Lincoln App. 3-5. According to the Government, these QHP Agreements are "wholly unrelated" to the risk corridors program because they "merely require an issuer that decided to issue QHPs ... to comply with specified electronic transmission standards."  Gov. Br. at 32-33.  But this argument ignores that these agreements were a prerequisite to participation in ACA exchanges and their corresponding programs, including risk corridors.  The express language of these Agreements is directly related to risk corridors.

They are each entitled as an "Agreement."  In paragraph II-d, CMS agreed "to undertake all reasonable efforts to implement systems and processes that will support QHPI functions." Each of those Agreements has an effective date and a termination provision and prohibits termination by QHPIs after October 31, prior to the covered benefit year.  There is a contract.

The Agreements reflect the desire to keep the money-mandating nature of the ACA in place unless expressly repealed by Congress.  Under § V.c, there is an amendment provision that "CMS may amend this Agreement for purposes of reflecting changes in applicable laws or regulations. ...", but only for prospective effect and CMS must give notice of such amendments so QHPs may reject them.  CMS never provided notice of the purported constructive repeal or repeal by implication of appropriations legislation under the QHP Agreements, so the risk

corridors program remains in effect by contract even if such change had been made.  There is a contract.

The Agreements provide in Section V.g that they are "governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated by HHS."  Of course, among these laws was the ACA itself – which mandates that RCPs be made and HHS regulations, that set forth the methodology by which a QHP is entitled to RCPs.  42 U.S.C. § 18062; 45 C.F.R. 153.510.

Even assuming that the QHP Agreements did not expressly incorporate the ACA and HHS regulations by reference (they did), the QHP Agreements contained additional language which indicates that the Government understood and intended to be bound to make risk corridors payments.  Here, the recitals in the QHP Agreements state that the parties "anticipated" that "payments of FHE user fees will be due between CMS and [Lincoln]."  *Id.* at p. 1.  This evidences that the Government both knew and understood that it would receive risk corridors payments in, but also would be responsible for risk corridors payments out (to insurers like Lincoln) even if the risk corridors program was not administered in a budget neutral manner.  Moreover, the QHP Agreements confirm this in Section II(c), which directs that CMS will either (1) "recoup" or (2) "net" payments due to Lincoln, including "Federally-facilitated Exchange user fees" as an appropriate type of payment.  *Id.* at p. 5.  The Government treated the payments it collected under the "payments in" portion of the risk corridors program as "user fees," and used them to make risk corridors payments.  AR at 114; *see also* AR 1482 (HHS General Counsel letter to GAO asserting HHS has authority to make risk corridors payments out of risk corridors user fees).

Finally, even the Government recognizes that the QHP Agreements govern Lincoln's participation in ACA exchanges.   According to the Government, "[t]he QHP Agreements establish the relevant contractual parameters of Land of Lincoln's offering of QHPs on a federally-facilitated Exchange. . . ." Gov. Br. at 40.   But the Government cannot recognize the QHPs as binding without also recognizing that the QHPs, via the fourth recital and Section II(c), manifest an intent to compensate Lincoln for RCPs it is owed.   So while the Government may now claim that the QHPs are "wholly unrelated" to the risk corridors program, that assertion does not withstand a faithful reading of the terms of the QHP Agreements, which not only adopt the ACA and its implementing regulations, but which also expressly recognize that the Government will be obligated to "net" payments to Lincoln.   The elements of an express contract and its breach are amply plead and support judgment for Lincoln on Count II.

### b.    Implied Contract.

Even if there was no express contract that the Government will make timely RCPs, the record supports an implied contract.

Challenging Lincoln's cause of action for breach of an implied-in-fact contract, the Government claims that Section 1342 and 45 C.F.R. § 153.510 do not manifest "that the government intended to contract for risk corridors payments." Gov. Br. at 37.   The parties' intent—as expressed by their conduct and in light of the surrounding circumstances—establishes precisely this intent.   "An implied-in-fact contract is one 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)).   Section 1342 reflects Congress's intent that risk corridors payments be made in full by directing HHS to (1) "establish and administer a program

35

of risk corridors" and to (2) "participate in a payment adjustment system" based on "the ratio of the allowable costs of the plan to the plan's aggregate premiums." 42 U.S.C. § 18062(a). Following Congress's directive, HHS determined that "[a] QHP issuer must adhere to" certain "payment parameters" that the government offered, all of which included "HHS payments to Health insurance issuers" under the risk corridors program. 45 C.F.R. § 153.510.

Lincoln acted in reliance on the Government's offer of risk corridor payments when it participated in federal ACA exchanges, despite the great pricing and actuarial risks in doing so. It would not have done so absent the assurance that it would be entitled to risk corridors payments each year if they were owed. Complaint, ¶¶ 189, 192. Moreover, HHS affirmed this relationship and its intent to be obligated to pay in full by its conduct, repeatedly assuring insurers such as Lincoln that full and timely risk corridor payments would be made without any restrictions based upon the federal budget. *See e.g.* 78 C.F.R. 15409, 15473 (AR 767); 77 C.F.R. 17219, 17238 (AR 969).

*Radium Mines* is the seminal case finding an implied contract based on conduct on the part of the Government, including through its published regulations. That case involved regulations of the Atomic Energy Commission which established a guaranteed minimum price at which the Government would purchase uranium. *See Radium Mines, Inc. v. United States*, 153 F. Supp. 403 (Ct. Cl. 1957). The Court rejected as "untenable" the Government's argument that the regulation was "a mere invitation to the industry to make offers to the Government." *Id.* at 405-406. In finding an intent to contract, the Court noted that the purpose of the regulation

> was to induce persons to find and mine uranium. The Government had imposed such restrictions and prohibitions upon private transactions in uranium that no one could have prudently engaged in its production unless he was assured of a Government market. It could surely not be urged that one who had complied in every respect . . . could have been told by the Government that it would

> pay only half the 'Guaranteed Minimum Price,' nor could he be
> told that the Government would not purchase his uranium at all.

*Id.* at 406.

Applying *Radium Mines* to this case, there can be no doubt that the purpose of the RCPs

program was to "induce" insurers to offer affordable coverage to a population about which they

lacked information. In enacting the ACA, the Government recognized that prudent insurers

pricing a product for an unknown population would need to add a "risk premium" to protect

against uncertainties. The Government included the risk corridors to mitigate some of that

uncertainty, and HHS expressly and repeatedly reminded insurers that the risk corridors program

should enable them to keep premiums low. Thus, like *Radium Mines*, the Government by its

conduct indicated an intent to enter into a binding contract to make the payments to plans that

satisfied the requirements for a RCP.

The Government argues that *Radium Mines* "clearly expressed" an intent to enter into a

contract. While the regulations quoted by the Court in that case did state that the Government

would enter into a "purchase contract" when presented with uranium that met its qualifications,

the express reference to a possible contract was not the basis of the Court's decision. Rather, the

"key" to *Radium Mines* "is that the regulations at issue were promissory in nature." *Baker v.*

*United States*, 50 Fed. Cl. 483, 490 (2001). The Supreme Court likewise cited *Radium Mines* as

an example of cases "where contracts were inferred from regulations promising payment" for

purposes of Tucker Act jurisdiction. *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728,

739 n.11 (1982).

As the Supreme Court's observation in *Army & Air Force Exchange Service* illustrates,

there is a natural overlap between the cases finding that a statute is "payment-mandating" and

those finding an implied contract. In *New York Airways*, for example, this Court described the

mandatory payment in that case as creating an implied contract once the plaintiff had satisfied the requirements for payment: "The actions of the parties support the existence of a contract at least implied in fact. The [Civil Aeronautics] Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer." *New York Airways*, 369 F.2d at 751. Similarly, the United States Court of Appeals for the Fifth Circuit has explained, when the Government includes "numerous requirements . . . to receive the payments" those payments are "compensatory in nature;" an entity accepts the Government's offer of payment by satisfying the listed requirements. *See Aycock-Lindsey Corp. v. United States*, 171 F. 2d 518, 521 (5th Cir. 1948).

By contrast, there is no mutuality of intent to contract when "[t]he only effort to be expended by . . . plaintiffs [is] to fill in the blanks of a Government prepared form," when there is "discretion . . . whether to award payments," or when the parties must "negotiate and fix a specific amount" of payment. *See Baker*, 50 Fed. Cl. at 491-93. None of those factors apply here. The amount to be paid is fixed by statute, and the Government has never disputed or denied the amounts claimed, nor claimed that it has discretion as to whether to pay them. To the contrary, the Government has continued to recognize them as an obligation of the United States Government for which full payment is required.

Likewise, the cases cited by the Government in support of its argument that the Government must expressly state an intent to enter into a contract are distinguishable, as both involved "contract disputes" on issues corollary to the right of payment. *ARRA Energy* involved a dispute as to whether the plaintiff had submitted documentation sufficient to support its claim for payment. *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 27 (2011). *AAA Pharmacy*

involved a dispute over the timeliness of the Government's response to a pharmacy's appeal from the denial of its Medicare billing privileges. *AAA Pharmacy, Inc. v. United States*, 108 Fed. Cl. 321 (2012). Those cases do not undercut the central holding of *Radium Mines* and *New York Airways* that the Government's promise to make payment can induce behavior that constitutes a mutuality of intent to contract. The Government has impliedly agreed to make full, timely risk corridors payments to QHPs.

### 2.    There Was Consideration.

There is ample consideration to support the finding of an express or implied contract to timely pay RCPs, and the Government does not argue otherwise. The provision of health benefits to tens of thousands of enrollees desired by the Government is ample consideration for payment of the RCPs. Indeed, the calculation of the RCPs is premised on the costs incurred by Lincoln to provide those benefits. Lincoln has incurred enormous expenses, and has incurred large losses qualifying for RCPs as a result of those expenses.

### 3.    There Is No Ambiguity in Offer and Acceptance.

There is no ambiguity in offer and acceptance of the express or implied contract. QHPs are the backbone of the Government's effort to provide affordable, accessible, comprehensive coverage through the Health Benefit Exchanges established under the ACA, and there are extensive requirements imposed on both the Plans and the Government. While Lincoln as a health insurance issuer was not required to create or offer a QHP product, when it did, both the Government and Lincoln committed to an intricate set of specific obligations including, for example, the following:

- Lincoln had to comply with certain "issuer participation standards" including standards on benefit design; standards regarding Health Benefit Exchanges processes and

procedures; and implementation and reports on quality improvement strategy, including use of Government-designed enrollee satisfaction surveys (45 C.F.R. § 156.200);

- Lincoln had to set rates for an entire benefit year, submit rate and benefit information to the Exchange, and had to submit a justification for any rate increase prior to implementation of the rate increase (45 C.F.R. § 156.210);

- Lincoln had to submit to HHS information regarding its claims payment policies and practices; periodic financial disclosures; data on enrollment; data on disenrollment; data on the number of claims that are denied; data on rating practices; and information on cost-sharing and payments with respect to out-of-network coverage (45 C.F.R. § 156.220);

- Lincoln had to use a provider network that meets federal standards (45 C.F.R. § 156.230);

- Lincoln had to enroll individuals during enrollment periods specified by the Government (45 C.F.R. § 156.260);

- Lincoln could only terminate coverage or enrollment under standards established by the Government (45 C.F.R. § 156.270);

- Lincoln had to provide HHS with information regarding its prescription drug distribution and cost reporting (45 C.F.R. § 156.295); and

- Lincoln had to insure that individuals eligible for Government-imposed cost-sharing reductions paid only the cost-sharing required (45 C.F.R. § 156.410).

In exchange, the Government committed that only Lincoln and other QHPs, and not any other type of health insurance plan:

- may be purchased through a Health Benefit Exchange (45 C.F.R. § 155.400);

- will receive payment of "advance premium tax credits" that subsidize an individual's premium costs (45 C.F.R. § 156.440);

- will receive payments to implement cost-sharing reductions for eligible individuals (45 C.F.R. § 156.430); and

- will receive risk corridors payments (45 C.F.R. § 153.510).

Lincoln accepted the Government's offer that if it complied with the numerous and extensive requirements to be a QHP, and served the population for whom the Government sought to provide health coverage, then it would receive the statutory payments, including RCPs. As in *Radium Mines* and *New York Airways*, the conduct of each party meets the offer and acceptance elements of an express or implied contract.

### 4. The Secretary of HHS Had Actual Authority to Contract.

Actual authority to contract can be express or implied; either is sufficient to bind the Government. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989). "Authority to bind the Government is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee." *Id.* at 324, citing J. Cibinic and R. Nash, *Formation of Government Contracts* 43 (1982).

Section 1342's instruction that the Secretary "shall establish" a risk corridors program and "shall pay" risk corridors payments to plans that incurred losses meeting the statutory threshold is an integral part of her statutory duties and is sufficient to support a contract. Similarly, in the cases where contracts have been inferred from statutes or regulations promising payment, the Government's actual authority to contract has not been questioned. *See, e.g., Radium Mines, supra; New York Airways, supra.*

The Government argues that there is no actual authority to contract because the Anti-deficiency Act prohibits government officials from involving the "government in a[n] . . . obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B). That argument is irrelevant in this case, because the U.S. Government Accountability Office ("GAO") concluded in September 2014 that the Secretary *did* have such authority. Lincoln's App. XII, 114-120. Specifically, the GAO concluded that the Secretary had authority to make risk corridors payments under CMS's "Program Management" appropriation. *Id.* at 3. The GAO also concluded that the Secretary had authority to make payments from the amounts HHS collected under the risk corridors program. *Id.* at 4-5. "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

Although later Congressional actions placed restrictions on CMS's Program Management appropriation in 2015 and 2016, that action took place *after* formation of the contract in 2014 when Lincoln as a QHP began providing benefits to its members. As noted above, HHS had sufficient funds to pay Lincoln all the RCPs that it is owed. By the time Congress imposed restrictions on the Secretary's ability to spend the Program Management appropriation for risk corridors payments, Lincoln had already been providing services – and incurring losses – for almost a year. Moreover, the Secretary's budget authority to make payments out of what HHS collects in risk corridors receivables (from plans that made an unexpectedly large profit) continues to this day, and was the basis for the 12.6% payment that the HHS has already made.

Thus, the Secretary had and has the budget authority as well as the actual legal authority to enter into an express or implied contract with Lincoln.

> **5.    Congress Cannot Exercise Its Appropriation Authority to Curtail the Government's Contractual Liability.**

As the Government fully concedes, Congress cannot curtail the government's contractual liability through the appropriations process. Gov. Br. at 30. *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2189 (2012); *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 646 (2005). As the Supreme Court explained in *Salazar*, "[w]hen a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, it has long been the rule that the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends." 132 S. Ct. at 2189 (citing *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892); *Dougherty v. United States*, 18 Ct. Cl. 496, 503 (1883); 2 GAO, *Principles of Federal Appropriations Law* 6–17 (2d ed. 1992) [hereinafter "GAO Redbook"]). This line of cases applies "even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made." *Cherokee Nation*, 543 U.S. at 637. "Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's 'valid obligations will remain enforceable in the courts.'" *Salazar*, 132 S. Ct. at 2189, citing GAO Redbook at 6–17. Lincoln's contract claims – which seek judgment from the Court for amounts within what has been appropriated for all QHPs – fall neatly within this line of cases.[13]  Lincoln is entitled to judgment, in the alternative, on Counts II and III.

---

[13]  The Government does make the peculiar argument (Gov. Br. at 40, part (b)) that the QHP agreement precludes the claim for implied contract. The Government's citation to *Durant*, 16 Ct. Cl. 447, is incomplete. There, the express contract precluded the implied contract because "the express contract already defines the parties rights and obligations on the identical subject matter." Likewise, in *Bank of Guam*, 578 F.2d 1329, also cited by the Government, the express contract precluded the implied contract unless it is entirely unrelated to the express contract. The Government itself argues here that the claimed express contract does not provide for RCPs and is

### 6.    The Government Has Not Acted In Good Faith and Fair Dealing.

For those reasons set forth in Sections IV.G 1-5 above, Lincoln has established that there is a contract between itself and the Government, whether that contract is express or implied in fact. And implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfering with another party's performance or from acting to destroy another party's reasonable expectations regarding the fruits of the contract. *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005). Here, and as alleged in the Complaint, the Government breached its duty of good faith and fair dealing by numerous acts. Complaint ¶ 207.

The Government's motion as to Count IV for breach of an implied covenant of good faith and fair dealing hinges entirely on its arguments as to Counts II and III. As Lincoln has properly plead and proven either its claim for breach of express or implied contract, the Government's motion fails. Moreover, the facts plead in Count IV stand uncontested by the Government and are fully supported by the AR.

The Government induced Lincoln to become a QHP and issue insurance to over 50,000 Illinois insureds. The Government promised to make RCPs as a *quid pro quo* for Lincoln's performance and presence in the market. Instead of meeting that clear obligation, the Government has repeatedly reneged and breached its legal obligation to treat Lincoln (and the other QHPs) in good faith and fair dealing, by at least:

    (a)    Inserting in HHS and CMS regulations a 30-day deadline for a QHP's full remittance of risk corridors charges to the Government, but failing to create a similar deadline for the Government's full payment of RCPs to

---

"wholly unrelated" to the risk corridors program. Gov. Br. p. 32. While the Government's assertion is not true, if it were, Lincoln can proceed on an alternative theory of implied contract. The Court's rules expressly permit alternative pleadings. RCFC 8(d)(2) and (3), regardless of consistency. The Government does not get it both ways.

QHPs, despite stating that QHPs and the Government should be subject to the same payment deadline *(see, e.g.,* 77 Fed. Reg. 17219, 17238, Ex. 11 to Complaint; AR 950);

(b)     Requiring QHPs to fully remit risk corridors charges to the Government, but unilaterally deciding, without any administrative basis, that the Government may make prorated RCPs to QHPs;

(c)     In Section 227 of the 2015 Appropriations Act, legislatively targeting and limiting funding sources for CY 2014 RCPs after Lincoln had undertaken significant expense in performing its obligations as a QHP in the Illinois ACA Exchanges, based on the reasonable expectation that the Government would make full and timely RCPs if Lincoln experienced sufficient losses in CY 2014;

(d)     In Section 225 of the 2016 Appropriations Act, legislatively targeting and limiting funding sources for CY 2015 RCPs after Lincoln had undertaken significant expense in performing its obligations as a QHP in the Illinois ACA Exchanges, based on the reasonable expectation that the Government would make full and timely RCPs if Lincoln experienced sufficient losses in CY 2015; and

(e)     Making repeated statements regarding its obligation to make RCPs, then depriving Lincoln of full and timely RCPs after Lincoln had fulfilled its obligations as a QHP by participating in the Illinois ACA Exchanges and had suffered losses which the Government had promised would be shared through mandatory RCPs.

Lincoln is entitled to judgment in the alternative on Count IV.

### 7. The Government Has Taken Lincoln's Right to Payment and Lincoln is Entitled to Judgment For This Taking Under The Fifth Amendment.

The Takings Clause of the Fifth Amendment instructs that "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. A claimant under the Takings Clause must show that the government, by some specific action, took a private property interest for a public use without just compensation. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294 (1981). In evaluating a takings claim, courts have developed a two-step approach. First, courts evaluate whether the claimant possessed a cognizable property interest in the subject of the alleged taking for purposes of the Fifth Amendment, or in other words, whether the claimant possessed a "stick in the bundle of property rights." *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (internal citation omitted). Upon determination that such a property interest exists, courts evaluate "whether the governmental action at issue constituted a taking of that 'stick.'" *Id.* (citing *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995)).

Here, Government claims that Lincoln has no "contractual right to risk corridors payments" and therefore "[i]ts takings claim must rest on its statutory or regulatory rights, if at all." Gov. Br. at p. 43. As set forth in Section IV.G 1-5 above, Lincoln enjoyed an unqualified contract right to RCPs, so the Government's opposition fails at its outset. Beyond this, Sections IV.C-E above establish that Lincoln's right to risk corridors payments is also grounded in the ACA and its implementing regulations. And the case law cited by the government applies only to a "statutory benefits program" (such as those existing under the FLSA, or state shares of future pension benefits). *See e.g. Adams v. United States*, 391 F.3d 1212, 1224 (Fed. Cir. 2004); *Nat'l Educ. Ass'n—Rhode Island v. Ret. Bd. Of the Rhode Island Employees' Ret. Sys.*, 172 F.3d

46

22, 30 (1st Cir. 1999). Here, by contrast, there is no government benefit program—the ACA and its risk corridors program were instead designed to limit the effects of adverse selection and to mitigate the annual risk and uncertainty inherent in establishing yearly rates for new, unquantifiable health insurance risks under an untested regulatory framework. It did so by ensuring that risk corridors payments "shall" be made "for any plan year" where allowable costs exceeded the target amount. As discussed above, this is precisely what occurred for 2014 and 2015. And thereafter, the Government took those payments by claiming that it would only pay Lincoln on a pro rata basis or not at all.

The Government's illegal conduct violates Lincoln's clear property interest and requires payment to Lincoln of just compensation under the Fifth Amendment. Lincoln is entitled to judgment, in the alternative, under Count V.

## V.    CONCLUSION

The Government presently owes RCPs for benefit years 2014 and 2015 to Lincoln in an amount totaling $75,758,669.48. Lincoln seeks full payment of the RCPs it is entitled to from the Government under the ACA for those years. The law is clear that the Government must abide by its statutory obligations to make the required RCPs. Lincoln respectfully asks the Court to compel the Government to do so now. Accordingly, Lincoln respectfully requests that the Court grant Lincoln's motion for judgment on the Administrative Record on all counts, for $75,758,669.48, also grant judgment for Lincoln for its RCP for fiscal year 2016 for the amount finally determined in 2017, and grant Lincoln all such further and additional relief as may be appropriate under the circumstances.

Dated: October 12, 2016                    Respectfully Submitted,


                                           s/ Daniel P. Albers

                                           Daniel P. Albers
                                           BARNES & THORNBURG LLP
                                           One N. Wacker Drive, Suite 4400
                                           Chicago, IL 60606
                                           Telephone:  (312)357-1313
                                           Fax:  (312) 759-5646
                                           Email: dalbers@btlaw.com

                                           *Of Counsel:*

                                           Scott E. Pickens
                                           BARNES & THORNBURG LLP
                                           1717 Pennsylvania Avenue N.W.
                                           Suite 500
                                           Washington, DC 20006
                                           Telephone: (202) 371-6349
                                           Fax: (202) 289-1330
                                           Email: scott.pickens@btlaw.com

                                           *Counsel for Plaintiff Land of Lincoln*
                                           *Mutual Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 12th day of October 2016, a copy of the foregoing was filed electronically. As I understand, pursuant to RCFC Appendix E, V.12.(c), the Court's Notice of Electronic Filing satisfies the service requirement of RCFC 5 and the proof of service requirement of RCFC 5.3 via operation of the Court's electronic filing system.

s/ Daniel P. Albers
Daniel P. Albers

# APPENDIX

1.      CMS, The Three Rs: An Overview (October 1, 2015)

# Appendix 1

Home > Newsroom > Media Release Database > Fact sheets > 2015 Fact sheets items >

## The Three Rs: An Overview

| | |
|---|---|
| Date | 2015-10-1 |
| Title | The Three Rs: An Overview |
| Contact | go.cms.gov/media |

### The Three Rs: An Overview

The Affordable Care Act (ACA) recognized that there would be uncertainty in the early years of the Marketplace for insurance companies as they tried to set premiums for a new group of people and implemented a higher standard of coverage – for example, no longer being able to deny coverage or charge more because of someone's pre-existing conditions.

The Act introduced three programs – risk adjustment, reinsurance, and risk corridors – to assist insurers through the transition period, and to create a stable, competitive and fair market for health insurance.

This document provides a brief overview of each program and how it has helped contribute to the stabilization of the Marketplaces, as well as information about 2014 risk corridors payments.

#### Reinsurance Program – Paying Insurers $7.9 Billion for 2014

The reinsurance program, which helps keep premiums affordable for consumers by spreading the cost of very large insurance claims across all coverage providers, will be paying $7.9 billion in reinsurance claims for 2014.

Because claims were not as high as expected, health insurance plans are being paid for 100 percent of their filed claims – 25 percent more than plans were expecting.

#### Risk Adjustment Program – $4.6 Billion Transferred Among Insurers

The risk adjustment program protects consumers' access to a range of robust coverage options by reducing the incentive for insurance companies to seek only to insure healthy individuals.

The program requires insurance companies with healthier consumers in a state to pay charges that help offset some of the costs of those insurance companies with sicker consumers in that state.

For 2014, the risk adjustment program will transfer about $4.6 billion among insurance companies nationwide. Unlike reinsurance, the risk adjustment program is not a temporary program and will be a long-lasting part of how the health insurance market functions.

#### Risk Corridors – Paying Insurers $362 Million for 2014

The temporary risk corridors program is modeled after a similar program used in the Medicare Part D Prescription Drug benefit.

The goal of the risk corridors program is to support the Marketplaces by providing insurers with additional protection against uncertainty in claims costs during the first three years of the Marketplace.

The temporary risk corridors program provides payments to insurance companies depending on how closely the premiums they charge cover their consumers' medical costs.

Issuers whose premiums exceed claims and other costs by more than a certain amount pay into the program, and insurers whose claims exceed premiums by a certain amount receive payments for their shortfall.

#### Risk Corridors – Data Validation

While conducting quality assurance of the risk corridors data insurance companies submitted, CMS identified a significant number of material differences in the data. On August 7, CMS announced that the data required additional review to make sure it was accurate, complete and validated and that we would not be publishing preliminary estimates for the 2014 risk corridors program as intended on August 14.

We requested that each company with plans on the Marketplace complete and attest to a checklist, which identified critical components of the risk corridors and MLR submissions, to validate the data and protect the integrity of the risk corridors and MLR programs. Some insurers were also asked to submit additional information about the claims or premiums information they had submitted. This information was requested by September 14.

Until we were sure the data was accurate, complete and validated, we could not know the final outcome for the program. During the validation process, we were in ongoing contact with health plans and states. Just over half of all plans resubmitted their data during the data validation process.

We have now completed the initial phase of the data validation process.

A–2

## Risk Corridors – Calculations

Based on current data for 2014, the first year of the three-year risk corridors program, insurers will pay risk corridors charges of approximately $362 million, and insurers have requested $2.87 billion of risk corridors payments. As a result, consistent with our guidance, insurers will be paid approximately 12.6% of their risk corridors payment requests at this time. Standard & Poor's Ratings Services estimated a similar result earlier this year saying that "risk corridor payables are less than 10 percent of the receivables insurers reported in 2014."

The risk corridors payments for program year 2014 will be paid in late 2015. The remaining 2014 risk corridors claims will be paid out of 2015 risk corridors collections, and if necessary, 2016 collections.

Since this is a three-year program, we will not know the total loss or gain for the full three years of the program until the fall of 2017.

We will continue our routine program integrity efforts throughout all three years of the program. Data concerns will be addressed during our auditing process.

In the event of a shortfall for the 2015 program year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments.

The Affordable Care Act reduces the deficit by $137 billion over the next decade according to the Congressional Budget Office. The law's coverage provisions cost about $200 billion less for 2015-20-19 than CBO predicted they would cost when the law first passed.

## Next Steps

We will work with state Departments of Insurance and insurance companies so that any issues raised by this announcement are addressed quickly and appropriately, with the consumer foremost in mind.

We recognize that for a limited number of insurers, a lower than expected 2014 risk corridor payment may raise concerns. We will be in close contact with these states and insurers in the coming days. We are beginning that outreach this afternoon and will continue to be available.

Open Enrollment starts on November 1.