## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAND OF LINCOLN MUTUAL HEALTH     :
INSURANCE COMPANY,                :     Judge Lettow
                                  :
        Plaintiff,                :     Case No. 16-744C
                                  :
    v.                            :
                                  :
THE UNITED STATES OF AMERICA,     :
                                  :
        Defendant.                :

---

## THE UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD ON COUNT I

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

TERRANCE A. MEBANE
CHARLES E. CANTER
SERENA M. ORLOFF
FRANCES M. MCLAUGHLIN
L. MISHA PREHEIM
United States Department of Justice
Civil Division, Commercial Litigation Branch

*Attorneys for the United States of America*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.    The Court Lacks Jurisdiction Because Full Payments Are Not Due Annually
and No Payments Are Due for 2015.................................................................... 3

    A.    A Presently Due Claim Is a Prerequisite of Tucker Act Jurisdiction ..................... 3

    B.    The Payments Land of Lincoln Seeks Are Not Presently Due ............................... 4

II.    On the Merits, the United States Is Entitled to Judgment on Count I Because
Congress Intended That Risk Corridors Payments Be Limited to Collections ............. 12

    A.    Congress Intended the Risk Corridors Program to Be Self-Funded ...................... 12

    B.    Congress Restricted Risk Corridors Payments With the Intent that the
Risk Corridors Program Be Budget Neutral While the Spending Laws
Are in Effect .......................................................................................................... 14

III.    Land of Lincoln Has Failed to State a Claim for Its Remaining Counts ........................ 21

    A.    No Express Contract Between HHS and Land of Lincoln Obligates the
United States to Make Risk Corridors Payments................................................... 21

    B.    No Implied in Fact Contract Obligates HHS to Make Risk Corridors
Payments ............................................................................................................... 23

    C.    Land of Lincoln Had No Vested Property Interest in Risk Corridors
Payments ............................................................................................................... 24

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States,*
  391 F.3d 1212 (Fed. Cir. 2004) ................................................................................25

*Am. Fed'n of Gov't Employees, AFL–CIO v. United States,*
  46 Fed. Cl. 586 (2000) ........................................................................................7

*Auburn Hous. Auth. v. Martinez,*
  277 F.3d 138 (2d Cir. 2002) ................................................................................ 18

*Avenal v. United States,*
  33 Fed. Cl. 778 (1995) .......................................................................................... 25

*Baker v. United States,*
  50 Fed. Cl. 483 (2001) ......................................................................................... 24

*Bath Iron Works Corp. v. United States,*
  20 F.3d 1567 (Fed. Cir. 1994) ............................................................................ 20

*Bowen v. Gilliard,*
  483 U.S. 587 (1987) .............................................................................................. 25

*Cathedral Candle Co. v. U.S. Int'l Trade Commn,*
  400 F.3d 1352 (Fed. Cir. 2005) ............................................................................ 5

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. U.S. EPA,*
  8 F. Supp. 3d 500 (S.D.N.Y. 2014) ...................................................................... 7

*Cessna Aircraft Co. v. Dalton,*
  126 F.3d 1442 (Fed. Cir. 1997) .......................................................................... 24

*Earman v. United States,*
  114 Fed. Cl. 81 (2013) ......................................................................................... 22

*Greenlee Cty. v. United States,*
  487 F.3d 871 (Fed. Cir. 2007) ........................................................................19, 20

*Hercules, Inc. v. United States,*
  4516 U.S. 417 (1996) ............................................................................................24

*Higashi v. United States,*
  225 F.3d 1343 (Fed. Cir. 2000) .......................................................................... 10

*Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*,
    48 F.3d 1166 (Fed. Cir. 1995) ...................................................................17, 18, 19

*HSH Nordbank AG v. United States*,
    121 Fed. Cl. 332 (2015) ...................................................................................... 24

*Kanemoto v. Reno*,
    41 F.3d 641 (Fed. Cir. 1994) ................................................................................. 4

*King v. Burwell*,
    135 S. Ct. 2480 (2015) .......................................................................................... 5

*Lorillard v. Pons*,
    434 U.S. 585 (1978) .............................................................................................. 7

*Massie v. United States*,
    226 F.3d 1318 (Fed. Cir. 2000) ......................................................................... 3, 4

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    132 S. Ct. 2566 (2012) ........................................................................................ 13

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ............................................................................................ 12

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
    470 U.S. 451 (1985) ............................................................................................ 23

*Northrop Grumman Info. Tech., Inc. v. United States*,
    535 F.3d 1339 (Fed. Cir. 2008) .......................................................................... 22

*Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*,
    373 F.3d 1251 (D.C. Cir. 2004) ............................................................................ 6

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ............................................................................................ 11

*Prairie Cty. Montana v. United States*,
    113 Fed. Cl. 194 (2013) ...................................................................................... 19

*Radium Mines, Inc. v. United States*,
    153 F. Supp. 403 (Ct. Cl. 1957) ......................................................................... 23

*Republic Airlines, Inc. v. U.S. Dep't of Transp.*,
    849 F.2d 1315 (10th Cir. 1988) .....................................................................17, 19

*Richardson v. Belcher*,
 404 U.S. 78 (1971) ................................................................................................ 25

*Rodriquez v. United States*,
 480 U.S. 522 (1987) .............................................................................................. 14

*Salazar v. Ramah Navajo Chapter*,
 132 S. Ct. 2181 (2012) .....................................................................................20, 21

*Schism v. United States*,
 316 F.3d 1259 (Fed. Cir. 2002) ........................................................................... 24

*Slattery v. United States*,
 635 F.3d 1298 (2011) ............................................................................................ 11

*Smithson v. United States*,
 847 F.2d 791 (Fed. Cir. 1988) .............................................................................. 22

*St. Christopher Associates, L.P. v. United States*,
 511 F.3d 1376 (Fed. Cir. 2008) ........................................................................... 22

*Steinberg v. United States*,
 90 Fed. Cl. 435 (2009) .......................................................................................... 23

*Tennessee Valley Authority v. Hill.*,
 437 U.S. 153 (1978) .............................................................................................. 20

*Todd v. United States*,
 386 F.3d 1091 (Fed. Cir. 2004) ......................................................................... 3, 4

*Twp. of Saddle Brook v. United States*,
 104 Fed. Cl. 101 (2012) ....................................................................................... 23

*United States v. Dickerson*,
 310 U.S. 554 (1940) .................................................................................17, 18, 19, 20

*United States v. King*,
 395 U.S. 1 (1969) .................................................................................................3, 4

*United States v. Mitchell*,
 109 U.S. 146 (1883) ..........................................................................................18, 19

*United States v. Will*,
 449 U.S. 200 (1980) ..........................................................................................17, 19

*W.E. Partners II, LLC v. United States*,
   119 Fed. Cl. 684 (2015) ........................................................................................... 1

*Wilson v. United States*,
   917 F.2d 529 (Fed. Cir. 1990) ................................................................................... 7

*Y.S.Y. Const. Co. v. United States*,
   30 Fed. Cl. 449 (1994) .............................................................................................. 5

## Constitution

U.S. Const. art. I, § 9, c. 7 ................................................................................... 1, 20

## Statutes

42 U.S.C. § 1395w-115 ................................................................................. 6, 7, 8, 14

42 U.S.C. § 1395w-116 ........................................................................................ 7, 14

42 U.S.C. § 18001 ................................................................................................... 13

42 U.S.C. § 18031 ............................................................................................. 13, 22

42 U.S.C. § 18041 ..................................................................................................... 5

42 U.S.C. § 18042 ................................................................................................... 13

42 U.S.C. § 18043 ................................................................................................... 13

42 U.S.C. § 18062 ............................................................................................. 6, 7, 8

42 U.S.C. § 18121 ................................................................................................... 13

Pub. L. No. 111-148 ................................................................................................ 13

Pub. L. No. 113-76 .................................................................................................. 15

Pub. L. No. 113-235 ................................................................................................ 16

Pub. L. No. 114-113 ................................................................................................ 17

Pub. L. No. 114-223 ................................................................................................ 17

## Regulations

42 C.F.R. § 423.336 .................................................................................................. 6

45 C.F.R. § 153.510 ..........................................................................................................21

45 C.F.R. § 153.530 ............................................................................................................4

45 C.F.R. § 156.50 .....................................................................................................22, 23

**Federal Register**

Patient Protection and Affordable Care Act; Establishment of Exchanges and
    Qualified Health Plans, Proposed Rules, 76 Fed. Reg. 41,929 (July 15, 2011) ........................ 9

Patient Protection and Affordable Care Act; Standards Related to Reinsurance,
    Risk Corridors and Risk Adjustment, Final Rule, 77 Fed. Reg. 17,220 (March 23, 2012).. 9, 10

Exchange and Insurance Market Standards for 2015 and Beyond Final Rule,
    79 Fed. Reg. 30,240 (May 27, 2014) .......................................................................................... 9

**Miscellaneous**

The Honorable Jess Sessions, the Honorable Fred Upton, B-325630 (Comp. Gen.)
    2014 WL 4825237 (Sept. 30, 2014)............................................................................... 13, 15, 16

GAO, *A Glossary of Terms Used in the Federal Budget Process*,
    GAO-05-734SP (Washington, D.C. Sept. 2005) ....................................................................... 16

GAO, *Principles of Federal Appropriations Law* (*Vol. II*) (GAO Redbook),
    (3d ed. 2004) .............................................................................................................................. 11

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).................................................................. 10, 17

S. Rep. No. 114-74 (2015) ........................................................................................................... 17

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343 (1988) ......................................... 21

**INTRODUCTION**

Under the Constitution, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  Congress did not appropriate funds for risk corridors payments when it enacted section 1342 in 2010, and for each of the years in which risk corridors payments could be made, Congress expressly restricted the available funds to make such payments to risk corridors collections.  Congress's intent in restricting those funds is clear: the risk corridors program must be budget neutral for the years the Spending Laws are in effect.  This clear congressional intent is dispositive as to both the jurisdictional and merits issues before the Court; the case should be dismissed.

With regard to the Court's jurisdiction, the case cannot proceed unless congressional enactments *require* HHS to make full payments annually.  Not only does section 1342 not require such payments, the Spending Laws do not permit them when payment requests exceed risk corridors collections.  Thus, the Department of Health and Human Services ("HHS") has implemented an administrative framework in which it makes payments to the extent of its budget authority in each annual payment cycle, with final payment not due until the end of the program in or about 2017.  Because this payment framework is consistent with both section 1342 and the subsequent Spending Laws (whereas the annual schedule advocated by Land of Lincoln ignores and would violate the Spending Laws), it is *per se* reasonable and must be upheld.  Moreover, Congress has essentially blessed HHS's payment framework by acknowledging, in the legislative history to the 2015 Spending Law, that risk corridors payments will be made to the extent of collections "over the three year period risk corridors are in effect."  Accordingly, Land of Lincoln has no claim for presently due money damages as it must for the Court to exercise jurisdiction under the Tucker Act.  In any event, Land of Lincoln's 2015 estimated claim for $68.9 million

must be dismissed because, even under the annual framework it advocates, no money is yet due for the 2015 benefit year.

If the Court does not dismiss for lack of jurisdiction, then the Court must uphold HHS's pro-rata distribution of risk corridors payments and grant judgment in favor of the United States on Count I because Congress's constitutional exercise of its power of the purse has limited the United States' liability under section 1342 to the extent of risk corridors collections. As explained in the United States' Motion, Docket No. 22, a long line of Supreme Court and Court of Appeals cases recognize that Congress can, through the annual appropriations process, limit the extent of the United States' obligations created in previously-enacted substantive legislation. To do so, Congress is not required to use any specific language nor is it required to enact an across-the-board prohibition on all appropriated funds, as Land of Lincoln suggests. What matters is that, in either the substantive legislation enacting the obligation or the later appropriations law from which payments would be made, Congress clearly expressed its intent to limit the United States' liability to the amount appropriated. When that intent is unequivocal and clear, as it is here, binding precedent requires that it be given effect.

In response, Land of Lincoln ignores the impact of the 2015 and 2016 Spending Laws in which Congress made clear its intent to limit risk corridors and instead relies on inapposite case law concerning federal contracts, misguided comparisons to Medicare Part D, and the policy objectives it believes underlie section 1342. But no contracts are at issue here, and Land of Lincoln's policy arguments operate from the mistaken premise that the risk corridors program was designed to unqualifiedly insure against, rather than *mitigate*, issuer losses. In any event, regardless of section 1342's purpose as originally enacted, Congress has now foreclosed HHS's ability to make payments in excess of collections for the years the Spending Laws are in effect and

expressed its intent that the program be budget neutral.  It is not the Court's role to second-guess congressional will.  Therefore, the narrow issues before the Court are (1) whether full annual payments are legally required so as to establish a justiciable and "presently due" claim under section 1342, and (2) if so, whether Land of Lincoln is entitled to receive additional payment notwithstanding section 1342's self-funding nature and the express restrictions imposed by Congress.  For the reasons set forth in the United States' Motion and elaborated below, each of these inquiries independently requires judgment for the United States.

## ARGUMENT

### I.  The Court Lacks Jurisdiction Because Full Payments Are Not Due Annually and No Payments Are Due for 2015

#### A.  A Presently Due Claim Is a Prerequisite of Tucker Act Jurisdiction

Land of Lincoln first contends, contrary to controlling Supreme Court and Federal Circuit case law, that a presently due claim for money damages is not a prerequisite to jurisdiction under the Tucker Act.  The jurisdictional requirement that the money a plaintiff seeks under the Tucker Act be presently due was laid down by the Supreme Court in *United States v. King*, 395 U.S. 1, 3 (1969), and has been repeatedly reaffirmed by the Federal Circuit since then.  *See, e.g.*, *Todd v. United States*, 386 F.3d 1091, 1095 (Fed. Cir. 2004); *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000).  Land of Lincoln has not cited a single case in which, under the rules and terms of the money-mandating authority at issue, payments were not yet due for *any participant* yet the court nevertheless exercised jurisdiction.  Instead, to support its assertion that "presently due" payment is no longer a requirement for jurisdiction, Land of Lincoln relies on a series of cases either concerning the standard for identifying a money-mandating source of law (not at issue here) or in which eligibility for payment under a money-mandating authority was disputed, but, assuming such eligibility, there was no dispute that the payment was due.  *See* Pl.'s Opp'n at 8.

3

None of these cases discuss, much less abrogate, the "presently due" requirement, nor could they do so given that the Supreme Court has interpreted the Tucker Act to include such a requirement.[1] *King*, 395 U.S. at 3.  To invoke the jurisdiction of the Court, Land of Lincoln must show that the payments it seeks are presently due.

### B.     The Payments Land of Lincoln Seeks Are Not Presently Due

Under no plausible interpretation of section 1342 are payments for 2015 presently due. Land of Lincoln filed this lawsuit the month before the deadline for issuers to submit their 2015 data to HHS to calculate risk corridors amounts.  *Compare* Compl., Docket No. 1 (filed June 23, 2016) *with* 45 C.F.R § 153.530(d) (providing that QHP issuers are not required to submit their risk corridors data until "July 31 of the year following the benefit year").  HHS has not announced the final results of its benefit year 2015 risk corridors calculations based on those submissions, much less begun collecting charges and making payments.  A.R. 1498.  Thus, even under Land of Lincoln's own theory of annual payment, payments for 2015 are not due.

Land of Lincoln's 2014 claims also are not presently due.  As set forth in the United States' Motion, section 1342 does not set payment deadlines, much less annual ones.  Rather, Congress granted HHS the discretion to establish an appropriate payment schedule consistent with the

---

[1]  Land of Lincoln also quotes a paragraph from the Federal Circuit's decision in *Kanemoto v. Reno*, 41 F.3d 641, 647 (Fed. Cir. 1994), in which the court stated that "[t]here is no requirement in the Tucker Act that there must be a finding that money is due before the Court of Federal Claims can exercise its jurisdiction."  *Kanemoto* concerned only the question of the proper forum (as between the Court of Federal Claims and the District Court) for a plaintiff challenging an agency determination that she was ineligible for restitution under a federal statute.  As with the other cases cited by Land of Lincoln, there appears to have been no dispute that if the claimant were eligible for payment as she claimed, the payment was due.  In any event, if the Federal Circuit's statement in *Kanemoto* is to be read in the way Land of Lincoln contends, the statement is directly contradicted by *King*, *supra*, and the court's more recent pronouncements affirming the "presently due" requirement as an independent element of jurisdiction.  *See, e.g.*, *Todd*, 386 F.3d at 1095; *Massie*, 226 F.3d at 1321.

programmatic objectives of section 1342.  HHS exercised that authority by establishing a framework in which it pays what it can each year based upon the amount of "payments in," with final "payments out" not due until the end of the program's three-year cycle.  Because HHS's framework reasonably fills a gap left in the statute, HHS's framework must be upheld and the case dismissed.

### 1.    HHS's Three-Year Framework Is Entitled to Deference

As Land of Lincoln acknowledges, a heightened "standard of deference applies if Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'"  Pl.'s Opp'n at 21 (citing *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361-62 (Fed. Cir. 2005)). Here, Congress has done both.  By conferring on HHS the authority to "establish and administer" the risk corridors program, Congress explicitly authorized HHS to fill any gaps regarding the administration of the program—including the implementation of a collection and payment framework.  *See, e.g.*, *Y.S.K. Const. Co. v. United States*, 30 Fed. Cl. 449, 458 (1994) (delegation of "broad authority to administer the statutory program" necessarily entails the "the authority to make any decisions necessary to fill any gaps or ambiguities in that statute").  And through Congress's general direction that "[t]he Secretary shall . . . issue regulations setting standards for meeting the requirements under this title" and "take such actions as are necessary to implement such other requirements," Congress also implicitly authorized HHS to fill any gaps.  42 U.S.C. § 18041(a), (c).

Arguing otherwise, Land of Lincoln first relies on *King v. Burwell*, 135 S. Ct. 2480 (2015), in which the Supreme Court held that deference was not due to the IRS's interpretation of the

statute because, "[i]n extraordinary cases, . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 2488-89. This is not such an "extraordinary case." First, unlike in *King*, Congress's delegation of authority to HHS to "administer" section 1342 is explicit, not implicit. 42 U.S.C. § 18062(a). Second, while the 3Rs programs serve an important role in achieving the goals of the ACA in its early years, the question here—when payments are due under section 1342—is not "central to th[e] statutory scheme." *Id.* at 2489. Third, whereas the Supreme Court concluded that the IRS "has no expertise in crafting health insurance policy of this sort," *id.*, HHS has precisely this type of technical expertise that the Supreme Court found lacking in *King*. Thus, this is an "ordinary" case, in which the Court should defer to the operational decisions made by the agency charged with administering the program.

Land of Lincoln also suggests that, although Congress did not enact a payment deadline in the ACA, it nevertheless left no gap regarding the timing of payment because it required the program to "be based on" the one under Medicare Part D. But Medicare Part D provides that "[p]ayments under this section *shall be based on such a method as the Secretary determines*," with no requirement for annual payments. 42 U.S.C. § 1395w-115(d) (emphasis added). Thus, HHS is no more statutorily required to remit annual payments under Medicare Part D than it is under the ACA.[2] Moreover, while HHS has exercised its discretion to pay Part D adjustments, in full, on an annual basis, *see* 42 C.F.R. § 423.336(c), it is not required to adopt an identical approach under section 1342 simply because Congress required the program to be "based on" Part D. *See Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) ("[t]here

---

[2] In the absence of any mandate for annual payments under Medicare Part D, Land of Lincoln is left to resort to the testimony of a private entity in the legislative history of the Medicare Part D statute. Pl.'s Opp'n at 18. But even if that testimony had any relevance to the intent of a different Congress under a different law, it does not mention annual payments.

is no question that the phrase 'based on' is ambiguous") (citation and quotation marks omitted); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 8 F. Supp. 3d 500, 540 (S.D.N.Y. 2014) (distinguishing between the phrase "based on" and "identical to").[3]  Indeed, HHS could not have structured the ACA risk corridors payments identically to those made under Medicare Part D because Congress did not enact identical language for making payments. Whereas Congress enacted funding for Part D payments, Congress did not do so as part of section 1342.   *Compare* 42 U.S.C. §§ 1395w-115(a) (conferring budget authority "in advance of appropriations Acts") & 1395w-116 (authorizing "appropriations to cover Government contributions") (capitalization omitted), *with* 42 U.S.C. § 18062 (omitting any mention of government contributions).  Thus, section 1342's silence as to the timing of payments constitutes a gap that HHS was authorized to fill so long as its approach was reasonable.   *Wilson v. United States*, 917 F.2d 529, 535-36 (Fed. Cir. 1990) ("when a statute is silent or ambiguous with respect to the specific issue, the administrative agency's interpretation, if reasonable, is to be followed by the court") (internal citation omitted).[4]

---

[3]  The cases on which Land of Lincoln relies are not contrary because those cases did not involve a broad statutory direction that a program "be based on" another program and were not cases challenging the agency's gap-filling power in such circumstances.  *See Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (conducting *de novo* interpretation of statute that directed enforcement "in accordance with the 'powers, remedies, and procedures" of another statute); *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 46 Fed. Cl. 586, 599-600 (2000) (conducting *de novo* statutory interpretation where agency's gap-filling authority was not at issue).

[4]  Land of Lincoln inexplicably describes the three-year framework as a "*post hoc* rationalization for litigation motivated entirely by the position in which Congress put the agency with the 2015 and 2016 Spending Laws."  Pl.'s Opp'n. at 22.  The three-year framework pre-dates the 2015 Spending Law by more than six months and pre-dates this suit by more than two years, but even if that were not the case, responding to statutory restrictions is not a "post hoc rationalization" but the proper course to maintain conformity with the law.

### 2.    HHS's Three-Year Framework Is Reasonable

HHS's three-year payment framework is reasonable and appropriate.  It fills a statutory gap left by Congress as to when final risk corridors payments are due.  And it is consistent both with section 1342 as enacted in 2010 and with the subsequently enacted Spending Laws because it provides for payments as determined under the statutory formula over the course of the three-year program while limiting total payments to amounts collected for each year the Spending Laws are in effect.

By contrast, Land of Lincoln's interpretation that full annual payments are required is not only legally flawed, it ignores the effect of the Spending Laws.  For example, Land of Lincoln contends that Congress's use of the plural "risk corridors" in section 1342 rather than the singular "risk corridor" somehow means that payments must be made annually.  Pl.'s Opp'n at 14.  But as Land of Lincoln's complaint makes clear, a risk corridor merely refers to a designated percentage range represented by an issuer's ratio of allowable costs to the target amount.  *See* Compl. ¶ 69 (reproducing American Academy of Actuaries illustration of the various allowable cost-to-target corridors).  HHS is required to assign one of several risk corridors (*i.e.*, 92-97%, 103-108%, etc.) to every participating plan in each year.  *See* 42 U.S.C. § 18062(b) (setting forth applicable corridors under the ACA); *see also* 42 U.S.C. § 1395w-115(e)(3) ("For each plan year the Secretary shall establish *a* risk corridor *for each* . . . plan.") (emphasis added).  Thus, Land of Lincoln's contention that there is only "one [risk corridor] for each calendar year" is wrong.  Pl.'s Opp'n at 14.  Congress's use of the plural denotes the fact that each issuer is assigned one of several possible risk corridors in each year.  It says nothing about when payments will take place.

The Court also should summarily reject Land of Lincoln's suggestion that the Court should not defer to the three-year framework HHS implemented but should instead defer to the approach

HHS only mentioned in its proposed rulemakings but never adopted.  Pl.'s Opp'n at 22.  Land of Lincoln oddly attempts to rely on HHS's March 2012 final rule that did *not* adopt deadlines and expressly stated that the agency "did not propose deadlines in the proposed rule." 77 Fed. Reg. 17,220, 17,238 (Mar. 23, 2012), A.R. 969; *see also* 76 Fed. Reg. 41,929, 41,943 (July  15, 2011) ("we are not proposing deadlines at this time"), A.R. 998.  Land of Lincoln provides no authority to support its suggestion that a court should defer to an approach an agency declined to propose or adopt through rulemaking, rather than to the approach it actually adopted.

Nor is there anything particularly dispositive about Land of Lincoln's observation that "everything about the program is annual." Pl. Opp'n at 14.  The fact that the payment formula uses annual data and HHS collects charges and computes payments on an annual basis does not mean that HHS is also required to remit full payments on an annual basis.  And in light of the shortfall in collections, HHS cannot remit full annual payments because Congress has restricted its ability to do so.  Indeed, HHS does operate an annual collection and payment cycle, and it remits payments on an annual basis to the extent possible.  79 Fed. Reg. 30,240, 30,260 (May 27, 2014), A.R. 6195.  HHS reasonably defers payment to later years only where the amount of collections does not permit it to make full payments in that year.  *Id.*; *see also* A.R. 108, 262.  That deferral is a rational response to a shortfall in collections and Congress's express funding limitation.  By contrast, the approach advocated by Land of Lincoln would be an unauthorized and illegal disregard of Congress's appropriations restrictions.  HHS has no authority to do so simply because "everything about the program is annual."

Land of Lincoln also suggests that annual payment would better meet the objectives of section 1342. Pl.'s Opp'n at 12.  It contends that "[i]f risk corridors amounts are not paid annually, then the program will fail . . . to provide any stabilization at all." *Id.* at 19.  While the risk corridors

program was designed to provide greater stability as insurance market reforms were implemented, it is only one of three programs to do so. *See, e.g.*, 77 Fed. Reg. at 17,221,17,222, A.R. 952, 953.[5] The program does so by limiting issuers' profits obtained by rate-setting that is too high and mitigating losses of rate-setting that is too low, thereby encouraging *accurate* rate setting. Land of Lincoln provides no reason why annual payments in the full amounts calculated under the formula are necessary to fulfill this goal. In any event, the Court's inquiry is not whether the three-year payment schedule is the best policy or even the framework the Court would adopt in the agency's stead. The inquiry is solely whether Congress "spoke clearly" to the question of when payments are due (it did not) and if not, whether HHS's approach is reasonable in light of the funding shortfall (it is).

The Spending Laws dissolve any doubt about the propriety of the framework because they also contemplate that payments may be made in any payment cycle across the program's life-span. *See* 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014) (discussing payments "over the three year period risk corridors are in effect"). It would be legal error to strike down the framework when, in enacting the Spending Laws, Congress acknowledged and blessed it and contemplated the same result. In Land of Lincoln's view, the Spending Laws merely transfer responsibility for payment from HHS to this Court, and congressional intent embodied in the Spending Laws is ignored. Because section 1342 does not require—and, in light of the shortfall in collections, the Spending Laws do not permit—full payment on an annual basis, HHS's three year framework must be allowed to run its course. *See Higashi v. United States*, 225 F.3d 1343, 1347 (Fed. Cir. 2000) ("This court defers to an agency's interpretation of a statute it administers when the statute leaves

---

[5] In pursuing its premium stabilization goals, section 1342 also provides a *measure* of financial stability to issuers. Land of Lincoln provides no support, however, for its suggestion that the program was intended to provide unqualified insurance for issuers.

to the agency 'the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress,' and the agency's interpretation is not arbitrary or capricious and does not contravene clearly discernible legislative intent.") (internal citations omitted).[6]

Lastly, Land of Lincoln suggests that because HHS has recorded risk corridors payments as an obligation for budgeting purposes, the United States admits that it owes full payment as calculated under section 1342. It is well-established, however, that "[i]f a given transaction is not sufficient to constitute a valid obligation, recording it will not make it one." GAO, Principles of Federal Appropriations Law (GAO Redbook) (Vol. II) at 7-8 (3d ed. 2004) (citations omitted). *See also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

In sum, HHS's three-year payment framework is a permissible construction of section 1342 and is entitled to deference because it (1) fills a gap in the statute left by Congress; (2) reflects the agency's considered deliberation, including in notice and comment rulemaking; and (3) is consistent with subsequently enacted laws governing expenditures during fiscal years 2015 and 2016. *Cf. W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 692 (2015) (giving reasons for deference to an agency's notice and guidance). Because risk corridors payments are not presently due under this framework, the Court lacks jurisdiction, and the case should be dismissed.[7]

---

[6] The Federal Circuit's *en banc* opinion in *Slattery v. United States* is not to the contrary. 635 F.3d 1298 (2011). Land of Lincoln misreads *Slattery* for the proposition that the Spending Laws have no bearing on the Court's jurisdiction. *See* Pl.'s Opp'n at 17. But *Slattery* merely held that whether a governmental entity falls within the Tucker Act's grant of jurisdiction for a "claim against the United States" is not based on "how the government entity is funded or its obligations met, but whether the government entity was acting on behalf of the government." 635 F.3d at 1301. *Slattery* did not hold that where payments under a money-mandating statute are not yet due, as determined by the agency and ratified by Congress in appropriations laws, a court may nevertheless exercise jurisdiction.

[7] For the same reason, Land of Lincoln's claims are not ripe. The issues are not "fit" for judicial decision because Congress may alter the funding scheme for the program's final year, HHS may collect enough to pay Land of Lincoln in full, or both. Thus, additional factual and legal

**II.     On the Merits, the United States Is Entitled to Judgment on Count I Because Congress Intended That Risk Corridors Payments Be Limited to Collections**

If the Court declines to dismiss the case and reaches the merits, the United States is entitled to judgment on the administrative record on Count I.  As explained in the United States' Motion, Congress planned the risk corridors program to be self-funded, and confirmed that intention when it enacted the 2015 and 2016 Spending Laws restricting risk corridors payments to collections. Motion at 22-26.  And even if Congress's intent in enacting section 1342 were unclear, Congress's intent in enacting the Spending Laws is unambiguous: the risk corridors program must be budget neutral while those Spending Laws are in effect.  *Id.* at 26-30.  Because the Spending Laws have been in effect since the first year in which risk corridors payments could be made, congressional intent as embodied in those Laws must govern.  Accordingly, the Court must uphold HHS's pro-rata distribution of risk corridors payments to issuers and grant judgment in favor of the United States on Count I because Congress's constitutional exercise of its power of the purse has limited the United States' liability under section 1342 to the extent of collections.

**A.     Congress Intended the Risk Corridors Program to Be Self-Funded**

As discussed in the United States' Motion, the structure of section 1342 contemplates a self-contained program "establish[ed] and administer[ed]" by HHS in which insurers that have lower-than-expected costs for a given year are required to make "payments in" to the program, and those payments are used to fund "payments out" to insurers that have higher-than-expected costs.  Land of Lincoln does not address this point, other than generally to insist that section

---

development would "significantly advance" the Court's ability to deal with the issues presented. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (citation omitted).  Likewise, the Court cannot grant declaratory relief for 2016 where Congress may yet alter the funding or structure of the program.  In any event, Land of Lincoln has not demonstrated that it would be entitled to risk corridors payments for 2016 where it ceased offering QHPs mid-year.

1342(b) requires full payments.  *See* Pl.'s Opp'n at 13-14, 18-19.  But while section 1342(b) outlines the formula for calculating risk corridors amounts, "payments in" are the only source of funding specified for "payments out."  Nothing in section 1342 or the ACA requires HHS to make up a shortfall in collections.

When Congress enacted section 1342, it did not appropriate money for risk corridors payments.  *See The Honorable Jeff Sessions the Honorable Fred Upton*, B-325630, 2014 WL 4825237, at *2 (Sept. 30, 2014) ("*GAO Op.*") ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1)").  In contrast, Congress did appropriate funds for many other programs.  *See, e.g.*, 42 U.S.C. §§ 18001(g)(1), 18031(a)(1), 18042(g), 18043(c), 18121(b).  Congress also omitted from section 1342 the language that it frequently uses when it intends payments to be funded from the Treasury through the annual appropriations process.  In such cases, it typically enacts an "authorization of appropriations" provision, as it did in dozens of other provisions in the ACA.  *See, e.g.*, Pub. L. No. 111-148, § 2705(f), 124 Stat. 119, 325 (2010) ("There are authorized to be appropriated such sums as are necessary to carry out this section.").[8]  The absence of either an appropriation or an authorization of appropriations for section 1342 indicates that Congress understood that funding for risk corridors payments would come from risk corridors collections.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.").  The absence of a separate funding mechanism for section 1342 also marked a

---

[8]  *See also, e.g.*, *id.*, §§ 1002, 2706(e), 3013(c), 3504(b), 3505(a)(5), 3505(b), 3506, 3509(a)(1), 3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b).

distinct contrast with the already-existing risk corridors program under Medicare Part D, under which Congress expressly provided "budget authority in advance of appropriations Acts . . . to provide for the payment of amounts provided under this section." 42 U.S.C. § 1395w-115(a)(2); *see also* 42 U.S.C. § 1395w-116 (authorizing appropriations for Medicare Part D payments). Consistent with Congress's omission of a separate funding mechanism for risk corridors, the CBO excluded the risk corridors program from its scoring at the time of the ACA's passage. Congress then relied on this cost estimate to find that "this Act will reduce the Federal deficit between 2010 and 2019." ACA § 1563(a)(1).

In sum, Land of Lincoln's argument that the United States is required to make full payments is inconsistent with section 1342's structure, the distinct absence in the ACA of any separate funding mechanism, and Congress's budgetary considerations at the time of the ACA's passage. These indicia of congressional intent regarding the budgetary impact of section 1342 cannot be overcome with unsupported appeals to the general purpose of the program or the ACA because "no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987).

**B.      Congress Restricted Risk Corridors Payments With the Intent that the Risk Corridors Program Be Budget Neutral While the Spending Laws Are in Effect**

Congress's present intent as conveyed in the 2015 and 2016 Spending Laws is clear: the risk corridors program must be budget neutral for the years the Spending Laws are in effect. This unmistakable intent is conveyed in the course of events leading up to the enactment of the 2015

and 2016 Spending Laws, the prohibition in these laws on the use of transferred funds for risk corridors payments, and the legislative history explaining that the purpose of the prohibition is to ensure that the program is budget neutral.

As explained in the United States' Motion, in early 2014, the drafters of the Spending Law riders asked the GAO to identify the funding sources that could lawfully be used on risk corridors payments given the absence of any appropriation in the law itself.  At the time, the Centers for Medicaid & Medicare Services ("CMS") Program Management appropriation provided, in full:

> For carrying out, except as otherwise provided, titles XI, XVIII, XIX, and XXI of the Social Security Act, titles XIII and XXVII of the PHS Act, the Clinical Laboratory Improvement Amendments of 1988, and *other* responsibilities of the Centers for Medicare and Medicaid Services, not to exceed $3,669,744,000, to be transferred from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the PHS Act and section 1857(e)(2) of the Social Security Act, funds retained by the Secretary pursuant to section 302 of the Tax Relief and Health Care Act of 2006; *and such sums as may be collected from authorized user fees* and the sale of data, which shall be credited to this account and remain available until September 30, 2019.

Pub. L. No. 113–76, div. H, title II, 128 Stat. 5, 374 (2014) (emphasis added).  Thus, the Program Management appropriation as then drafted included a lump sum amount transferred from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund as well as funds collected by HHS under other specified statutory authority, including "authorized user fees."  In fiscal year 2014, all of these funds could be spent, to the extent not otherwise restricted, on unspecified "other responsibilities of [CMS]."

In response to the congressional inquiry, the GAO looked at this appropriation language and concluded that risk corridors payments could constitute "other responsibilities of [CMS]" such that the lump sum transferred to the Program Management appropriation from CMS trust funds would have been available to make risk corridors payments had payments been due in fiscal year

2014.  *See GAO Op.*, 2014 WL 4825237, at \*4-\*5, A.R. 1366, 1482.  The GAO also opined that

risk corridors collections constituted "user fees" under 31 U.S.C. § 9701 and federal appropriations

law such that those collections also would have been available for risk corridors payments under

the language of the Program Management appropriation.[9]  The GAO noted, however, that HHS

would not collect risk corridors charges or make payments in fiscal year 2014.  *GAO Op.*, 2014

WL 4825237 at \*1 & \*5.  Therefore, risk corridors payments were not one of HHS's "other

responsibilities" that year, and the 2014 appropriations act did not appropriate any funds for risk

corridors payments.  Thus, the GAO's conclusion that Program Management funds could be used

for risk corridors payments was necessarily dependent on the enactment of similar appropriations

laws in the years in which risk corridors payments would be made.  *Id.* at \*5.

In response to the GAO's conclusion, Congress passed the 2015 Spending Law, which

included the same CMS Program Management appropriation, as stated above, but also provided:

> None of the funds made available by this Act from [CMS trust funds], or transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services—Program Management' account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

Pub. L. No. 113-235, div. G, title II, § 227 (2014).  Thus, through this appropriations rider,

Congress limited the amount of funds available in the CMS Program Management appropriations

for making risk corridors payments in that fiscal year to amounts derived from "such sums as may

be collected from authorized user fees," which, for purposes of section 1342, consists of risk

corridor collections.

---

[9]  As the GAO explained, "user fees" in the appropriations context are fees "assessed to users for goods or services provided by the federal government" and "apply to federal programs or activities that provide special benefits to identifiable recipients above and beyond what is normally available to the public."  *GAO Op.*, 2014 WL 4825237, at \*4 (quoting GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO–05–734SP (Washington, D.C. Sept. 2005), at 100).

In the accompanying Explanatory Statement, Congress indicated that the restriction was added "to prevent the CMS Program Management appropriation account from being used to support risk corridors payments." 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014). Congress's intent was unchanged the following fiscal year, when it included an identical restriction in the 2016 Spending Law. Pub. L. No. 114-113, div. H, title II, § 225 (2015). The Senate Committee Report to the 2016 Spending Law stated that the funding limitation "requir[es] the administration to operate the Risk Corridor program in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education appropriations bill to be used as payments for the Risk Corridor program." Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 2016, S. Rep. No. 114-74, at 12 (2015). It was under this Spending Law that HHS made its pro-rata payments in December 2015, A.R. 262, and the provisions of the 2016 Spending Law continue in effect under a continuing resolution, Pub. L. No. 114-223, div. C (Sept. 29, 2016). Thus, in the appropriations process for the first two fiscal years in which risk corridors payments could be made, Congress confirmed what was implicit in the structure of section 1342: risk corridors payments are funded solely from collections.

As the United States explained in its Motion, at 26-30, even if the Spending Laws are interpreted as limiting (rather than merely clarifying and confirming) the extent of HHS's payment obligations under section 1342, courts have long recognized that Congress can limit the Government's obligations in appropriations laws so long as it is clear regarding its intent to do so. *See e.g.*, *United States v. Dickerson*, 310 U.S. 554 (1940); *United States v. Will*, 449 U.S. 200 (1980); *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166 (Fed. Cir. 1995); *Republic Airlines, Inc. v. U.S. Dep't of Transp.*, 849 F.2d 1315 (10th Cir. 1988). Land of Lincoln attempts to distinguish this case law based on minor differences in statutory language,

Pl. Opp'n at 26-29, but Land of Lincoln misses the central point of these cases.  The question whether a specific appropriations act limits the Government's obligations does not depend on the use of specific words over other words; rather "[t]he whole question depends on the intention of congress as expressed in the statutes."  *United States v. Mitchell*, 109 U.S. 146, 150 (1883).[10]

In this case, Congress did not intend to prohibit risk corridors payments entirely, and therefore, it did not use the language used in *Dickerson* or the different and unique language used in *Will* and the other cited cases.  Instead, as explained in the 2015 Explanatory Statement and 2016 Senate Committee Report, Congress intended only to limit risk corridors payments to the extent of collections.  By targeting the prohibition at monies transferred to the CMS Program Management appropriation from other sources, Congress ensured that monies deposited into the account from risk corridors collections would still be available for risk corridors payments.  Furthermore, the GAO had just informed Congress that the CMS Program Management account was the *only* source of funding potentially available for risk corridors payments under existing appropriations laws.  Congress was not required to wall off every other appropriation in the Spending Laws where those appropriations could not legally be spent on risk corridors anyhow.  Thus, Land of Lincoln's attempt to distinguish controlling Supreme Court precedent based on immaterial differences in the statutory language, where the congressional objective in those cases was different from the objective in this case, should be rejected.

The Court should likewise reject Land of Lincoln's attempt to distinguish *Highland Falls* on the purported basis that the enabling legislation in that case "*recognize[d]* that Congress may

---

[10]  If congressional intent cannot be clearly discerned, a court must look to whether a later-enacted spending law can effectively be harmonized with an earlier-enacted statutory obligation.  *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 145 (2d Cir. 2002).  If not, the court must give effect to the later-enacted law.  *Id.*

choose to appropriate less money for entitlements under the Act than is required to fund those entitlements fully." Pl.'s Opp'n at 28 (emphasis Plaintiff's). In fact, although the statute in *Highland Falls* recognized that Congress might appropriate a lesser amount for "entitlements under the Act," it also provided that in the event Congress did so, school districts would nevertheless be paid at one hundred percent. *See Highland Falls*, 48 F.3d at 1168 ("§ 240(c) specifies that § 237 shall be funded at 100% of entitlements in those fiscal years in which the total amount appropriated by Congress is insufficient to fund all entitlements under the Act."). Thus, the enabling legislation in *Highland Falls* contemplated that the plaintiff would be paid at one hundred percent *notwithstanding subsequent appropriations laws*. Nevertheless, the Federal Circuit held that the agency properly pro-rated the plaintiff's payment because Congress, in earmarked appropriations, had clearly expressed its intent to appropriate a lesser amount. *Id.* at 1170 ("We conclude that Congress has directly spoken to this question and that DOE, in following the approach it did, gave effect to the unambiguously expressed intent of Congress.") (citation and quotations marks omitted). *Highland Falls* is thus on all fours with this case.[11]

In fact, the differences among the text of the appropriations law riders in each of the cited cases are at least as stark as the differences between the text in those cases and the text of the

---

[11] Land of Lincoln also suggests, citing *Prairie Cty., Montana v. United States*, 113 Fed. Cl. 194 (2013), and *Greenlee Cty., Ariz. v. United States*, 487 F.3d 871 (Fed. Cir. 2007), that, in order to limit risk corridors payments through the Spending Laws, Congress was required to include language in the ACA making payments subject to appropriations. Pl.'s Opp'n at 29-30. But the principle that obligations of the United States are limited to amounts appropriated is inherent in the Constitution; Congress is not required to reserve its appropriations power separately in every law that it passes. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). Thus, Congress can indicate its intent to limit payments in the authorizing legislation, as it did in *Greenlee County* and *Prairie County*, or in a subsequent appropriations law, as it did in *Dickerson*, *Will*, *Mitchell*, *Highland Falls*, *Republic Airlines*, and the many other cases cited at pages 26-29 of the United States' Motion. The fact that it chose the former in *Greenlee County* and *Prairie County* has no bearing on Congress's authority to choose the latter in this case.

Spending Law riders here, yet in each case, the disparate provisions led courts to the same result. The explanation is simple. Congressional intent, as expressed in both the text of the appropriations laws at issue and the legislative history of those laws, is the common thread connecting cases from the 19th century through the 20th century to this case. Indeed, to ignore the legislative history in interpreting the Spending Laws would contravene binding precedent and be error. *See Dickerson*, 310 U.S. at 562 (consulting legislative history of appropriations laws to conclude that Congress intended to prohibit payment of enlistment bonuses because "[t]he meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction"); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1584 (Fed. Cir. 1994) (considering legislative history of appropriations restriction). Land of Lincoln does not cite a single, non-contract case in which congressional intent to limit an obligation was clear and yet the court declined to give it effect.[12] Land of Lincoln cannot do so because the Supreme Court has been clear: where congressional intent to limit the Government's obligations is clear, that intent controls.

In short, this case does not concern a "mere failure of Congress to appropriate funds," *Greenlee Cty.*, 487 F.3d at 877, a repeal by implication, *Tennessee Valley Authority v. Hill*, 437

---

[12] Land of Lincoln appears to concede that *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012), applies only to contractual obligations, Pl.'s Opp'n at 29. As set forth in the United States' Motion, at 30-31 & 32-42, the United States has no contractual obligation to make risk corridors payments, and Land of Lincoln has failed to state a claim on a contract theory. In any event, Count I is based on the statute and implementing regulations, not contract, and nothing in the statute or regulations contains any mention or indication of contractual obligations. Moreover, even assuming Land of Lincoln's express and implied contract theories had merit, they necessarily incorporate as contractual terms all applicable federal law, including the Spending Laws and HHS's three-year framework. As a result, even if the United States had a contractual obligation to make risk corridors payments, that obligation would be limited to the extent of collections across the three-year cycle, just as is the statutory obligation. Thus, contrary to Land of Lincoln's suggestion, Pl.'s Opp'n. at 23-25, *Ramah Navajo* does not apply here and does not preclude judgment in the United States' favor on Count I.

U.S. 153, 189-90 (1978), or an attempt to limit an existing contractual obligation, *Ramah Navajo*. Instead, Congress, for the only fiscal years in which risk corridors payments could be made, enacted appropriations laws limiting the source of funds to make those payments. "[A]ppropriations do not merely set aside particular amounts of money; they define the character, extent, and scope of authorized activities."  Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1356 (1988).  Thus, where Congress's intent is clear, the extent of the appropriation defines the extent of the program and, thus, the extent of the Government's obligation.

Here, Congress unequivocally expressed its intent to limit risk corridors payments to the amount of collections and thereby ensure that the program is budget neutral while those spending restrictions are in effect.  Because Land of Lincoln has not refuted this congressional purpose, nor identified any other plausible purpose behind the Spending Law riders, its contention that the Spending Laws do not alter the Government's liability under section 1342, Pl.'s Opp'n at 23-30, is untenable.  Land of Lincoln has not cited any authority that would permit the Court to ignore the intent embodied in Congress's exercise of its Constitutional authority over the public fisc, and there is none.  Accordingly, the United States is entitled to judgment on the administrative record on Count I.

III.    **Land of Lincoln Has Failed to State a Claim for Its Remaining Counts**

   A.    **No Express Contract Between HHS and Land of Lincoln Obligates the United States to Make Risk Corridors Payments**

As explained in the United States' Motion, at 32-37, the QHP Agreements on which Land of Lincoln relies have nothing to do with risk corridors.  The Agreements do not reference "risk corridors," section 1342, 45 C.F.R. § 153.510, or anything else that plausibly suggests risk corridors are a contractual obligation.  Land of Lincoln continues to press its contention that the governing law clause somehow incorporates the entire body of federal law, including the ACA,

Pl.'s Opp'n at 34.  This contention has no merit, and Land of Lincoln makes no attempt to address the cases cited in the United States' Motion that belie such a contention.  *See, e.g.*, *St. Christopher Associates, L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008); *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008); *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988); *Earman v. United States*, 114 Fed. Cl. 81, 104 (2013).

Land of Lincoln now raises a new, equally flawed argument that because the QHP Agreements mention "Federally-facilitated Exchange user fees" and because risk corridors collections are a type of "user fee" for purposes of appropriations law, the QHP Agreements "indicate[] that the Government understood and intended to be bound to make risk corridors payments."  Pl. Opp'n. at 34.  Under no reasonable construction of the QHP Agreements do risk corridors collections constitute "Federally-facilitated Exchange user fees."  A "Federally-facilitated Exchange user fee" is a different type of user fee authorized under section 1311 of the ACA, 42 U.S.C. § 18031(d)(5), and specifically defined in CMS regulations as a monthly fee collected from participating issuers to support an Exchange's functions.  45 C.F.R. § 156.50(c) provides:

> *Requirement for Federally-facilitated Exchange user fee.* (1) To support the functions of Federally-facilitated Exchanges, a participating issuer offering a plan through a Federally-facilitated Exchange must remit a user fee to HHS each month, in the timeframe and manner established by HHS, equal to the product of the monthly user fee rate specified in the annual HHS notice of benefit and payment parameters for Federally-facilitated Exchanges for the applicable benefit year and the monthly premium charged by the issuer for each policy under the plan where enrollment is through a Federally-facilitated Exchange.

As discussed in the United States' Motion, at 36-37, an issuer need not operate on a Federally-facilitated Exchange to owe charges or receive payments under section 1342, a point Land of Lincoln fails to address.  Monthly Federally-facilitated Exchange user fees are manifestly not annual risk corridors collections.  Indeed, nowhere in section 1342, the ACA, or HHS's regulations

are risk corridors collections described as "user fees."  Rather, as explained above, they qualify as user fees for purposes of federal appropriations law, an altogether different context from the QHP Agreements.  Land of Lincoln has failed to allege facts that could plausibly support a claim for breach of an express contract.  Count II should be dismissed for failure to state a claim.

### B.   No Implied in Fact Contract Obligates HHS to Make Risk Corridors Payments

Land of Lincoln similarly fails to establish the threshold requirements to plead an implied-in-fact contract regarding risk corridors payments.  First, Land of Lincoln merely recites the statutory and regulatory obligations regarding the risk corridors program, Pl. Opp'n at 35-36, but identifies nothing to overcome the presumption that Congress did not intend to bind itself contractually to make risk corridors payments.  *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985).  Second, Land of Lincoln asserts that it "acted in reliance" on the Government's alleged offer of risk corridor payments, but reliance is not an element of an implied in fact contract; it is an element of an implied-in-law contract for which Congress has not waived sovereign immunity.  *See Steinberg v. United States*, 90 Fed. Cl. 435, 444 (2009) ("'Detrimental reliance' is an element of a claim of promissory estoppel, a contract implied in law, but is not an element of a contract in fact."); *Twp. of Saddle Brook v. United States*, 104 Fed. Cl. 101, 111 (2012) ("promissory estoppel theory does not fall within the jurisdiction granted to the court by the Tucker Act").  Third, Land of Lincoln relies on *Radium Mines, Inc. v. United States*, 153 F. Supp. 403 (Ct. Cl. 1957), but in that case, the court found no contract was formed.  In any event, *Radium Mines* involved the federal purchase of uranium ore from private parties and regulations that specifically referenced contracts, but here HHS did not procure anything from insurers who chose to participate on the Exchanges and its regulations neither state nor imply that risk corridors payments are a contractual obligation.

Fourth, Land of Lincoln grounds its implied contract theory on "an intricate set of specific obligations" and lists a number of regulations. But this is just another attempt to convert regulatory obligations into contractual ones. It has no basis in law, and it has no limiting principle. Rather, under Land of Lincoln's theory, every federally regulated activity involving mutual rights and obligations between an entity and the Government creates a contractual relationship. "[T]he United States cannot be contractually bound merely by invoking the cited statute and regulation." *Baker v. United States*, 50 Fed. Cl. 483, 489 (2001).

Finally, HHS could not have contracted in 2013 or 2014 to make risk corridors payments in fiscal years 2015 or 2016 because "[a]s far as government contracts are concerned," the Antideficiency Act, 31 U.S.C. § 1341(a)(1), "'bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, existing appropriation.'" *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1142, 1449 (Fed. Cir. 1997) (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 426 (1996)); *see also Schism v. United States*, 316 F.3d 1259, 1288 (Fed. Cir. 2002) (*en banc*); 31 U.S.C. § 1341(a)(1). Land of Lincoln has failed to state a claim for breach of an implied contract, and Count III must be dismissed.[13]

## C.  Land of Lincoln Had No Vested Property Interest in Risk Corridors Payments

Land of Lincoln cannot establish a vested property interest in risk corridors payments. As Land of Lincoln appears to concede, Pl. Opp'n at 46, an ordinary obligation on the part of the United States to pay money under a statutory benefits program does not give rise to a Fifth Amendment property interest. *See, e.g.*, *Adams v. United States*, 391 F.3d 1212, 1225 (Fed Cir.

---

[13]  Because Land of Lincoln cannot plausibly plead the existence of a contract with respect to risk corridors, its claim for breach of an asserted duty of good faith and fair dealing fails as a matter of law. *HSH Nordbank AG v. United States*, 121 Fed. Cl. 332, 341 (2015). Count IV must be dismissed.

2004); *Avenal v. United States*, 33 Fed. Cl. 778, 788 (1995) ("It is well established that recipients of benefits under government entitlement programs do not possess a substantive property right in the continuation of those benefits for purposes of the Fifth Amendment.") (citing *Bowen v. Gilliard,* 483 U.S. 587, 604-05 (1987); *Richardson v. Belcher,* 404 U.S. 78, 80-81 (1971)).  Yet, Land of Lincoln rests its Takings claim entirely on section 1342's "shall pay" language.  Land of Lincoln fails to explain how this language distinguishes risk corridors payments from any other statutory benefit program providing for the payment of money.  It does not and it cannot.  Land of Lincoln fails to state a Takings claim.

## CONCLUSION

Land of Lincoln's Complaint should be dismissed, and the United States is entitled to judgment in its favor on the administrative record on Count I.

Dated: October 19, 2016                    Respectfully submitted,

                                           BENJAMIN C. MIZER
                                           Principal Deputy Assistant Attorney General

                                           RUTH A. HARVEY
                                           Director
                                           Commercial Litigation Branch

                                           KIRK T. MANHARDT
                                           Deputy Director

                                           /s/ Terrance A. Mebane
                                           TERRANCE A. MEBANE
                                           CHARLES E. CANTER
                                           SERENA M. ORLOFF
                                           FRANCES M. MCLAUGHLIN
                                           L. MISHA PREHEIM
                                           United States Department of Justice
                                           Civil Division, Commercial Litigation Branch
                                           Telephone: (202) 307-0493
                                           Facsimile: (202) 307-0494
                                           Terrance.A.Mebane@usdoj.gov

                                           *Attorneys for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of October 2016, a copy of the foregoing, *The United States' Reply in Support of its Motion to Dismiss and Motion for Judgment on the Administrative Record on Count I*, was filed electronically with the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing will be sent to all parties by operation of the Court's ECF system.


/s/ Terrance A. Mebane
TERRANCE A. MEBANE
United States Department of Justice