# In the United States Court of Federal Claims

No. 16-744C

(Filed:  November 10, 2016)

| | |
|---|---|
| ************************************* ) <br><br> **LAND OF LINCOLN MUTUAL** <br> **HEALTH INSURANCE COMPANY,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **UNITED STATES,** <br><br> **Defendant.** <br><br> ************************************* | Claim by qualified health insurance plan participating in a federally-run state Exchange to damages based upon statutory or regulatory entitlement to receive "risk-corridors" payments; Section 1342 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18062; 45 C.F.R. § 153.510; claims for damages based upon alleged breach of an express contract, an implied-in-fact contract, or an implied covenant of good faith and fair dealing; takings claim |

Daniel P. Albers, Barnes & Thornburg LLP, Chicago, Illinois, for plaintiff.  With him on the briefs was Scott E. Pickens, Barnes & Thornburg LLP, Washington, D.C.

Terrance A. Mebane and Charles E. Canter, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With them on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Ruth A. Harvey, Director, Kirk T. Manhardt, Deputy Director, Serena M. Orloff, Trial Attorney, Frances M. McLaughlin, Trial Attorney, and L. Misha Preheim, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C.

## OPINION AND ORDER

LETTOW, Judge.

Since 2014, Land of Lincoln Mutual Health Insurance Company ("Lincoln") has provided qualified health insurance plans in Illinois under the Patient Protection and Affordable Care Act ("the Affordable Care Act" or "the Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010). In this action, Lincoln seeks damages under Section 1342 of the Act, codified at 42 U.S.C. § 18062, which establishes and governs a temporary program of "risk corridors" applicable to calendar years 2014, 2015, and 2016, where qualifying health plans ("QHPs") participating on

health insurance Exchanges pay money to or receive money from the Department of Health and Human Services ("HHS"), depending upon the ratio of premiums received to claimed costs.[1]

Lincoln is an Illinois not-for-profit company with its headquarters in Chicago that served nearly 50,000 customers on the Illinois Health Insurance Marketplace in 2014, 2015, and part of 2016. Compl. ¶ 13.[2] Lincoln suffered losses in 2014 and 2015 and thus is deemed eligible to receive payment from HHS under the risk-corridors program. HHS paid Lincoln approximately 12.6% of the amount Lincoln is due for 2014, and nothing for 2015. Compl. ¶ 8. As a general matter, the payments HHS owes to qualified health plan issuers under the program exceed the fees received by HHS under the program, and HHS has stated that it will make payments only from fees collected, to the extent such fees are available, on a proportional basis to those owed payment.

Lincoln filed its complaint on June 23, 2016, alleging that it had a statutory and regulatory entitlement to the full amount of the payments due it under the program for 2014 and 2015, totaling at least $72,859,053, and that the full entitlement was and is due on an annual basis. Compl. ¶¶ 9, 77. Additionally, Lincoln alleges that the government's actions breached an express or implied-in-fact contract, breached the implied covenant of good faith and fair dealing, and contravened the Takings Clause of the Fifth Amendment. Compl. ¶ 1. Shortly after the complaint was filed, Lincoln requested "expedite[d] disposition of this action" because, among other things, it otherwise lacked funds to survive as a continuing entity. Pl.'s Mot. for an Early Pretrial Conference Pursuant to Rule 16(a) at 1 (July 26, 2016), ECF No. 7. In that regard, Lincoln advised that "the State of Illinois Director of Insurance has obtained an Order of Rehabilitation against Lincoln dated July 14, 2016." *Id.* at 2. Absent an infusion of funds by September 30, 2016, the health insurance Lincoln was providing to citizens of Illinois would have to be cancelled. *Id.* Promptly thereafter, the court held a status conference with the parties, and, because the case involves a claim of statutory and regulatory entitlement, the court requested the government to file the administrative record of its regulations and its actions respecting Lincoln. *See* Hr'g Tr. 32:1-2 (Aug. 12, 2016). The court set an accelerated schedule for submission and briefing of potentially dispositive motions and calendared an early hearing. *See* Scheduling Order (Aug. 12, 2016), ECF No. 12. With one subsequent adjustment to the

---

[1]The Act assigns HHS the responsibility for implementing many aspects of the Act. HHS delegates some of those responsibilities to the Centers for Medicare & Medicaid Services ("CMS"), including the responsibility to establish and administer the risk-corridors program. *See* Delegation of Authorities, 76 Fed. Reg. 53,903, 53,904 (Aug. 30, 2011). For purposes of this opinion, both HHS and CMS will be referred to as "HHS."

[2]Lincoln is a nonprofit issuer that provided health plans through the government's Consumer Operated and Oriented Plan program, which was intended to "foster the creation of qualified nonprofit health insurance issuers." *See* 42 U.S.C. § 18042(a); Pl.'s Mot. for Judgment on the Administrative Record and Mem. in Support ("Pl.'s Mot.") at 3, ECF No. 20. Nonetheless, as an Illinois health insurance provider, Lincoln must file its rates, along with other information, with the State of Illinois and receive approval from the State before it can issue health insurance. See 215 Ill. Comp. Stat. 5/355, 5/143 (2016).

schedule, *see* Amended Scheduling Order (Oct. 18, 2016), ECF No. 36, the parties have followed this procedural path.

## BACKGROUND

In 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, to expand individual health insurance coverage. The Act requires health insurance providers offering health insurance in a particular state to accept all individuals and qualified employers applying for coverage in that state, subject to certain restrictions. 42 U.S.C. § 300gg-1(a). Further, the Act prohibits insurance providers from setting premiums based upon a particular person's health. *See King v. Burwell*, __ U.S., __, __, 135 S. Ct. 2480, 2486 (2015) (citing 42 U.S.C. § 300gg); *see also* 45 C.F.R. §§ 147.108-116.

Additionally, the Act establishes health insurance "Exchanges," *i.e.*, marketplaces within each state where individuals and qualified employers can purchase health insurance. *See* 42 U.S.C. § 18031. The Act provides that each individual state may administer its respective Exchange if it elects to do so, or, if the state elects not to establish an Exchange, "the Secretary shall . . . establish and operate such Exchange within the [s]tate." 42 U.S.C. § 18041(c)(1). Health insurance providers wishing to offer insurance coverage on an Exchange can only do so if they offer a "qualified health plan," which is defined within the Act and the implementing regulations. *See* 42 U.S.C. §§ 18021, 18031(b)(1)(A); 45 C.F.R. § 155.20. The Act requires insurers participating on the Exchanges to, among other requirements, be certified as qualified health plans. *See* 42 U.S.C. § 18031(d)(4)(A), (e); 45 C.F.R. § 155.20.

### A. The Risk-Corridors Program

Because the Act enabled health insurance coverage to be made available to many individuals who were previously underinsured or uninsured, Lincoln alleges that health insurance providers "had no previous experience or reliable data to meaningfully assess the risks and set the premiums for this new population of insureds." Compl. ¶ 4. Recognizing this uncertainty, Congress established three stabilization programs, *see* 42 U.S.C. §§ 18061-18063, to mitigate the uncertainty and pricing risks for insurers, which programs have become commonly known as "reinsurance," "risk corridors," and "risk adjustment," respectively. *See* HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,411 (Mar. 11, 2013), AR 1807;[3] Def.'s Mot. to Dismiss and Mot. for Judgment on the Administrative Record on Count I ("Def.'s Mot.") at 6, ECF No. 22. The risk-corridors program established under Section 1342 of the Act, which is the stabilization program pertinent to Lincoln's claims, was designed to "protect against uncertainty in rate setting for qualified health plans by limiting the extent of issuers' financial losses and gains." HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. at 15,411, AR 1807. The risk-corridors program is a three-year temporary program that pertains to the calendar years of 2014, 2015, and 2016. 42 U.S.C. § 18062(a). It applies only to qualified

---

[3] "AR__" refers to the administrative record certified by HHS and filed with this court in compliance with Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").

health plans offered through an Exchange.  *Id.*; *see* 45 C.F.R. § 153.510.[4]  The program was "based on" a similar program enacted under Part D of Title XVIII of the Social Security Act.  42 U.S.C. § 18062(a) (referring to Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-101 *et seq.*) ("the Medicare Program")).

The risk-corridors program calls upon HHS to provide a mechanism to even out the losses and gains of qualified health plans during the three-year phase-in period.  *See* 42 U.S.C. § 18062(b); 45 C.F.R. § 153.510.  When a qualified health plan issuer experiences a loss in a calendar year, such that the plan's "allowable costs" are more than 103 percent of the plan's "target amount" for that year, HHS is directed to pay the issuer a portion of that loss.  42 U.S.C. § 18062(b)(1); 45 C.F.R. § 153.510(b).  Correlatively, when the issuer experiences a gain in a calendar year, such that the plan's "allowable costs" are less than 97 percent of the plan's "target amount" for that year, the issuer is directed to pay the HHS a certain amount of that gain.  42 U.S.C. § 18062(b)(2); 45 C.F.R. § 153.510(c).  The "[p]ayments out" and "[p]ayments in" are specified by statute as follows:

(b) Payment methodology

(1) Payments out

The Secretary shall provide under the program established under subsection (a) that if –

(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(2) Payments in

The Secretary shall provide under the program established under subsection (a) that if –

---

[4]If a health insurer chooses not to offer coverage through an Exchange, then it is not subject to the risk-corridors program.  *See* 45 C.F.R Part 155 ("Exchange Establishment Standards and Other Related Standards under the Affordable Care Act"), Subpart K ("Exchange Functions: Certification of Qualified Health Plans"), § 155.1000(b) ("The Exchange must offer only health plans which have in effect a certification issued or are recognized as plans deemed certified for participation in an Exchange as a QHP, unless specifically provided for otherwise.").

>       (A) a participating plan's allowable costs for any plan year are less
>   than 97 percent but not less than 92 percent of the target amount, the
>   plan shall pay to the Secretary an amount equal to 50 percent of the
>   excess of 97 percent of the target amount over the allowable costs; and
>
>       (B) a participating plan's allowable costs for any plan year are less
>   than 92 percent of the target amount, the plan shall pay to the
>   Secretary an amount equal to the sum of 2.5 percent of the target
>   amount plus 80 percent of the excess of 92 percent of the target
>   amount over the allowable costs.

42 U.S.C. § 18062(b).[5]  Allowable costs include the costs incurred by the qualified
health plan in providing benefits under the plan, other than administrative costs.  42

---

[5]The HHS regulations implementing the payment-out methodology set forth
"substantially similar terms" to those set out in the statute.  Def.'s Mot. at 7 (citing 45 C.F.R. §
153.510(b)-(c)).  As HHS explained:

>   For example, a [qualified health plan] has a target amount of $10 million,
>   and the [qualified health plan] has allowable costs of $10.5 million, or 105
>   percent of the target amount.  Since 103 percent of the target amount
>   would equal $10.3 million, the amount of allowable costs that exceed 103
>   percent of the target amount is $200,000.  Therefore, HHS would pay 50
>   percent of that amount, or $100,000 to the [qualified health plan] issuer.

Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. 41,930,
41,943 (July 15, 2011), AR 11295.  And further:

>   For example, a [qualified health plan] has a target amount of $10 million.
>   The [qualified health plan] has allowable costs of $11.5 million, or 115
>   percent of the target amount.  Since 108 percent of the target amount
>   would be $10.8 million, the amount of allowable costs that exceed 108
>   percent of the target amount is $700,000.  Therefore, HHS pays 2.5
>   percent of the target amount, or $250,000, plus 80 percent of $700,000, or
>   $560,000, for a total of $810,000.

*Id*.

        The regulations follow the Act in setting forth the obverse methodology when a qualified
health plan issuer reports gains in a calendar year, but the issuer is required to make payments
rather than receive payments.  The issuer is required to pay HHS under the same formulas, but
the allowable cost-to-target amount ratios are 97 and 92 percent, rather than 103 and 108 percent.
*See* 45 C.F.R. § 153.510(b), (c).

U.S.C. § 18062(c)(1)(A).[6]  The target amount consists of the total amount of premiums received under the plan, reduced by any administrative costs.  42 U.S.C. § 18062(c)(2).[7]

The Act does not include a time limit by which payments must be made to, or received from, HHS, *see* 42 U.S.C. § 18062, but the implementing regulations do include a deadline for when qualified health plan issuers must pay HHS.  If a qualified health plan's allowable costs are sufficiently below the target amount such that the issuer is required to make payments to HHS, the issuer must do so "within 30 days after notification of such charges."  45 C.F.R. § 153.510(d).  In March 2012, before HHS implemented this regulation, HHS noted that it had considered a 30-day deadline for paying qualified health plan issuers because "issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and [qualified health plan] issuers."  Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. 17,220, 17,238 (Mar. 23, 2012), AR 969.  Even so, this deadline was only considered by HHS; it was not included in the proposed or final rule.  *Id.*  And, the implementing regulation did not refer to any time limit for HHS to make payments.  *See* 45 C.F.R. § 153.510.  Instead, HHS explained through a guidance bulletin issued on April 11, 2014, that if it failed to make sufficient payments for 2014, it would use the program's collected fees from 2015, and then 2016 if necessary, to satisfy amounts due.  CMS, *Risk Corridors and Budget Neutrality* (Apr. 11, 2014), AR 108-09.  HHS explained that it would be administering the risk-corridors payments "over the three-year life of the program, rather than annually."  Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. 30,240, 30,260 (May 27, 2014), AR 6195.

---

[6]Allowable costs are also reduced by "any risk adjustment and reinsurance payments received" by the qualified health plan issuer under Sections 1341 and 1343 of the Act.  42 U.S.C. § 18062(c)(1)(B).

[7]HHS had no direct role in the premiums Lincoln charged for its health insurance coverage, either for individuals or for small groups.  Hr'g Tr. 47:4-8 (Nov. 7, 2016) ("HHS has no legal say in what any QHP charges in its premiums.") (The date will be omitted from subsequent citations to the transcript of the hearing held on Nov. 7, 2016.).  Rather, by providing coverage (and participating on the federally-run Exchange for Illinois), Lincoln agreed to offer qualifying plans (*e.g.*, platinum, gold, silver, bronze) and to accept applications notwithstanding pre-existing conditions.  Hr'g Tr. 47:12 to 48:19; *see also* 42 U.S.C. § 18022(d) (levels of coverage).  The premium rates for those plans were subject to regulation by the State of Illinois' Department of Insurance.  *See supra*, at 2 n. 2; Hr'g Tr. 47:5-8.

Federal law and regulations require plans seeking premium increases to provide justification for the increases and to post the justification on the issuers' website.  *See* 42 U.S.C. § 18031(e)(2); 45 C.F.R. § 155.1020.  The regulations require consideration of specified factors in determining rate increases.  45 C.F.R. § 155.1020(b); *see also* Hr'g Tr. 13:22 to 14:25.  An Exchange can take the justification into account in deciding whether to make a plan available through the Exchange.  42 U.S.C. § 18031(e)(2).

### B.  Funding of the Risk-Corridors Program

Paragraphs 1342(b)(1) and (2) of the Act provide that HHS "shall pay" and plans "shall pay" amounts due out and due in under the payment methodology described in Subsection 1342(b), but the Subsection is otherwise silent regarding deficits or excess funds under the risk-corridors program.  *See* 42 U.S.C. § 18062(b); Def.'s Mot. at 8 ("Congress did not include in the [Act] either an appropriation or an authorization of funding for risk corridors.").  The Government Accountability Office ("GAO") reached this same conclusion in 2014 in response to a congressional inquiry.  *See* The Honorable Jeff Sessions, the Honorable Fred Upton, B-325630, 2014 WL 4825237, at *2 (Comp. Gen. Sept. 30, 2014), AR 116 ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in [S]ection 1342(b)(1).") ("*GAO Op.*").[8]  Similarly, the implementing regulation states that qualified health plans will receive payments from HHS without any reference to any source of funding or appropriations apart from the "payments in."  *See* 45 C.F.R. § 153.510(b).

On July 15, 2011, HHS noted in a proposed rule that prior to enactment of the Affordable Care Act, the Congressional Budget Office ("CBO") analyzed the estimated costs that would be attributable to passage, but "did not score the impact of risk corridors," under the assumption that "collections would equal payments to plans in the aggregate."  Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. at 41,948, AR 11300; *see* Letter from Douglas W. Elmendorf, Director, Congressional Budget Office, to Nancy Pelosi, Speaker, U.S. House of Representatives, Table 2 (Mar. 20, 2010), https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/costestimate/amendreconprop.pdf ("March 2010 CBO Letter") (providing an estimate of the spending and revenue impact for the Act's two other stabilization programs, reinsurance and risk adjustment, but not for the risk-corridors program).  Despite this budget-scoring circumstance and the lack of specific authorization for appropriations, on March 11, 2013, HHS stated in adopting a final rule that "[t]he risk corridors program is not statutorily required to be budget neutral.  Regardless of the balance of payments and receipts, HHS will

---

[8]GAO drew upon its prior appropriation precedents for its reasoning:

> At issue here is whether appropriations are available to the Secretary of HHS to make the payments specified in section 1342(b)(1).  Agencies may incur obligations and make expenditures only as permitted by an appropriation.  U.S. Const., art. 1, § 9, cl. 7; 31 U.S.C. § 1341(a)(1); B-300192, Nov. 13, 2002, at 5.  Appropriations may be provided through annual appropriations acts as well as through permanent legislation.  *See e.g.*, 63 Comp. Gen. 331 (1984).  *The making of an appropriation must be expressly stated in law.*  31 U.S.C. § 1301(d).  *It is not enough for a statute to simply require an agency to make a payment.*  B-114808, Aug. 7, 1979.  Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1).  In such cases, we next determine whether there are other appropriations available to an agency for this purpose.

*GAO Op.*, 2014 WL 4825237, at *2, AR 116 (emphasis added).

remit payments as required under section 1342 . . . ."  HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. at 15,473, AR 1869.  Then, one year later, HHS issued a final rule stating that the risk-corridors program would be implemented "in a budget neutral manner," while also noting the possibility of "future adjustments . . . to the extent necessary."  HHS Notice of Benefit and Payment Parameters for 2015 Final Rule, 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014), AR 4929.

In its guidance of April 11, 2014, HHS explained that under the budget-neutral criterion for administration of the program, fees collected by HHS through the program would be the only funds used to pay the qualified health plans eligible for payment.  *Risk Corridors and Budget Neutrality*, AR 108; *see* 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014) (noting that budget neutral means "the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect").  Thus, qualified health plans with allowable costs less than 97 percent of the target amount for the year would supply the funds used to pay qualified health plans with allowable costs greater than 103 percent of the target amount for the year.  In its guidance of April 2014, HHS went on to state:

> [I]f risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

*Risk Corridors and Budget Neutrality*, AR 108.  HHS has adhered to this budget-neutral implementation in subsequent rules and guidance.  *See e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195; HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,779 (Feb. 27, 2015), AR 8153.

In establishing this payment plan, HHS recognized the "unlikely" possibility that HHS would not receive sufficient collection fees to make all necessary payments for the 2016 calendar year, the final year of the program.  HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. at 10,779, AR 8153.  If such a situation did occur, however, HHS stated it would "use other sources of funding for the risk corridors payments, subject to the availability of appropriations."  *Id.*

In September 2014, GAO responded to a congressional inquiry by finding that HHS, and more specifically CMS, was permitted to draw from its general lump-sum 2014 program-management appropriation of $3.6 billion to make payments under the risk-corridors program.  *GAO Op.*, 2014 WL 4825237, at *2-5, AR 116-20.[9]  GAO nonetheless noted that for general funds to be available in 2015, the year HHS had stated it would begin making risk-corridors

---

[9]The parties have reported that CMS's program-management appropriation for 2014 was spent.  Hr'g Tr. 8:8-19.

payments, the 2015 CMS appropriation would have to "include language similar to the language" in the 2014 CMS appropriation. *Id.* at \*5, AR 120.[10] Shortly thereafter, in December 2014, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 227, 128 Stat. 2130, 2491 (2014), which differed from the 2014 appropriation act by explicitly prohibiting HHS from using any of its lump-sum appropriation for payments under the risk-corridors program in the 2015 fiscal year.[11] An identical provision appeared in the Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 225, 129 Stat. 2242, 2624 (2015), for the 2016 fiscal year.

---

[10]The appropriation for 2014 specifically provided:

> For carrying out, except as otherwise provided, titles XI, XVIII, XIX, and XXI of the Social Security Act, titles XIII and XXVII of the PHS Act, the Clinical Laboratory Improvement Amendments of 1988, and other responsibilities of the Centers for Medicare and Medicaid Services, not to exceed $3,669,744,000, to be transferred from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the PHS Act and section 1857(e)(2) of the Social Security Act, funds retained by the Secretary pursuant to section 302 of the Tax Relief and Health Care Act of 2006; and such sums as may be collected from authorized user fees and the sale of data, which shall be credited to this account and remain available until September 30, 2019.

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. H, Title II, 128 Stat. 5, 374 (2014). GAO found that the appropriation "made funds available to CMS to carry out its responsibilities, which, with the enactment of [S]ection 1342, include the risk corridors program." *GAO Op.*, 2014 WL 4825237, at \*3, AR 117.

Notably, the Consolidated Appropriations Act, 2014, allowed "such sums as may be collected from authorized user fees and the sale of data" to "remain available until September 30, 2019." Pub. L. No. 113-76, Div. H, Title II, 128 Stat. 374. To be subject to that limited continuing authorization, however, the user fees had to be collected in fiscal year 2014. *See* Hr'g Tr. 56:23 to 58:25.

[11]The 2015 Appropriations Act specifically stated:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

Pub. L. No. 113-235, § 227, 128 Stat. 2130, 2491 (2014).

In these circumstances, HHS has acknowledged its statutory obligation to make full payments to qualifying health plan issuers under Section 1342, subject to the availability of funds.  *See* Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers."); HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. at 10,779, AR 8153 (noting that CMS would draw upon "risk corridors collections" and might be able to "use other sources of funding for the risk corridors payments, subject to the availability of appropriations"); Def.'s Mot. App. at A47 (CMS, *Risk Corridors Payments for 2015* (Sept. 9, 2016)) (same).[12]

### C.  Lincoln is a Qualified Health Plan Issuer That Has Not Yet Received All Payments Owed to It Under the Risk-Corridors Program

In September 2013, Lincoln sought to become a qualified health plan issuer and entered into an agreement with HHS, acting through CMS.  Compl. ¶¶ 35-36, Ex. 2.  The agreement remained valid until December 31, 2014.  Compl. Ex. 2, Section III.a.  Lincoln entered into similar agreements with "materially and substantially identical" terms for the calendar years of 2015 and 2016.  Compl. ¶¶ 41, 45, Exs. 3-4.[13]  Each agreement provides that the qualified health plan issuer will abide by certain standards when using "CMS Data Services Hub Web Services," such as performing certain testing and formatting transactions appropriately.  Compl. Ex. 2, Section II.b; Ex. 3, Section II.b; Ex. 4, Section II.b.  Each agreement also states that "CMS will recoup or net payments due" to the qualified health plan issuer with respect to the "payment of [f]ederally-facilitated Exchange user fees."  Compl. Ex. 2, Section II.c; Ex. 3, Section III.b; Ex. 4, Section III.b.

Thus, Lincoln was certified as a qualified health plan issuer under the risk-corridors program for the calendar years of 2014, 2015, and 2016.  Lincoln alleges that it relied upon the protections offered by the risk-corridors program when it agreed to become a qualified health plan issuer, and that it set premiums for its qualified health plans at lower rates than it otherwise

---

[12]Like plaintiff's motion, defendant's motion is accompanied by a sequentially paginated appendix, but one that consists of only two documents, *viz*., CMS's "Standard Companion Guide Transaction Information[:] Instructions related to the ASC X12 Benefit Enrollment and Maintenance (834) transaction, based on the 005010X220 Implementation Guide and its associated 005010X220A1 addenda for the Federally [F]acilitated Exchange (FFE)[- -] Comparison Guide Version Number: 1.5[,] March 22, 2013," Def.'s Mot. App. at A1-A46, and a memorandum from CMS dated September 9, 2016 styled "Risk Corridors Payments for 2015," *id.* at A47-A48.  The index to the appendix notes that this memorandum is incorrectly dated September 9, 2015.

[13]Notably, the title of the agreement changed from "Agreement Between Qualified Health Plan Issuer and [CMS]" in 2014 to "Qualified Health Plan Certification Agreement and Privacy and Security Agreement Between Qualified Health Plan Issuer and [CMS]" in the 2015 and 2016 agreements.  *See* Compl. Exs. 2, 3, 4.

would have if the program had not been in place.  Compl. ¶ 28; Pl.'s Mot. at 5; *cf.* HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. at 15,413, AR 1809 ("The risk corridors program will protect [qualified health plan] issuers . . . against inaccurate rate setting and will permit issuers to lower rates . . . .").

Lincoln suffered losses in 2014, and as a result Lincoln was due $4,492,243.80 for 2014 under the risk-corridors program's payment methodology.  AR 270.  In October 2015, however, HHS announced that it received $362 million in fees under the risk-corridors program, but owed $2.87 billion in payments.  CMS, *Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015), AR 1254.  Due to the budget-neutral criterion, HHS paid qualified health plan issuers 12.6% of the payments they were owed.  *Id.*  As a result, HHS paid Lincoln $566,825.32, but still owes Lincoln $3,925,418.48 in risk-corridors payments for 2014.  AR 270; Pl.'s Mot. at 7. HHS explained that it will pay the remainder of the 2014 payments with fees collected from the 2015 risk-corridors program, and the 2016 program if necessary.  AR 293.

Lincoln also claims that it is entitled to $71,833,251 from HHS under the risk-corridors program for losses Lincoln suffered in 2015.  Pl.'s Mot. at 7-8 & App. 8 at A56 to A59.[14]  HHS has not announced final collections and payments for 2015, but HHS stated in September 2015 that it anticipates "all 2015 benefit year collections will be used towards remaining 2014 benefit year risk corridors payments, and no funds will be available at this time for 2015 benefit year risk corridors payments."  Def.'s Mot. App. at A47.  HHS has since indicated that it plans to begin making further payments for 2014 in December 2016, but it has not yet specified the amount of fees it collected in 2015.  *See* AR 1498; Def.'s Mot. at 13-14.

### D.  Lincoln's Action in This Court

Lincoln filed this action on June 23, 2016.  It alleges that it is entitled to damages from the government on the grounds that the government violated its risk-corridors "payment obligations" under Section 1342 of the Act and the implementing federal regulations (Count I), breached an express contract or, alternatively, an implied-in-fact contract (Counts II, III), breached the implied covenant of good faith and fair dealing (Count IV), and contravened the Fifth Amendment by taking Lincoln's property for public use without just compensation (Count V).  *See generally* Compl.  Lincoln demands $75,758,669.48 from the government for payments Lincoln is allegedly owed to date under the risk-corridors program, consisting of $3,925,418.48 for 2014 and $71,833,251 for 2015.  Pl.'s Mot. at 2.[15]  Lincoln additionally requests that the

---

[14]In 2015, Lincoln's experience deteriorated to the point that its adjusted risk-corridors ratio for individual coverage was 183.5% and that for small-group coverage was 177.7%, Pl.'s Mot. App. 8 at A59, far removed from the target amounts.

[15]Lincoln requested an amount of "at least $72,859,053" when it filed its complaint in June 2016, Compl. at 44-45, but Lincoln subsequently adjusted that figure in September 2016 to reflect Lincoln's final 2015 costs.  *See* Pl.'s Mot. at 2; Pl.'s Reply in Support of Mot. for Judgment on the Administrative Record ("Pl.'s Reply") at 6 n.4, ECF No. 37.

court require the government to fulfill its risk-corridors payment obligations for 2015 and 2016 within 30 days of determining payments owed.  Compl. at 45.

On September 23, 2016, Lincoln filed a motion for judgment on the administrative record, and the government filed a motion to dismiss Lincoln's claims and a motion for judgment on the administrative record with respect to Count I.  *See generally* Pl.'s Mot.; Def.'s Mot.  The government argues that the court should dismiss Lincoln's claims for lack of jurisdiction pursuant to RCFC 12(b)(1), or, alternatively, that it is entitled to judgment on the administrative record under Count I and that the court should dismiss Counts II, III, IV, and V for failure to state a claim pursuant to RCFC 12(b)(6).  *See generally* Def.'s Mot.  Lincoln opposed the government's motion and filed a cross-motion for judgment on the administrative record with respect to Counts II-V, *see* Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss and Mot. for Judgment on the Administrative Record and Cross-Mot. for Judgment on the Administrative Record on Counts II-V ("Pl.'s Resp. and Cross Mot."), ECF No. 29, which the government opposed, *see* Def.'s Opp'n to Pl.'s Cross-Mot. for Judgment on the Administrative Record on Counts II-V ("Def.'s Opp'n to Pl.'s Cross Mot."), ECF No. 43.  The competing motions were addressed at a hearing held on November 7, 2016.

## JURISDICTION

*A.  The Court Has Subject Matter Jurisdiction Over Lincoln's Claims for Money Damages, but Not Over Lincoln's Request for Declaratory Relief*

*1.  Claim for money damages under Section 1342 and the implementing regulations.*

As plaintiff, Lincoln has the burden of establishing jurisdiction.  *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Under the Tucker Act, this court has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act waives sovereign immunity, which allows a plaintiff to sue the United States for money damages.  *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  It does not, however provide a plaintiff with any substantive rights.  *United States v. Testan*, 424 U.S. 392, 398 (1976).  Rather, to establish jurisdiction, "a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) (citing *Mitchell*, 463 U.S. at 216; *Testan*, 424 U.S. at 398); *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) (noting that the source of substantive law must be "money-mandating" to support jurisdiction under the Tucker Act).  This jurisdictional inquiry is separate from the merits of the case and "does not require a determination that the plaintiff has a claim on the merits."  *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 875 (Fed. Cir. 2007); *see also Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) ("We have held that jurisdiction under [the Contract Disputes Act, 41 U.S.C. § 7102(a), like the Tucker Act,] requires no more than a non-frivolous *allegation* of a contract with the government.") (emphasis in original) (citations omitted); *Jan's Helicopter*

*Serv.*, 525 F.3d at 1309 ("There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.").

In short, the court will have jurisdiction when a plaintiff invokes a money-mandating source and makes a "non-frivolous assertion" that the plaintiff is entitled to relief under that source. *Jan's Helicopter Serv.*, 525 F.3d at 1307 n.8; *Greenlee Cnty.*, 487 F.3d at 876-77 (citations omitted). A source is money-mandating when "it can fairly be interpreted as mandating compensation" by the government. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citing *Mitchell*, 463 U.S. at 217). Under this standard, a source will be money-mandating when it is "reasonably amenable to the reading that it mandates a right of recovery in damages." *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 19 (2011) (quoting *White Mountain Apache Tribe*, 537 U.S. at 473). In contrast, a source is not money-mandating when it provides the government with "complete discretion" regarding whether it will make payments. *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citations omitted); *see ARRA Energy Co. I*, 97 Fed. Cl. at 19 (noting that the determination of whether a source is money-mandating "generally turns on whether the government has discretion to refuse to make payments under that [source]").

While the word "may" in a statute creates a presumption of government discretion, *Doe*, 463 F.3d at 1324 (citing *McBryde v. United States,* 299 F.3d 1357, 1362 (Fed. Cir. 2002)), the Federal Circuit has "repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating." *Greenlee Cnty.*, 487 F.3d at 877 (quoting *Agwiak v. United States,* 347 F.3d 1375, 1380 (Fed. Cir. 2003)). For example, in *Agwiak*, the Federal Circuit found that a statute and its implementing regulations were money-mandating because both stated that certain employees "shall be paid" by the government. 347 F.3d at 1380; *see also Greenlee Cnty.*, 487 F.3d at 877 (finding that the relevant statute was "reasonably amenable" to a money-mandating interpretation because it provided that "the Secretary of the Interior shall make a payment . . ."); *Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed. Cl. 584, 594 (2011) (finding a statute to be money-mandating because the use of the word "shall" bound the government "to pay a qualifying tribe the amount to which it is entitled under the [statutory] formula"). Even if the word "shall" is not present, a statute can still be money-mandating when the government is required to make payments after certain statutory requirements are met. *See Fisher*, 402 F.3d at 1174-75; *see also United States v. Larionoff*, 431 U.S. 864, 869 (1977) (construing and applying a statute providing a reenlistment bonus for active duty soldiers); *Laughlin v. United States*, 124 Fed. Cl. 374, 383-85 (2015) (addressing a statute governing the Dental Office Multiyear Retention Bonus applicable to the military), *appeal filed*, No. 16-1627 (Fed. Cir.) (to be argued Dec. 8, 2016); *Hale v. United States*, 107 Fed. Cl. 339, 345-46 (2012) (applying statutes providing military service members with special and incentive bonuses), *aff'd*, 497 Fed. Appx. 43 (Fed. Cir. 2013).

Here, Section 1342 of the Act provides that when a qualified health plan's allowable costs exceed the target amount by more than 103 percent, "the Secretary *shall* pay to the plan" an amount set forth in Section 1342, depending on whether the costs exceed the target amount by more than 103 or 108 percent. 42 U.S.C. § 18062(b)(1) (emphasis added). Further, the implementing regulation states that qualified health plan issuers "will receive payment from HHS" under the criteria and formulas described in Section 1342. 45 C.F.R. § 153.510(b).

Neither the statute nor the regulation use the word "may" or provide any indication that HHS has discretion to refuse risk-corridors payments if funds are available. Regardless of whether the program is budget neutral or whether full payments are required annually, which topics are addressed *infra*, it is evident that HHS is obliged to make payments to qualified health plans when certain criteria are satisfied and funds are available. HHS has acknowledged this requirement. *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers."). Thus, Section 1342 and the implementing regulation are money-mandating sources of law.

Nonetheless, the government argues that the court does not have jurisdiction over Lincoln's claims because the payments that HHS owes are not "presently due." Def.'s Mot. at 16. To support its argument, the government cites *Todd v. United States*, where the Federal Circuit held that this court has jurisdiction under the Tucker Act only when the money damages are "actual" and "presently due." 386 F.3d 1091, 1093-94 (Fed. Cir. 2004) (quoting *Testan*, 424 U.S. at 398 (in turn quoting *United States v. King*, 395 U.S. 1, 3 (1969))). This court has found jurisdiction lacking under the "presently due" standard when, for example, a plaintiff brought suit against the government to receive a lump sum set forth in a settlement agreement between the two parties, but the agreement provided for periodic payments. *See Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173, 179-80 (2009). Because the government was current on its periodic payments and further payments were not presently due, the plaintiff was not entitled to bring suit for the entire sum. *Id.* The government contends that a similar analysis applies to Lincoln's claims because HHS has established a three-year framework and payments under the risk-corridors programs will not be due until the end of the program in 2016, to the extent funds are available, even for losses that qualified health plans incurred in 2014 and 2015. Def.'s Mot. at 16-17. The government argues that the "fair inference" standard, discussed *supra*, must be analyzed in conjunction with this "presently due" requirement. *See* Def.'s Opp'n to Pl.'s Mot. for Judgment on the Administrative Record ("Def.'s Opp'n to Pl.'s Mot.") at 11, ECF No. 30.

The government's argument reaches too far. The court's jurisdictional analysis differs depending on whether the plaintiff relies on a money-mandating statute. *See Bevevino v. United States*, 87 Fed. Cl. 397, 408 (2009) (noting that the Federal Circuit has "distinguished cases brought under money-mandating statutes, and those brought under statutes that are not money-mandating") (citing *Dysart v. United States,* 369 F.3d 1303, 1315 n.9 (Fed. Cir. 2004)); *Speed v. United States*, 97 Fed. Cl. 58, 66-68 (2011) (distinguishing between the jurisdictional analysis for claims arising out of a money-mandating statute and claims arising out of a contract). The cases upon which the government relies, such as *Todd* and *Annuity Transfers*, relate to allegations based upon contracts, rather than money-mandating statutes. *See Todd*, 386 F.3d at 1094; *Annuity Transfers*, 86 Fed. Cl. at 179-80. In rejecting the government's jurisdictional challenge, the court in *Bevevino* explained that the government's reliance on *Todd* was "misplaced" because the claims in *Todd* were premised on contractual obligations, whereas the claims in *Bevevino* were based upon a money-mandating statute. 87 Fed. Cl. at 407-08. Similarly, Lincoln's claim in Count I is based upon Section 1342 of the Act and its implementing regulation, which can be fairly interpreted as money-mandating sources of law. Thus, the court has jurisdiction over Lincoln's claim. In this instance, the government concedes that at least

*some* money was due and more may be due shortly, even though all of Lincoln's claimed amounts might not be payable on a current basis.[16]

>  2.  *Claims for money damages under an express contract or, alternatively, an implied-in-fact contract theory.*

This court has jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  Thus, as discussed *supra*, a contract can serve as the substantive source for a plaintiff's claim to monetary relief under the Tucker Act.  *See Speed*, 97 Fed. Cl. at 64 (citing *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990)).

Similar to the court's jurisdictional analysis of Lincoln's claim based upon Section 1342, the merits of Lincoln's contract claims must be separated from the court's assessment of its power to rule on these claims.  *See Engage Learning*, 660 F.3d at 1353-54.  The court has jurisdiction over express and implied contract claims as long as a plaintiff makes a "non-frivolous allegation of a contract with the government."  *Id.* (citing *Lewis v. United States,* 70 F.3d 597, 602, 604 (Fed. Cir. 1995); *Gould, Inc. v. United States,* 67 F.3d 925, 929-30 (Fed. Cir. 1995)).  However, the claim must still be for "actual, presently due money damages."  *Speed*, 97 Fed. Cl. at 66 (citing *King*, 395 U.S. at 3).

Here, Lincoln seeks risk-corridors payments of $3,925,418.48 for 2014 and $71,833,251 for 2015.  Pl.'s Mot. at 2.  Lincoln argues that it is entitled to these payments under an express contract theory because prior to each year of the risk-corridors program Lincoln offered a qualified health plan, and it allegedly entered into written agreements with HHS that allegedly required HHS to make full payment for the upcoming year.  *See* Compl. ¶¶ 166-78; Pl.'s Resp. and Cross-Mot. at 31-35, 39-43.  Alternatively, Lincoln argues that the course of conduct

---

[16]The government embellishes its contention that the court lacks jurisdiction over Count I by referring to HHS's three-year framework for applying "payments in" and "payments out," urging that no further payments for 2014 are now due, and averring that the "presently due" standard consequently has not been satisfied.  As the government would have it, the decision by HHS to apply a three-year framework is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  *See* Def.'s Mot. at 17-18; Hr'g Tr. 70:6-9.  This argument is misplaced.  The government's argument addresses the merits of whether and when Lincoln is entitled to recover money under the statute, which does not correspond to the jurisdictional inquiry of whether the statute itself is money-mandating.  *See Greenlee Cnty.*, 487 F.3d at 876 (explaining that the money-mandating analysis only requires the court to ask "whether the plaintiff is within the class of plaintiffs entitled to recover under the statute if the elements of a cause of action are established") (citing *Fisher*, 402 F.3d at 1172-73). The *Chevron* prongs apply to the merits of the case, as discussed *infra*.  *See generally Adair v. United States*, 497 F.3d 1244 (Fed. Cir. 2007) (applying the "reasonably amendable" standard without reference to *Chevron* deference in finding jurisdiction through a money-mandating source of law, and then applying a *Chevron* analysis to the merits of the case); *Sharp v. United States*, 80 Fed. Cl. 422, 427 (2008) (same).

between the government and Lincoln gave rise to an implied-in-fact contract that would also entitle Lincoln to full annual payments from HHS. Compl. ¶¶ 180-97; Pl.'s Resp. and Cross-Mot. at 39 ("[T]he [g]overnment's promise to make payment can induce behavior that constitutes a mutuality of intent to contract.").

The court concludes that Lincoln has sufficiently made non-frivolous contract claims against the government for monetary relief. Lincoln has established that it entered into written agreements with HHS certifying Lincoln as a qualified health plan provider under the risk-corridors program for all three years of the program. *See* Compl. Exs. 2-4. Further, the government engaged in conduct that indicated an intent to make at least some payments under the risk-corridors program to qualified health plans. *See, e.g.*, HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. at 15,411, AR 1807 ("The risk corridors program will protect against uncertainty in rate setting for qualified health plans by limiting the extent of issuers' financial losses and gains.").

Thus, the court has jurisdiction over Lincoln's express and implied contract claims to the extent that the 2014 and 2015 risk-corridors payments are presently due. Under Lincoln's alleged 2014 contract with HHS, payment was due in 2015 after HHS determined the amount of payment it owed to Lincoln. HHS paid approximately 12% of that amount, *see Risk Corridors Payment Proration Rate for 2014*, AR 1254, and the remaining balance is allegedly due. Additionally, Lincoln alleges that HHS repudiated its 2015 contract obligations when HHS stated that it did not anticipate making any 2015 payments during 2016. *See* Pl.'s Resp. and Cross-Mot. at 11-12; Def.'s Mot. App. at A47. Lincoln chose to treat that repudiation as a present breach. Pl.'s Resp. and Cross-Mot. at 11-12; *see Franconia Assocs. v. United States*, 536 U.S. 129, 143-44 (2002) (noting that a plaintiff may treat the other party's repudiation as a present breach by bringing suit); *Kasarsky v. Merit Sys. Prot. Bd.*, 296 F.3d 1331, 1338 (Fed. Cir. 2002) (same) (citing *Franconia Associates*, 536 U.S. at 143-44). Under Lincoln's alleged anticipatory breach claim, HHS's stated intention not to pay constitutes a present breach and the 2015 payments owed to Lincoln are due as well.[17]

### 3. *Claim for money damages under the Takings Clause of the Fifth Amendment.*

The court has jurisdiction via the Tucker Act over claims brought under the Takings Clause of the Fifth Amendment. *See, e.g.*, *Preseault v. Interstate Commerce*, 494 U.S. 1, 12 (1990); *Jan's Helicopter Serv.*, 525 F.3d at 1309 (citing *Moden v. United States*, 404 F.3d 1335,

---

[17]This conclusion is not inconsistent with the holdings of *Todd* and *Annuity Transfers*, as relied upon by the government. Lincoln is requesting monetary relief attributable to HHS's alleged anticipatory breach. In contrast, the plaintiff in *Todd* was seeking non-monetary relief, *see* 386 F.3d at 1094, and the plaintiff in *Annuity Transfers* was not alleging an anticipatory breach, but was instead seeking to change the contract, *see* 86 Fed. Cl. at 179. This court has repeatedly exercised its jurisdiction over anticipatory breach claims seeking monetary relief. *See, e.g.*, *Tamerlane, Ltd. v. United States*, 81 Fed. Cl. 752 (2008); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004).

1341 (Fed. Cir. 2005)).  A takings claim need only be non-frivolous for this court to find jurisdiction under the Tucker Act.  *Moden*, 404 F.3d at 1341.  Here, Lincoln has presented a non-frivolous claim that the government took the payments that Lincoln is entitled to under Section 1342 and the implementing regulation.  Thus, the court has jurisdiction over Lincoln's takings claim.

### 4.  *Request for declaratory relief.*

Additionally, Lincoln requests that, incidental to a monetary judgment, the court declare that the government must fulfill and fully satisfy its risk-corridors payment obligations for 2015 and 2016 within 30 days of determining payments owed.  Compl. at 45; Pl.'s Resp. and Cross-Mot. at 30-31.  The court does not have jurisdiction over such a request.

The Tucker Act provides the court with jurisdiction to grant equitable or declaratory relief in three circumstances.  *See Annuity Transfers*, 86 Fed. Cl. at 181.  First, the court may "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records" as an "incident of and collateral to" a monetary judgment.  28 U.S.C. § 1491(a)(2).  Second, the court has jurisdiction to hear nonmonetary disputes arising under the Contract Disputes Act, 28 U.S.C. § 1491(a)(1) (last sentence), and third, it has juridical power to grant equitable relief in bid protests.  28 U.S.C. § 1491(b)(2).  None of these three circumstances apply here.  Although Lincoln is seeking declaratory relief that it contends is collateral to its request for monetary judgment, the relief sought is not necessarily derivative from or attendant to any money judgment that might issue, but rather would turn on future developments.  Thus, the court does not have jurisdiction over Lincoln's request for declaratory relief.

### B.  *Lincoln's Claims Are Ripe For Judicial Review*

The justiciability doctrines of Article III apply in this court, including the ripeness requirement.  *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 321 (2015); *see Fisher*, 402 F.3d at 1176.  The government argues that Lincoln's claims are not ripe for judicial consideration because HHS has not determined the final payment amounts under the risk-corridors program and will not do so until the end of the three-year period the program is in effect.  Def.'s Mot. at 20-22; Def.'s Opp'n to Pl.'s Mot. at 11-12.

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  An unripe claim is dismissed without prejudice.  *Pernix Grp., Inc. v. United States*, 121 Fed. Cl. 592, 599 (2015) (citing *Shinnecock Indian Nation v. United States,* 782 F.3d 1345, 1350 (Fed. Cir. 2015)).  In determining whether an action is ripe, the court evaluates (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."  *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1294-95 (Fed. Cir. 2008) (citing *Abbott Labs.*, 387 U.S. at 149).

A case will generally be fit for judicial review when "further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'" *Caraco Pharm. Labs.*, 527 F.3d at 1295 (citing *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)). Contrastingly, a claim will not be fit if it is "contingent upon future events that may or may not occur." *Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383 (Fed. Cir. 2012) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). The court must also consider whether its involvement "would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

Respecting hardship, the court must consider whether withholding court consideration would have an "immediate and substantial impact" on the plaintiff. *Caraco Pharm. Labs.*, 527 F.3d at 1295 (quoting *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)). This element of the doctrine requires a lesser showing compared to that required of a plaintiff seeking injunctive relief, which calls upon a plaintiff to show irreparable harm. *See Systems Application & Techs.*, 691 F.3d at 1385. Even so, the mere possibility of harm is not sufficient to establish hardship. *See Confederated Tribes & Bands of The Yakama Nation v. United States*, 89 Fed. Cl. 589, 616 (2009) ("[A] possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action.") (quoting *Abbott Labs.*, 387 U.S. at 153); *Pernix Grp.*, 121 Fed. Cl. at 599 ("Abstract, avoidable or speculative harm is not enough to satisfy the hardship prong.").

1. *Section 1342 and the implementing regulation.*

In evaluating fitness for review, the parties focus on Lincoln's claim for damages under Section 1342 of the Act and the implementing regulation. Lincoln asserts that qualified health plans satisfying the conditions of Section 1342 are entitled to payment under the risk-corridors program, and the government accepts this assertion in substantial part. *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers."). That said, the parties differ in interpreting Section 1342 and the implementing regulations. Lincoln asserts that both the statute and regulations require HHS to make full payment annually, *see* Pl.'s Mot. at 9-11; Pl.'s Resp. and Cross-Mot. at 12-23, while the government contends that payments are not due until the end of the program, depending upon the availability of funds, *see* Def.'s Mot. at 23-25; Def.'s Opp'n to Pl.'s Mot. at 18-22. The dispute centers on an issue of statutory interpretation and is therefore fit for judicial review. *See Coalition for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1316 (Fed. Cir. 2006) ("[W]e find that the issues presented by the parties deal largely with legal issues of statutory construction, which we have previously held fit for pre-enforcement judicial review.") (citing *National Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003)). No further factual development is necessary in determining the meaning and application of Section 1342 and the implementing regulation.

The possibility of the government's making some or all of the risk-corridors payments in the future does not change this calculus. In *Confederated Tribes & Bands of The Yakama Nation*, the government argued that plaintiffs' breach of trust and fiduciary duties claims were

not fit for judicial review because the government still had the means to obtain and provide the money requested by plaintiffs. 89 Fed. Cl. at 614-15. The government asserted that those future efforts would alter the facts of the case. *See id.* at 615. The court rejected that argument and found the claims fit for judicial review, explaining that the government's as-yet indeterminate further actions might be relevant to determining the plaintiffs' damages award, but had "no bearing on the accrual and fitness of plaintiffs' claim." *Id.* Regardless of future events, the facts underlying plaintiffs' claim of breach of trust were "fixed." *Id.* at 616. Similarly, the facts underlying Lincoln's claim are fixed as well. As Lincoln would have it, HHS allegedly breached its statutory and regulatory obligations by failing to make full payments annually. Subsequent HHS payments might bear on Lincoln's ability to receive amounts due, but they will not affect Lincoln's underlying claim.

Lincoln has also demonstrated hardship. Lincoln is allegedly due nearly $4 million for losses it suffered in 2014. AR 270; Pl.'s Mot. at 7. Further, Lincoln is allegedly due more than $70 million for losses in 2015, *see* Pl.'s Mot. at 7-8 & App. 8 at A59, but HHS has stated that it does not anticipate making any 2015 payments this year. Def.'s Mot. App. at A47. Lincoln's excess of claims paid compared to premiums received is not uncertain or speculative; as previously noted, Lincoln's adjusted risk-corridors ratios for coverages in 2015 were more than 175% over its target for 2015 and Lincoln suffered substantial losses as a result. *See supra*, at 11 n. 14. Lincoln did not have reserves to cover the deficit, and it was placed in liquidation proceedings as of October 1, 2016. *See* Def.'s Mot. to Strike Pl.'s Cross-Mot. for Judgment on the Administrative Record on Counts II-V at 3-4 & Attach., ECF No. 31; Pl.'s Resp. to Def.'s Mot. to Strike Pl.'s Cross-Mot. for Judgment on the Administrative Record on Counts II-V at 4-5, ECF No. 34.[18] Coupled with Lincoln's premium-setting policies, HHS's failure to make timely payments at least contributed to this insolvency and liquidation. *See Inter-Tribal Council of Ariz., Inc. v. United States*, 125 Fed. Cl. 493, 504 (2016) (finding that plaintiff's breach of trust claim established hardship because government's "years of missed payments and lack of security" was threatening the sustainability of the trust at issue). Thus, Lincoln's claim under Section 1342 and the implementing regulations is ripe for judicial review.

   *2. Express and implied contract claims.*

Ordinarily, a breach of contract claim ripens when the breach occurs. *See Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 615-16 (2014) (citing *Nager Elec. Co. v. United States*, 368 F.2d 847, 851-52 (Ct. Cl. 1966)), *aff'd*, 805 F.3d 1049 (Fed. Cir. 2015). If a party repudiates a contract, the claim "ripens when performance becomes due or when the other party to the contract opts to treat the repudiation as a present total breach." *Id.* at 616 (citations omitted); *see also Franconia Associates*, 536 U.S. at 143 (noting that when a party repudiates a contract by renouncing a contractual duty before performance is due, the repudiation "ripens into a breach . . . if the promisee elects to treat it as such") (internal quotation marks and citations omitted).

---

[18] *See* Agreed Order of Liquidation with a Finding of Insolvency, *Illinois v. Land of Lincoln Mut. Health Ins. Co.*, No. 16 CH 09210 (Ill. Cir. Ct., Cook Cnty., Chancery Div. Sept. 29, 2016), appended as the attachment to Def's Mot. to Strike Pl.'s Cross-Mot. for Judgment on the Administrative Record on Counts II-V, ECF No. 31-1.

Lincoln alleges that HHS had a contractual obligation to make full and annual payments under the risk-corridors program. Again, HHS made payments for the 2014 year, but did not pay in full. Further, as Lincoln would have it, HHS allegedly committed an anticipatory breach of the 2015 contract when it announced that it would not be making 2015 payments this year, and Lincoln has treated HHS's so-called repudiation as a present and total breach. *See* Pl.'s Resp. and Cross-Mot. at 11-12. Lincoln's contract claims for 2014 and 2015 consequently also are ripe for review.

### 3. *Takings claim.*

Generally, a regulatory takings claim is ripe when the "government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186 (1985)). An agency action is final when (1) it constitutes the "consummation of the agency's decisionmaking process" such that it is not "of a merely tentative or interlocutory nature," and (2) it is a decision where "rights or obligations have been determined" or from which "legal consequences will flow." *Barlow & Haun*, 118 Fed. Cl. at 616 (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)) (internal quotation marks omitted). Additionally, a party must have first taken "reasonable and necessary steps" to allow the regulatory agency to exercise its "full discretion." *Washoe Cnty., Nev. v. United States*, 319 F.3d 1320, 1324 (Fed. Cir. 2003) (quoting *Palazzolo v. Rhode Island,* 533 U.S. 606, 620-21 (2001)).

Lincoln submitted timely accounts of its losses and entitlement to payment for 2014 and 2015, but it has received less than full payment from the government. While HHS has stated that it intends to fulfill its 2014 payment obligations as funds become available, it did not make full payments annually. This was not a tentative decision by HHS, but rather reflected the agency's budget-neutral scheme and determined Lincoln's rights as a qualified health plan issuer. HHS's actions represent a final decision on behalf of the agency, and the legal consequences of those actions have directly affected Lincoln. Lincoln's takings claim is also ripe.

## STANDARDS FOR DECISION

### A. *Rule 12(b)(6)*

Under RCFC 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged must be sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). In evaluating a motion to dismiss pursuant to RCFC 12(b)(6), the court draws all "reasonable inferences" in favor of the non-moving party. *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 253 (2011) (quoting *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001)), *aff'd*, 695 F.3d 1380 (Fed. Cir. 2012). However, the court is not required to accept legal conclusions, even if placed

within factual allegations.  *See Rack Room Shoes v. United States*, 718 F.3d 1370, 1376 (Fed. Cir. 2013) (citing *Iqbal*, 556 U.S. at 678); *Kam-Almaz*, 682 F.3d at 1367-68 (citing *Twombly*, 550 U.S. at 555).

### B.  Judgment on the Administrative Record

In a case dependent upon the administrative record, a party is permitted to move for judgment on the administrative record pursuant to RCFC 52.1(c).  The court reviews decisions of a federal agency under the standards set forth in the Administrative Procedure Act ("APA"), codified in pertinent part at 5 U.S.C. § 706(2)(A).  *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009); *Meyer v. United States*, 127 Fed. Cl. 372, 381 (2016).  Under the APA, a court shall set aside an agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs*, 345 F.3d 1334, 1339 (Fed. Cir. 2003).  In this instance, Lincoln argues that only the "contrary to law" aspect of the standard applies, *see* Pl.'s Reply in Support of Cross-Mot. for Judgment on the Administrative Record on Counts II-V ("Pl.'s Reply in Support of Cross-Mot.") at 9, ECF No. 44, and the court will apply that criterion.

## ANALYSIS

## I.  THE STATUTORY ENTITLEMENT COUNT

Land of Lincoln's fundamental claim is that HHS has misconstrued Section 1342 of the Act and that the statute when properly interpreted establishes an entitlement to "payments out" on an annual basis and in full, even in the absence of an authorization for, or appropriation of, specific funding beyond the "payments in" due under the statute.

When a party challenges an agency's interpretation of a statute administered by the agency, the court applies the two-step process established in *Chevron*, 467 U.S. at 842-43.  *See White v. United States*, 543 F.3d 1330, 1333 (Fed. Cir. 2008).  Under step one, the court must determine whether "Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  An agency must apply an unambiguous statute according to its terms as expressed by Congress, and in that circumstance no deference is accorded an agency's interpretation.  *White*, 543 F.3d at 1333 (citations omitted).

But, if Congress has not spoken to the precise issue, the court turns to step two and applies the "*Chevron* standard of deference."  *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) ("[T]he *Chevron* standard of deference applies if Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'") (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)); *see White*, 543 F.3d at 1333 (noting that courts "must defer to an agency's interpretation of a statute if the statute is ambiguous or contains a gap that

Congress has left for the agency to fill through regulation") (citing *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 395 (2008)).

In supporting its position, Lincoln relies upon a variant of the plain-meaning doctrine applicable to *Chevron* step one, while the government contends that Section 1342 is ambiguous because of gaps in the language and urges the court to defer to the agency's interpretation under *Chevron* step two.

A. *Section 1342 Provides No Specific Authorization for Use of Appropriated Funds and is Ambiguous as to Whether HHS Is Required to Make Payments Annually*

Under step one of *Chevron*, "the precise question at issue" here is whether Congress intended for HHS to make full payments annually under Section 1342, regardless of the amount of fees collected under the risk-corridors program. The court begins with the language of the statute. *Sursely v. Peake*, 551 F.3d 1351, 1355 (Fed. Cir. 2009) (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977)); *see Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) ("We therefore begin . . . our search for Congress's intent with the text and structure of [the statute]."). Statutory terms are interpreted "in accordance with [their] ordinary or natural meaning." *Sursely*, 551 F.3d at 1355 (citing *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 449 (2007)) (internal quotation marks omitted). When interpreting statutory terms, the court may consider the text, structure, legislative history, and canons of construction. *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000).

Paragraph 1342(b)(1) provides that if a qualified health plan reports allowable costs for "any plan year" that sufficiently exceed the plan's target amount, "the Secretary shall pay to the plan" a percentage of those costs. 42 U.S.C. § 18062(b)(1). Lincoln emphasizes the "shall pay" language and the year-by-year reporting and calculus of its cost-revenue experience. Although Paragraph 1342(b)(1) contemplates that qualified health plans will be reporting costs on an annual basis via the phrase "any plan year," that arrangement reflects the year-by-year transitory aspect of the temporary risk-corridors program.[19] The "[p]ayments out" and "[p]ayments in " methodology in Subsection 1342(b) governs the amounts that HHS must pay to and receive from qualified health plans, but it does not establish when these payments are to be made. Similarly, Subsection 1342(a) states that the Secretary "shall establish and administer" the program "for calendar years 2014, 2015, and 2016," but it does not specify the timing of the various payments over those three years.[20]

_____

[19]Lincoln also points to several other annual aspects of the program to support its argument that HHS is required to make full payments annually, *see* Pl.'s Resp. and Cross-Mot. at 14-15; Pl.'s Reply at 4, but those aspects concern HHS's requirement that qualified health plans must submit data to HHS annually, *see* 45 C.F.R. § 153.530(d), and must be certified annually, *see* 45 C.F.R. § 155.1045; Compl. Exs. 2-4. Those provisions for annual qualification for participation and for consideration of data over a calendar year do not control what is to happen with the data submitted by qualified plans and do not refer to payments to and from issuers.

[20]Lincoln argues that the plural "corridors," as opposed to "corridor," demonstrates that Congress intended to implement multiple risk corridors for each calendar year, with separate

Additionally, the only statutory source of funding for the risk-corridors program is Paragraph 1342(b)(2), which refers to "[p]ayments in" from qualified health plans. 42 U.S.C. § 18062(b)(2); *see GAO Op.*, 2014 WL 4825237, at *2, AR 116 ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in [S]ection 1342(b)(1)."). No other source of funds is mentioned or specified. *See supra*, at 7-9 & nn. 8-10 for a discussion of GAO's consideration of other appropriated CMS program-management funds that might have been available during fiscal year 2014. In March 2010, while Congress was considering the bills that eventually become the Affordable Care Act, the CBO provided Congress with an estimate of how the Act would affect future government spending and revenue. *See generally* March 2010 CBO Letter. The CBO explicitly provided revenue and spending estimates for the Act's two other stabilization programs, reinsurance and risk adjustment, but it omitted any budgetary estimate for the risk-corridors program. *See id.*, Table 2. That circumstance is significant. Congress explicitly relied upon the CBO's findings when enacting the Affordable Care Act. *See* Affordable Care Act § 1563.[21] Congress also provided appropriations or authorizations of funds

---

payments for each year. Pl.'s Resp. and Cross-Mot. at 14. The implementing regulations define "risk corridors" as "any payment adjustment system based on the ratio of allowable costs of a plan to the plan's target amount." 45 C.F.R. § 153.500. Subsection 1342(b) sets forth multiple payment adjustment systems, depending on whether a qualified health plan's allowable costs fall above or below the target amount by specified percentages. The plural "corridors" reflects that more than one payment adjustment system exists within the program.

[21]Section 1563 of the Act is entitled "Sense of the Senate Promoting Fiscal Responsibility." It provides:

Sec. 1563. Sense of the Senate Promoting Fiscal Responsibility

(a) FINDINGS. – The Senate makes the following findings:

(1) Based on Congressional Budget Office (CBO) estimates, this Act will reduce the federal deficit between 2010 and 2019.
(2) CBO projects this Act will continues to reduce budget deficits after 2019.
(3) Based on CBO estimates, this Act will extend the solvency the Medicare HI Trust Fund.
(4) This Act will increase the surplus in the Social Security Trust Fund, which should be reserved to strengthen the finances of Social Security.
(5) The initial net savings generated by the Community Living Assistance Services and Supports (CLASS) program are necessary to ensure the long-term solvency of that program.

(b) SENSE OF THE SENATE. – It is the sense of the Senate that –

for other programs within the Act, but it never has done so for the risk-corridors program. *See, e.g.*, 42 U.S.C. §§ 18031(a)(1), 18054(i); *see also National Fed'n of Indep. Bus. v. Sebelius*, __ U.S. __, __, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.") (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).[22]

Lincoln additionally emphasizes that the risk-corridors program is explicitly "based on" Part D of the Medicare Program, *see* 42 U.S.C. § 18062(a), which requires full payments annually and is not budget neutral. Pl.'s Mot. at 12; Pl.'s Resp. and Cross-Mot. at 15-16, 18-19. However, the Medicare Program is not helpful to Lincoln's argument. The Medicare Program sets forth a risk-corridors payment program between HHS and qualified prescription drug plans. *See* 42 U.S.C. § 1395w-115. While Section 1342 is "based on" the Medicare Program and the

---

> (1) the additional surplus in the Social Security Trust Fund generated by this Act should be reserved for Social Security and not spent in this Act for other purposes; and
>
> (2) the net savings generated by the CLASS program should be reserved for the CLASS program and not spend in this Act for other purposes.

Affordable Care Act § 1563, 124 Stat. 270-71.

[22]In post-enactment reports, the CBO's observations related to the risk-corridors program have been inconsistent. *See, e.g.*, Congressional Budget Office, *Estimates for the Insurance Coverage Provisions of the Affordable Care Act Updated for the Recent Supreme Court Decision*, at Tables 2, 4 (July 2012), https://www.cbo.gov/sites/default/files/112th-congress-2011-2012/reports/43472-07-24-2012-CoverageEstimates.pdf (providing spending and revenue estimates for reinsurance and risk adjustment, but not risk corridors); Congressional Budget Office, *The Budget and Economic Outlook: 2014 to 2024*, at 59 (Feb. 2014), https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/45010-outlook2014feb0.pdf (estimating the spending and revenue of the risk-corridors program and noting that "risk corridor collections . . . will not necessarily equal risk corridor payments, so that program can have net effects on the budget deficit"); Congressional Budget Office, *Insurance Coverage Provisions of the Affordable Care Act–CBO's January 2015 Baseline*, Table B-1 (Jan. 2015), https://www.cbo.gov/sites/default/files/51298-2015-01-ACA.pdf ("The risk corridors program is now recorded in the budget as a discretionary program.").

These post-enactment observations by CBO are of limited utility for statutory interpretation. For purposes of determining the congressional intent underpinning Section 1342, the CBO's March 2010 estimate is the only pertinent report because that is what Congress relied upon in passing the Act. *See United States v. Fausto*, 484 U.S. 439, 455, 461 n.9 (1988) (Stevens, J., dissenting) ("If we construe a statute in a different legal environment than that in which Congress operated when it drafted and enacted the statute, we significantly increase the risk that we will reach an erroneous interpretation."), *superseded by statute as stated in Kaplan v. Conyers*, 733 F.3d 1148, 1160-61 (Fed. Cir. 2013).

two programs share many similarities, they are not identical.  The Medicare Program specifically requires that "*[f]or each plan year*, the Secretary shall establish a risk corridor . . . ." 42 U.S.C. § 1395w-115(e)(3)(A) (emphasis added).  In contrast, Congress chose to omit "for each plan year" in Section 1342 and instead required that "[t]he Secretary shall establish and administer a program of risk corridors."  42 U.S.C. § 18062(a).  The only mention of "any plan year" is in reference to the qualified health plan's reported costs, rather than HHS's obligation to pay.  *See* 42 U.S.C. § 18062(b)-(c).  Additionally, unlike Section 1342, the Medicare Program explicitly provides for authorization of appropriations.  *See* 42 U.S.C. § 1395w-115(a)(2) ("This section constitutes budget authority in advance of appropriations Acts and represents the obligation of the Secretary to provide for the payment of amounts provided under this section.").  "When Congress omits from a statute a provision found in similar statutes, the omission is typically thought deliberate."  *Turtle Island Restoration Network v. Evans*, 284 F.3d 1282, 1296 (Fed. Cir. 2002) (noting that Congress's failure to include an embargo in the statute, when it did so in similar statutes, suggested that Congress did not intend to impose an embargo) (citing *Immigration & Naturalization Serv. v. Phinpathya*, 464 U.S. 183, 190 (1984)).  Here, the differences between the two statutes suggest that Section 1342 does not require HHS to make full payments annually.

In short, Section 1342 is ambiguous in terms of the "payments in" and "payments out" arrangement for risk-corridors payments because it does not contain an express authorization for appropriations to make up any shortfall in the "payments in" to cover all of the "payments out" that may be due.[23]  And, it does not explicitly require "payments out" to be made on an annual basis, whether in full or not.  *Chevron* step two thus seemingly comes into play.

Lincoln nonetheless argues that *Chevron* deference is inappropriate because (1) HHS's interpretation of Section 1342 is a *post hoc* rationalization that the government has merely advanced for purposes of litigation, and (2) deference is not appropriate in the context of the Affordable Care Act.  *See* Pl.'s Resp. and Cross-Mot. at 21-22.

HHS initially outlined its three-year, budget-neutral interpretation of Section 1342 in 2014, several years before this suit began.  *See, e.g.*, HHS Notice of Benefit and Payment Parameters for 2015 Final Rule, 79 Fed. Reg. at 13,787, AR 4929; Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195.  HHS's interpretation thus is not merely a "convenient litigation position."  *See Parker v. Office of Pers. Mgmt.*, 974 F.2d 164, 166 (Fed. Cir. 1992); *see also Auer v. Robbins*, 519 U.S. 452, 462 (1997) (rejecting petitioners' argument that the agency's interpretation was undeserving of deference merely because it was presented through a legal brief, and holding that there was "no reason to suspect that the interpretation [did] not reflect the agency's fair and considered judgment on the matter in question").  Rather, HHS's interpretation reflects the agency's deliberations and efforts through the rulemaking process.  The fact that the agency may have taken inconsistent positions prior to 2014 does not alter the analysis.  *See Chevron*, 467 U.S. at 863-64 ("The fact that the agency has from time to time changed its interpretation of the term 'source' does not, as

---

[23]Correlatively, the statute does not indicate the disposition of any potential *excess* of "payments in" over "payments out" for any given year, but that rather unlikely scenario is perhaps only of academic interest.

respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute . . . . [T]he fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible . . . .").

In resisting deference, Lincoln also relies on *King v. Burwell*, __ U.S. at __, 135 S. Ct. at 2488-89, where the Supreme Court did not give deference to the Internal Revenue Service's ("IRS") interpretation of the Affordable Care Act.  The Court reasoned that deference was not appropriate because that "extraordinary case[]" involved tax credits that were "central" to the Act's statutory scheme, implicated "billions of dollars" that would affect health insurances prices, and related to an implicit delegation of authority from Congress to the IRS, which did not have expertise in health insurance policy. *Id.*  Here, in contrast, Congress delegated the responsibilities of administering the risk-corridors program to HHS, which addresses health insurance policy in a variety of different contexts.  Lincoln has failed to demonstrate that this setting is sufficiently "extraordinary" to obviate reference to *Chevron* deference.

B.   *HHS's Three-Year, Budget-Neutral Interpretation of Section 1342 is Reasonable Under the* Chevron *Step-Two Standard of Deference*

Under step two of *Chevron*, the court must defer to HHS's interpretation of Section 1342 as long as that interpretation is reasonable.  HHS's interpretation was reflected in its final rule on May 27, 2014, when it stated that it intended "to administer risk corridors in a budget neutral way over the three-year life of the program, rather than annually."  Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195.  "[A] court must defer to an agency's reasonable interpretation of a statute and must not substitute its own judgment for that of the agency even if the court might have preferred another interpretation and even if the agency's interpretation is not the only reasonable one."  *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1360-61 (Fed. Cir. 2007); *see also Federal Express Corp.*, 552 U.S. at 395 (holding that when an agency interprets an ambiguous statute through a regulation, the court must defer to the agency's reasonable interpretation).

Section 1342 directs HHS to establish the risk-corridors program and sets forth the amounts that HHS must receive and pay under the payment methodology subsection, but it does not obligate HHS to make annual payments or authorize the use of any appropriated funds.  HHS's interpretation is consistent with the CBO's 2010 report, Congress's decision explicitly to authorize funds for other sections of the Act but not Section 1342, and Congress's choice to omit from Section 1342 the critical appropriation language used in the Medicare Program, as discussed *supra*.  HHS's three-year, budget-neutral interpretation reasonably reflects these circumstances.

Lincoln argues that HHS's interpretation is unreasonable because HHS's failure to make full payments annually defeats the purpose of the risk-corridors program, which is to provide stability and protection for qualified health insurance plans. *See* Pl.'s Resp. and Cross-Mot. at 19-20.  In this vein, HHS has repeatedly acknowledged its obligation to pay qualified health plans that are eligible for payment under the risk-corridors program. *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.").  That said, HHS's payments in due course, not necessarily annually, to the extent

funds are available from "payments in" without resort to appropriated funds, can still serve the program, albeit not to the extent Lincoln urges.  Importantly, Lincoln's argument based on broad purposes is not persuasive.  "[P]olicy considerations cannot override our interpretation of the text and structure of [a statute], except to the extent that they may help to show that adherence to the text and structure would lead to a result so bizarre that Congress could not have intended it." *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1192 (Fed. Cir. 2004) (quoting *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 188 (1994)); *see also Sharp*, 80 Fed. Cl. at 433 ("While the outcome of granting more money to married people than to similarly situated single people may seem odd, it is entirely reasonable to assume a scenario in which various factions within Congress, each of which had different policy goals, were motivated to– and did–compromise in order to pass the Veterans Benefits Act of 2003.").[24]  HHS's interpretation does not lead to such a "bizarre" result.  Congress directed HHS to establish the risk-corridors program and make payments as necessary and appropriate, but it gave HHS discretion in administering the program.

The primary implementing regulation for the risk-corridors program, 45 C.F.R. § 153.510, sets forth substantially similar terms to Section 1342.  As to "payments out," the regulation provides:

> (b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
>> (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
>>
>> (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

45 C.F.R. § 153.510(b).  Correlatively to Section 1342, the regulation omits any reference to when payment from HHS is due or how HHS is to fund the program.  There is no deadline for

---

[24]As the Supreme Court observed in *Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986), "[a]pplication of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action."  The Court commented that "Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises." *Id*. at 374; *see also America Online, Inc., v. United States*, 64 Fed. Cl. 571, 579 (2005) (quoting and relying on *Dimension Financial* in construing an excise tax statute).

HHS to make payments to the qualified health plan issuers.  *See generally* 45 C.F.R. § 153.510.
The only relevant difference is that the regulation explicitly provides a deadline for qualified
health plan issuers to remit overages to HHS.  *See* 45 C.F.R. § 153.510(d).  Thus, for the reasons
discussed *supra*, the court finds HHS's interpretation of the ambiguous statute to be reasonable.
HHS's decision not to make full payments annually cannot be considered contrary to law.  The
government's motion for judgment on the administrative record with respect to Count I is
granted.

## II. THE CONTRACT COUNTS

*A.  Count II: Lincoln Has Failed to Allege a Valid Express Contract Because the Agreements
Between Lincoln and HHS Do Not Establish Any Contractual Commitment Pertaining to
the Risk-Corridors Program*

Lincoln alleges that it entered into three one-year contracts with HHS when it agreed to
be a qualified health plan issuer for 2014, 2015, and 2016 and that HHS breached those contracts
by failing to make full payments annually.  *See* Compl. ¶¶ 166-78, Exs. 2-4.  The government
responds that the agreements between Lincoln and HHS are not contracts and are unrelated to the
risk-corridors program.  *See* Def.'s Mot. at 31-37; Def.'s Opp'n to Pl.'s Cross-Mot. at 12-18.
For the reasons set out below, the court concludes that Lincoln has failed to establish that an
express contract exists between Lincoln and HHS respecting the risk-corridors program.

To establish a valid contract with the government, a plaintiff must demonstrate "(1)
mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance,
and (4) authority on the part of the government agent entering the contract."  *Suess v. United
States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008) (citations omitted).  In evaluating an alleged
contract, the court begins with the language of the agreement.  *Coast Fed. Bank, FSB v. United
States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032,
1034 (Fed. Cir. 1993)).  When the terms of the agreement are "clear and unambiguous, they must
be given their plain and ordinary meaning."  *Bell/Heery v. United States*, 739 F.3d 1324, 1331
(Fed. Cir. 2014) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir.
1996)) (internal quotation marks omitted).  Additionally, the agreement is "construed as a whole
and 'in a manner that gives meaning to all of its provisions and makes sense.'"  *Id.* (quoting
*McAbee Constr.*, 97 F.3d at 1435); *see also Jowett, Inc. v. United States*, 234 F.3d 1365, 1368
(Fed. Cir. 2000).

 Here, Lincoln entered into one-year agreements with HHS for 2014, 2015, and 2016.
*See* Compl. Exs. 2-4.[25]  The agreements certified Lincoln as a qualified health plan issuer, as
required by the Affordable Care Act and the implementing regulations.  *See* 42 U.S.C. §
18031(d)(4)(A), (e); 45 C.F.R. § 155.20.  The substance of each agreement is contained in the
"Acceptance of Standard Rules of Conduct," where the qualified health plan issuer agrees to use
HHS's internet services in accord with the conduct outlined in the agreement.  *See* Compl. Ex. 2,

---

[25]The three agreements are not identical, but they are substantially similar and contain the
same language in pertinent part.

Section II.b; Ex. 3, Section II.b; Ex. 4 Section II.b.  The conduct specifically relates to the qualified health plan's communications through the government's internet service.  The qualified health plan agrees to properly test and format transactions, submit test transactions, and abide by certain transaction standards, among other internet service-related requirements.  *See* Compl. Ex. 2, Section II.b; Ex. 3, Section II.b; Ex. 4, Section II.b.  The agreements do not explicitly refer to the risk-corridors program.  *See generally* Compl. Exs. 2-4.  Rather, they reflect Lincoln's agreement to comply with HHS's standards and the government's acceptance of Lincoln into the Affordable Care Act's Exchange program.  Because Illinois elected not to establish an Exchange under the provisions of 42 U.S.C. § 18031(d), HHS stepped in to provide a federally-run Exchange in Illinois pursuant to 42 U.S.C. § 18041(c).  The plain language of the agreements does not indicate any contractual commitment on behalf of HHS to make risk-corridors payments.[26]

Lincoln presents several arguments as to why the agreements represent a contractual obligation to pay qualified health plans under the risk-corridors program, including that: (1) the agreements provide that HHS will "undertake all reasonable efforts to implement systems and processes" to support the qualified health plan issuers, (2) the agreements state that they are "governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated by HHS," and (3) the agreements state that HHS "will recoup or net payments due" to qualified health plan issuers "against amounts owed" to HHS with respect to the "payment of [f]ederally-facilitated Exchange user fees."  *See* Compl. Exs. 2-4; Pl.'s Resp. and Cross-Mot. at 33-34.  These arguments do not constitute persuasive support to Lincoln's position for the reasons set forth below.

First, HHS's obligation "to implement systems and processes," *see* Compl. Ex. 2, Section II.d; Ex. 3, Section III.a; Ex. 4, Section III.a, must be read in the context of the agreements as a whole.  The agreements explicitly relate to the qualified health plan's use of HHS's "Data Services Hub Web Services."  *See* Compl. Ex. 2, Section II.b; Ex. 3, Section II.b; Ex. 4, Section II.b.  The qualified health plan agrees to abide by certain requirements so that it can be certified to offer insurance through this internet service.  Given this context, "systems and processes" must relate to the electronic system that HHS and the qualified health plan will be using, and the processes that support this electronic system.  This interpretation is reinforced by the language of the "Companion Guide," which is explicitly cited within the agreement.  *See, e.g.*, Compl. Ex. 2, Section II.b; Ex. 3, Section II.b; Ex. 4, Section II.b.  The guide identifies the various processes that are implicated by HHS's internet service, such as the testing process and validation process.

_____

[26]The government also notes that Lincoln's express contract claim, if accepted, would result in an "artificial policy distinction" between the qualified health plans using federally-facilitated Exchanges and the qualified health plans using state-established Exchanges.  *See* Def.'s Mot. at 36-37.  The risk-corridors program applies to all qualified health plans.  *See generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.  However, only qualified health plans under the federally-facilitated Exchanges, not the state-established Exchanges, enter into the types of agreements with HHS that are at issue here.  *See* Def.'s Mot. at 36-37.  Thus Lincoln's express contract theory, if adopted, would create an inconsistent and unintended result where some qualified health plans have an allegedly express contractual basis for risk-corridors payments, but others do not.

*See* Def.'s Opp'n to Pl.'s Cross-Mot. at 13-14, App. at A1-A5.  The "systems and processes" language does not give rise to any risk-corridors obligations.

Second, the general reference to "the laws and common law of the United States, including . . . such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies," Compl. Ex 2, Section V.g; Ex. 3, Section V.g; Ex. 4, Section V.g, does not incorporate the risk-corridors program into the agreement.  For a contract to incorporate a document, "the incorporating contract must use language that is *express* and *clear*, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract."  *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (emphasis in original).  A reference to the laws of the United States, or to statutes or regulations generally, will typically not suffice to incorporate a specific statutory provision or regulation.  *See, e.g.*, *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (holding that a general reference to the agency's regulations did not incorporate a specific regulation promulgated by the agency or a specific section of the agency's handbook); *Smithson v. United States*, 847 F.2d 791, 794-95 (Fed. Cir. 1988) (holding that a contract did not incorporate an agency's regulations, despite the statement in the contract that it was "subject to the present regulations of the [agency] and to its future regulations not inconsistent with the express provisions hereof"); *Dobyns v. United States*, 118 Fed. Cl. 289, 315-16 (2014) (holding that an agreement's reference to "all laws regarding or otherwise affecting the Employee's employment" did not incorporate specific agency provisions).  As the Federal Circuit explained in *Smithson*, holding otherwise would allow a private party to "choose among a multitude of regulations as to which he could claim a contract breach" and impose entirely new obligations on the government through implication.  847 F.2d at 794 (internal quotation marks and citations omitted).  Here, the general reference to federal law and HHS regulations does not expressly or clearly incorporate the specific risk-corridors provisions upon which Lincoln relies.

Third, HHS's obligations regarding "[f]ederally-facilitated Exchange user fees," *see* Compl. Ex. 2, Section II.c; Ex. 3, Section III.b; Ex. 4, Section III.b, do not relate to the risk-corridors program.  Neither Section 1342 of the Act nor Section 153.510 of the regulations refer to such fees.  *See* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.  Rather, the term "user fees" is included in Section 1311 of the Act, which permits the Exchanges "to charge assessments or user fees to participating health insurance issuers."  42 U.S.C. § 18031(d)(5)(A).[27]  The implementing regulations, under a provision entitled "Requirement for [f]ederally-facilitated Exchange user fee," explain that participating health insurance issuers offering plans through a federally-facilitated Exchange "must remit a user fee to HHS."  45 C.F.R. § 156.50(c)(1), (2).[28]  HHS is

[27]The cited Subparagraph relates to state-established Exchanges, but as noted *supra*, at 3, 6 n. 7, HHS provided an Exchange in Illinois when the State did not.

[28]In 2014, HHS and GAO described risk-corridors payments as "user fees."  *See* Letter from William B. Schultz, Gen. Counsel, HHS, to Julia C. Matta, Assistant Gen. Counsel, GAO (May 20, 2014) ("Schultz-Matta Letter"), AR 1482-84; *GAO Op.*, 2014 WL 4825237, at *3-5, AR 117-19.  These characterizations were made, however, in the context of analyzing the 2014

obligated to adjust or reduce the user fee if the issuer satisfies certain conditions, such as making payments for a contraceptive service. *See id.* § 156.50(d). Thus, the agreements between HHS and Lincoln simply acknowledge that Lincoln will pay the user fee set forth in Section 156.50 of the implementing regulations. The reference to HHS's recouping or netting payments reflects the agency's obligations described in Section 156.50(d), which states when an adjustment to the user fee is applicable. The risk-corridors program is not mentioned as a basis for an adjustment. *See generally* 45 C.F.R. § 156.50(d).

Thus, Lincoln has failed to allege that the agreements between Lincoln and HHS created a valid express contract pertaining to risk-corridors payments. The government's motion to dismiss Lincoln's claim of breach of an express contract is granted.

> B. *Count III: Lincoln Has Failed to Allege a Valid Implied-in-Fact Contract Because Mutuality of Intent and Offer and Acceptance are Lacking, and Even if an Implied-in-Fact Contract Did Exist, the Scope of the Contract Would be Limited by the Implementing Regulations*

Lincoln alleges that it formed an implied-in-fact contract with the government and that the government implicitly agreed to make full risk-corridors payments annually, which it has failed to do. *See* Compl. ¶¶ 180-97; Pl.'s Resp. and Cross-Mot. at 35-39. The government responds that Section 1342 and the implementing regulations and the course of conduct of the parties do not establish the existence of any contract between the government and qualified health plans. *See* Def.'s Mot. at 37-42.

An implied-in-fact contract is based upon a meeting of the minds, which is inferred from the conduct of the parties and the surrounding circumstances. *Night Vision Corp. v. United States*, 469 F.3d 1369, 1375 (Fed. Cir. 2006) (citing *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)). The requirements for a binding contract are the same for express and implied contracts. *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); *see Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986) (noting that to find an implied-in-fact contract, "all of the elements of an express contract must be shown by the facts or circumstances surrounding the transaction . . . so that it is reasonable, or even necessary, for the court to assume that the parties intended to be bound").[29] Plaintiff has the

---

appropriation act's reference to "sums as may be collected from authorized user fees." *See* Schultz-Matta Letter, AR 1482-84; *GAO Op.*, 2014 WL 4825237, at *2-5, AR 116-19. Here, in contrast, the agreements between Lincoln and HHS do not simply contain the term "user fees," but instead refer to "*[f]ederally-facilitated Exchange* user fees." *See* Compl. Ex. 2, Section II.c; Ex. 3, Section III.b; Ex. 4, Section III.b (emphasis added). In this setting, Section 156.50 of the implementing regulations is instructive rather than HHS's and GAO's past characterizations, because Section 156.50 explicitly addresses a "[f]ederally-facilitated Exchange user fee." *See* 45 C.F.R. § 156.50(c), (d).

[29]To support its implied contract claim, Lincoln argues that it relied on the government's alleged offer to make risk-corridors payments when Lincoln chose to participate on the Illinois Exchange. *See* Pl.'s Resp. and Cross-Mot. at 36. However, detrimental reliance is not an

burden of proving that a valid contract exists. *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998); *see Hanlin*, 316 F.3d at 1328 (noting that plaintiff has the burden of establishing an implied-in-fact contract); *AAA Pharmacy, Inc. v. United States*, 108 Fed. Cl. 321, 328-29 (2012) (granting the government's motion to dismiss when plaintiff failed to allege the necessary elements for a valid contract with the government).

"[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued . . . ." *National R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry.*, 470 U.S. 451, 465-66 (1985) (citing *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79 (1937)) (internal quotation marks omitted); *see AAA Pharmacy, Inc.*, 108 Fed. Cl. at 329 ("Only when statutes or regulations have clearly expressed the Government's intent to enter into a contractual arrangement with program participants have courts found an implied-in-fact contract.") (citations omitted). For example, in *Hanlin*, the Federal Circuit rejected plaintiff's claim that the relevant statute and regulation gave rise to an implied-in-fact contract. 316 F.3d at 1329-30. There, the statute provided that the agency "may direct" payment of attorneys' fees under certain circumstances, but the regulation stated that such fee arrangements "will be honored" by the agency only when specific conditions were met. *Id.* at 1328-29. The Federal Circuit explained that "[t]he statute and the regulation set forth the [agency's] authority and obligation to act, rather than a promissory undertaking . . . . The statute is a directive from the Congress to the [agency], not a promise from the [agency] to the [plaintiff]." *Id.* at 1329; *see also AAA Pharmacy*, 108 Fed. Cl. at 328-29 (dismissing plaintiff's breach of contract theory based on the government's alleged failure to abide by Medicare regulations because the regulations represented the government's independent obligations and did not indicate an intent to contract).

Here, similarly, Section 1342 and the implementing regulations do not provide any express or explicit intent on behalf of the government to enter into a contract with qualified health plan issuers. Although the provisions may mandate payment from HHS, albeit not annually, when a qualified health plan satisfies statutory and regulatory conditions, that alone does not demonstrate intent to contract. *See ARRA Energy Co. I*, 97 Fed. Cl. at 28 (dismissing plaintiffs' implied-in-fact contract claim because the statute failed to indicate an unambiguous offer or intent to contract, even though the government may have had a statutory obligation to make an award to the plaintiffs); *see also Hanlin*, 316 F.3d at 1331 (noting that an agency "may indeed be obligated to follow a statute and regulation regardless of whether it also has a contractual duty to perform"). HHS's obligation to make risk-corridors payments when certain conditions are met represents the agency's independent authority and obligation as directed by

---

element of an implied-in-fact contract claim. *Steinberg v. United States*, 90 Fed. Cl. 435, 444 (2009), *appeal dismissed*, 451 Fed. Appx. 915 (Fed. Cir. 2010). It is an element of an implied-in-law claim, over which this court does not have jurisdiction. *See, e.g.*, *International Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *Baistar Mech. Inc., v. United States*, __Fed. Cl. __, __, 2016 WL 5404169, at *7 (2016); *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 782-83 (2015).

Congress, not any promissory undertaking or offer to qualified health plans issuers such as Lincoln.  Thus there is no apparent mutuality of intent to contract.

To support its implied contract claim, Lincoln primarily relies on *Radium Mines, Inc. v. United States*, where the court construed a regulation as an offer that invited acceptance by performance.  153 F. Supp. 403, 405-06 (Ct. Cl. 1957).  Lincoln contends that HHS's obligation to make payments under the risk-corridors program constituted an offer, which Lincoln accepted by participating in the Exchange as a qualified health plan and complying with the various statutory and regulatory requirements.  *See* Pl.'s Resp. and Cross-Mot. at 39-41.  However, in *Radium Mines*, the regulation explicitly provided that the government would contract with uranium producers that offered to sell uranium to the government, as long as certain conditions were met.  *See* 153 F. Supp. at 405-06.  For example, one provision in the regulation stated that "the Commission will forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance." *Id.* at 405.  And similarly, in *Grav v. United States*, 14 Cl. Ct. 390, 391-93 (1988), *aff'd*, 886 F.2d 1305 (Fed. Cir. 1989), the court held that a statute gave rise to an implied-in-fact contract between the government and private parties because it stated that "the Secretary shall offer to enter into a contract . . . ."  Here, unlike the regulation in *Radium Mines* and the statute in *Grav*, Section 1342 and the implementing regulations make no explicit reference to an offer or contract.  *See AAA Pharmacy, Inc.*, 108 Fed. Cl. at 329 (finding that a regulation providing for payment from the government did not create an implied-in-fact contract because, unlike in *Radium Mines*, the regulation did "not include any language manifesting either an offer or an intent to enter into contract"); *ARRA Energy Co. I*, 97 Fed. Cl. at 27-28 (finding that a statute did not create an implied-in-fact contract because, unlike in *Radium Mines*, it did not clearly express an intent to contract).

Additionally, Lincoln relies on *New York Airways, Inc. v. United States*, 369 F.2d 743, 745 (Ct. Cl. 1966), where the relevant statute provided that the "Postmaster General shall make payments out of appropriations for the transportation of mail by aircraft . . . as is fixed and determined by the [Civil Aeronautics] Board . . . ."  The Board promulgated an order that fixed the monthly compensation for mail transporters, including plaintiffs.  *Id.* at 744.  In finding an implied-in-fact contract, the court stated that the Board's order constituted "an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer." *Id.* at 751.  The facts of *New York Airways*, however, are distinguishable from Lincoln's implied-in-fact contract claim.  In *New York Airways*, the plaintiffs' were entitled to fixed monthly compensation from the Board in exchange for transporting mail; no further action was necessary because the Board's order invited acceptance by performance.  *Id.*  That invitation and acceptance were deemed to form a binding obligation even though the appropriations that had been made for the mail service had been exhausted.  *Id.* at 746-49.  In contrast, qualified health plans are not entitled to compensation solely by offering health insurance on the Exchange.  The only health plans eligible for payment are those that suffer sufficiently high losses and submit those losses to the government.  *See* 45 C.F.R. §§ 153.510(b), (g), 156.430(c).  Even then, HHS has some discretion in determining when payments will be made because the risk-corridors program does not require full payments annually, as discussed *supra*.  Thus, Section 1342 and the implementing regulations do not constitute an offer or invite acceptance by performance alone.  *See Baker v. United States*, 50 Fed. Cl. 483, 495 (2001) (holding that a regulation did not constitute an offer

inviting acceptance by performance because further action from the agency was necessary before the private party was entitled to the benefits provided in the regulation).

Alternatively, even assuming Lincoln could show that Section 1342 and the implementing HHS regulations constituted a contractual offer relating to risk-corridors payments that Lincoln accepted, thus giving rise to an implied-in-fact-contract,[30] Lincoln cannot establish that HHS breached a contractual obligation. *See Anderson v. United States*, 73 Fed. Cl. 199, 201 (2006) ("For plaintiff to recover on her breach of contract claim, she must establish the existence of a valid contract with defendant and a breach of a duty created by that contract.") (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004)). If a valid implied contract obligated HHS to make risk-corridors payments, HHS's contractual obligations would be defined by Section 1342 and the implementing regulations pertaining to the risk-corridors program. As discussed *supra*, neither Section 1342 of the Act nor Section 153.510 of the regulations dictate when HHS must make payments. Additionally, subsequent to Lincoln's 2014 qualified health plan certification but prior to Lincoln's 2015 certification, HHS expressly stated that it would be implementing a three-year, budget-neutral scheme for risk-corridors payments. *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond Final Rule, 79 Fed. Reg. at 30,260, AR 6195. Lincoln cannot establish that HHS breached any implied contract because the three-year, budget-neutral risk-corridors program has not ended.

---

[30]Assuming that Lincoln could show mutuality of intent and offer and acceptance, consideration and authority to contract would not bar Lincoln's 2014 and 2015 contract claims, but the latter element would bar a claim for 2016. As consideration for HHS's payments, Lincoln provided health insurance on the government Exchange and complied with various regulatory requirements. *See* Pl.'s Resp. and Cross-Mot. at 39-40. Additionally, HHS may have had authority to contract when it entered into the 2014 and 2015 agreements with Lincoln. One caveat to that observation is that the Anti-Deficiency Act prevents an agency from authorizing an expenditure that exceeds available appropriations or contracting for a monetary payment in advance of available appropriations, unless authorized by law. 31 U.S.C. § 1341(a)(1)(A), (B); *see Hercules Inc. v. United States*, 516 U.S. 417, 427 (1996). An alleged contract with the government that does not comply with the Anti-Deficiency Act will be void *ab initio*, *see Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 190 (2015), due to lack of contracting authority, *see, e.g.*, *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008). However, if the agency has authority when the contract is formed, the Anti-Deficiency Act is not triggered and a subsequent government action that restricts available funds will not negate the formation of that contract. *See Wetsel-Oviatt Lumber Co. v. United States*, 38 Fed. Cl. 563, 570 (1997). Here, the 2014 and 2015 agreements certifying Lincoln as a qualified health plan were signed before December 2014, *see* Compl. Exs. 2-3, when Congress enacted the 2015 appropriations bill that restricted risk-corridors payments to fees collected under the program. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 227, 128 Stat. at 2491. Prior to the appropriations bill, the GAO determined that HHS had the authority to use general CMS appropriations to make risk-corridors payments. *GAO Op.*, 2014 WL 4825237, at *2-5, AR 116-20. Thus, HHS may have had sufficient appropriations to make a contract regarding risk-corridors payments prior to December 2014 without triggering the Anti-Deficiency Act, but not thereafter.

Thus, the government's motion to dismiss Lincoln's breach of implied-in-fact contract claim is granted.

C.   *Count IV: Lincoln Failed to Allege a Breach of the Implied Covenant of Good Faith and Fair Dealing Because No Valid Contract Exists*

Lincoln alleges that the government breached the implied covenant of good faith and fair dealing by failing to make full risk-corridors payments annually. *See* Compl. ¶¶ 199-209. Every contract contains an implied "duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting *Restatement (Second) of Contracts* § 205 (1981)). However, this implied duty only attaches to a valid contract and will not otherwise apply. *See, e.g.*, *HSH Nordbank AG v. United States*, 121 Fed. Cl. 332, 341 (2015) ("[S]ince Plaintiff failed to establish either an express or implied contract . . . , its dependent claim for a breach of implied covenant of good faith and fair dealing also must be dismissed."), *aff'd*, 644 Fed. Appx. 1004 (Fed. Cir. 2016); *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 205 (2013) ("[T]here is no contractual . . . duty to which the implied duty of good faith and fair dealing can attach."). Because Lincoln failed to allege a valid express or implied contract with the government, the dependent implied covenant claim does not appertain. The government's motion to dismiss Lincoln's breach of implied covenant of good faith and fair dealing is granted.

## III. THE TAKINGS COUNT

Lincoln alleges that HHS's failure to make full risk-corridors payments annually violated the Fifth Amendment because it resulted in a taking of Lincoln's property for public use without just compensation. *See* Compl. ¶¶ 211-17. The Takings Clause of the Fifth Amendment provides that private property shall not be taken without just compensation. U.S. Const. amend. V, cl. 4. In evaluating a takings claim, the court must first determine whether the plaintiff has a cognizable interest in the property at issue. *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (citations omitted). Absent a valid property interest, a plaintiff's takings claim will fail as a matter of law. *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013), *aff'd*, 589 Fed. Appx. 991 (Fed. Cir. 2015). If the plaintiff does have a property interest, only then will the court determine whether the government's actions constituted a taking of that interest. *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004).

Here, Lincoln does not have a valid property interest in receiving full risk-corridors payments annually. Lincoln's statutory entitlement claim does not give rise to a takings claim because Lincoln is not entitled to full payments annually, and because a statutory right to payment is not a recognized property interest. *See Adams*, 391 F.3d at 1225 (holding that appellants' right to unpaid compensation under the Fair Labor Standards Act did not create a property interest); *Hicks v. United States*, 118 Fed. Cl. 76, 85 (2014) ("Even if plaintiff's demand represented a genuine obligation of the government, the failure to pay such a monetary obligation would not amount to a taking.") (citations omitted); *Meyers v. United States*, 96 Fed. Cl. 34, 62 (2010) (dismissing plaintiffs' takings claim based on the Conservation Security Program because the program's monetary benefits did not provide plaintiff with a property

interest), *appeal dismissed*, 420 Fed. Appx. 967 (Fed. Cir. 2011).  Additionally, although contracts are property, Lincoln's contract claims do not establish a property interest because Lincoln failed to allege the elements of a valid express or implied-in-fact contract related to risk-corridors payments.  *See, e.g.*, *Piszel v. United States*, 121 Fed. Cl. 793, 803 (2015) ("[T]his [c]ourt has long recognized that *valid* contracts are property.") (emphasis added), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016).  Thus, the government's motion to dismiss Lincoln's takings claim is granted.

## CONCLUSION

For the reasons stated above, the government's motion for judgment on the administrative record is GRANTED with respect to Count I, and the government's motion to dismiss plaintiff's complaint pursuant to RCFC 12(b)(6) is GRANTED with respect to Counts II, III, IV, and V.  Plaintiff's motion and cross-motion for judgment on the administrative record are DENIED.  The clerk will enter judgment in accord with this disposition.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge